Julie Erickson, State Bar No. 293111 (julie@eko.law)
Elizabeth Kramer, State Bar No. 293129 (elizabeth@eko.law)
Kevin Osborne, State Bar No. 261367 (kevin@eko.law)
**Erickson Kramer Osborne LLP**
44 Tehama Street
San Francisco, CA 94105
Phone: 415-635-0631
Fax: 415-599-8088

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD, individually and on behalf of others similarly situated, | Case No.: |
|      Plaintiffs, | CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL |
| vs. | |
| JUMP TRADING, LLC; JUMP CRYPTO HOLDINGS LLC; and DOES 1-10 | Complaint for: |
|      Defendants. | 1. Breach of Contract<br>2. Conversion<br>3. Unjust Enrichment<br>4. Civil Theft (Cal. Penal Code §§ 484 & 496)<br>5. Unfair Business Practices (Cal. Bus & Prof. Code §§ 17200, *et seq.*) |

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1

Plaintiffs AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD ("Plaintiffs"), on behalf of themselves and others similarly situated ("the Class"), bring this action against Defendants JUMP TRADING, LLC; JUMP CRYPTO HOLDINGS LLC;  and DOES 1-10 ("Defendants" or "Jump") for actual damages suffered by Plaintiffs and the Class and for other recovery specified herein, and allege upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record, as follows:

## **INTRODUCTION**

1.      Since the introduction of Bitcoin in late 2008, digital assets have evolved from a technological curiosity into a market of thousands of digital financial instruments used by millions of ordinary Americans. Today, more than 50 million Americans have invested in some form of digital asset, and that number is growing rapidly.

2.      TerraUSD ("UST") was a cryptocurrency developed and issued by the Singapore-based Terraform Labs PTE Ltd. ("Terraform Labs"). UST was in a class of cryptocurrency referred to as "stablecoins" because, unlike Bitcoin, it was purportedly "pegged" to a stable reserve asset. In the case of UST, its reserve asset was the U.S. dollar, to which it was purportedly pegged at a rate of one-to-one.

3.      Thousands of U.S. investors purchased UST through companies that provided digital "wallet" services ("Wallet Apps"), which acted like interest-earning savings accounts for cryptocurrency investors. When users bought UST tokens and deposited them into their Wallet Apps, they could earn interest returns as high as twenty percent annually. Because UST was pegged to the U.S. dollar, it was expected to be inherently stable. One token of UST could, in theory, always be redeemed for exactly one U.S. dollar. This stability, along with the high yields offered by Wallet Apps, made UST an attractive option for digital asset investors who wanted to hedge against cryptocurrency's wild volatility.

4.      Jump is an institutional trading firm and cryptocurrency market maker. The company was an early partner and primary financial backer of Terraform Labs.

5.      Between November 2019 and July 2021, Jump entered into a series of agreements with Terraform Labs and a trust and escrow company specializing in digital asset investments called

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Prime Trust to provide market-making services for UST transactions. Jump's role was to provide market liquidity when UST investors placed orders to buy and sell UST tokens. Jump's primary functions under the agreements were to provide investors with UST tokens on demand and to provide a means for investors to get their U.S. dollars back in the event that there was a run on UST that threatened its stability. As a Jump partner company put it in 2018, "if everybody who owned a stablecoin decided to do a run and liquidate and get their money back, then that should be possible. All of the money should be available." Jump was the liquidity provider that contracted to make that possible. In exchange, Jump received the right to purchase other Terraform Labs tokens at a steep discount, which could then be resold into the market to further Jump's own profits.

6.     For years, Jump was aware that UST and Terraform Labs' other tokens were susceptible to wild volatility. In May 2022, UST began to unravel. On May 9, 2022, it fell from the one-to-one peg with the U.S. dollar to approximately $0.90, causing depositors, including Plaintiffs, to rush to liquidate mass quantities of UST.

7.     Thousands of UST depositors placed sell orders through their Wallet Apps. The Wallet Apps routed user orders to Prime Trust, which required Jump's cooperation as UST's liquidity provider to fill such orders. But Jump, sensing imminent losses on its own investments in Terraform Labs assets, went dark. Instead of filling the sell orders, Jump simply refused to respond, breaching its contractual obligations. No transactions were processed. Users were left to watch helplessly as their savings vanished.

8.     In the days that followed, UST continued to lose value, eventually bottoming out at less than $0.10. Many in the industry squarely placed the blame for the collapse on Jump. The SEC fined a Jump subsidiary over $100 million for misleading investors about the stability of UST. In depositions, Jump's CEO invoked the Fifth Amendment when questioned regarding Jump's role in the chaos. Insofar as the Wallet App investors were concerned, Jump's breach of its promises cost them any chance of mitigating their losses as UST's value crumbled.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**JURISDICTION AND VENUE**

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there are 100 or more individuals within the proposed class, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest or costs, and there is minimal diversity because Plaintiffs and Defendants are citizens of different states.

10.     This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this judicial district, do substantial business in this State and within this judicial district, have subjected themselves to personal jurisdiction in this judicial district by actively engaging in litigation in this judicial district (*see*, *e.g.*, *Patterson v. Jump Trading LLC*, Case No. 5:22-cv-03600-PCP (N.D. Cal.)), have urged courts to permit them to litigate in courts in this judicial district (*see*, *e.g.*, *Kim v. Jump Trading, LLC*, Case No. 1:23-cv-02921, Dkt. No. 28, Defendants' Opposed Motion to Transfer Venue to the Northern District of California (N.D. Ill. June 6, 2023); *Kim v. Jump Trading, LLC*, 2024 WL 2863331 (N.D. Ill. June 6, 2024))[1], and have purposely availed themselves of the privilege of conducting activities in this forum.

11.     Venue is proper under 28 U.S.C. §1391(b)(2) because occurrences central to the litigation occurred within this judicial district, witnesses and evidence that are material to the case are located within this judicial district, a substantial part of the underlying dispute occurred in this judicial district, and at least one Plaintiff and likely a substantial number of class members were caused injury while residing in this judicial district.

**THE PARTIES**

12.     Plaintiff Austin Ward is, and at all relevant times was, a resident of the state of California. Plaintiff Ward held UST through a Wallet App on May 9, 2022. On May 9, 2022, he attempted to redeem the UST he held in exchange for U.S. dollars. His order was routed to Prime

---

[1] Both *Patterson v. Jump Trading LLC* and *Kim v. Jump Trading, LLC* allege Jump manipulated the market for UST and caused its value to collapse. The claims in those matters, which rely on theories of fraud on the securities market, are unrelated to this matter, which alleges only that Jump breached contractual obligations to serve as a liquidity provider and fill investors' orders to sell.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Trust and denied because Jump refused to provide the liquidity necessary to fill the order. His redemption order was never filled.

13.     Plaintiff David Krevat is, and at all relevant times was, a resident of the state of Florida. Plaintiff Krevat held UST through a Wallet App on May 9, 2022. On May 9, 2022, he attempted to redeem the UST he held in exchange for U.S. dollars. His order was routed to Prime Trust and denied because Jump refused to provide the liquidity necessary to fill the order. His redemption order was never filled.

14.     Plaintiff Nabil Mohamad is, and at all relevant times was, a resident of the state of Washington. Plaintiff Mohamad held UST through a wallet service provider on May 9, 2022. On May 9, 2022, he attempted to redeem the UST he held in exchange for U.S. dollars. His order was routed to Prime Trust and denied because Jump refused to provide the liquidity necessary to fill the order. His redemption order was never filled.

15.     Defendant JUMP TRADING, LLC is a limited liability company incorporated in Delaware, with its principal place of business and headquarters at 600 West Chicago Avenue in Chicago, Illinois. Defendant JUMP TRADING, LLC is an SEC-registered broker-dealer and serves as a market maker on certain exchanges. The company is one of the largest private trading firms in the world. In court filings and elsewhere, Defendant JUMP TRADING, LLC has described Defendant JUMP CRYPTO HOLDINGS LLC as its "cryptocurrency arm." Through Defendant JUMP CRYPTO HOLDINGS LLC and other entities under the Jump umbrella of companies, Defendant JUMP TRADING, LLC has played a central role in the development of cryptocurrency investing worldwide. It has provided capital for the development of various cryptocurrency startups, including Terraform Labs. In 2022, when many of the operative events alleged herein occurred, Jump was one of, if not the, most dominant investment firms in the cryptocurrency space.

16.     Defendant JUMP CRYPTO HOLDINGS LLC is a limited liability company incorporated in Delaware, with its principal place of business and headquarters at 600 West Chicago Avenue, in Chicago, Illinois. Defendant JUMP TRADING, LLC used Defendant JUMP CRYPTO HOLDINGS LLC and its subsidiaries to fund and partner with Terraform Labs. Through various

subsidiary arrangements, Defendants JUMP TRADING, LLC and JUMP CRYPTO HOLDINGS LLC entered agreements with Terraform Labs and other entities that are the subject of this action.

17.    DOES 1 through 10, inclusive, are unknown to Plaintiffs who sue such Defendants by use of such fictitious names. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is legally responsible for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct. DOES 1 through 10 include, but are not limited to, corporate entities related to Defendants, Defendants' wholly owned subsidiaries, and Defendants' corporate affiliate entities that all acted on Defendants' behalf in performing the conduct described herein. At all relevant times, the unlawful conduct against Plaintiffs and class members as described herein was actuated, in whole or in part, by a purpose to serve Defendants. At all relevant times, upon information and belief, the unlawful conduct described herein was reasonably foreseeable by Defendants and committed under actual or apparent authority granted by Defendants such that all unlawful conduct is legally attributable to Defendants. Plaintiffs will amend this complaint to add the true names of DOES 1 through 10 when they are ascertained.

## FACTUAL ALLEGATIONS

### Cryptocurrency and the "FinTech" that Supports It

18.    For most of the last 75 years, the role of technology in banking and finance was limited to the behind-the-scenes infrastructure that supports money transfers and the stock market. Now, banking and financial services companies use financial technology, or "FinTech," applications for a wide array of services, including consumer-facing mobile banking, peer-to-peer payment services, and automated trading platforms.

19.    Cryptocurrency is another outgrowth of FinTech. It was originally conceived as a supply of digital money, called "tokens," that buyers and sellers could use to transact goods and services, much like fiat currency. All transactions using cryptocurrency tokens are encrypted and recorded in "blocks" across a network of different computer servers, called a "blockchain." In theory, the blockchain concept allows a marketplace where individual participants can remain

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

anonymous, but all transactions are recorded publicly and visible to all. It also operates independent of banks, which many cryptocurrency enthusiasts see as corrupt.

20.    Many of the most popular cryptocurrencies are highly volatile, fluctuating in value by more than 100 percent in a single year, making them an inefficient means of exchange. They have thrived, however, as investment vehicles. While they were once considered exotic and novel, investors now treat them as mainstream. In a September 2022 committee hearing, Sen. Dick Durbin described the state of the cryptocurrency market as "an industry where one in five Americans now has invested and had some risk—and we're now getting into retirement accounts and 401(k)s and the like, and the major brokers like Fidelity and others are starting to include this in their plan."

21.    In 2014, several companies began issuing a class of cryptocurrency called "stablecoins." As the name suggests, stablecoins are intended to offer investors stability in the otherwise volatile digital asset market. Stablecoins differ from other cryptocurrencies because, where a typical cryptocurrency's value is based on the market for the asset itself, a stablecoin's value is "pegged" to the value of another financial instrument, like the U.S. dollar or gold. This gives stablecoins greater price stability than other digital assets.

### The Anchor Protocol and UST

22.    Terraform Labs was a private digital asset company co-founded by Korean national Do Kwon and headquartered in Singapore. It was founded in 2018 with the goal of creating a decentralized financial ecosystem using blockchain technology.

23.    The company developed the Terra blockchain, which supported a suite of algorithmic stablecoins, the most notable being UST. Unlike traditional stablecoins backed by actual fiat currency reserves, UST was designed to maintain a $1 peg through an algorithmic relationship with another cryptocurrency called Luna. This system relied on a "burn and mint" mechanism where UST and Luna tokens were exchanged to stabilize UST's value without direct dollar backing.

24.    Terraform Labs quickly gained popularity, especially due to its "Anchor Protocol." The Anchor Protocol was designed to function on the Terra blockchain like a high-yield savings

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

account. It allowed users either to deposit UST into the Protocol and earn interest on that deposit, or to borrow UST by posting collateral and paying interest on that loan. The Anchor Protocol generated interest for UST deposits by collecting interest from UST borrowers. Investors who deposited UST in the Anchor Protocol earned 20 percent annual interest on those deposits.

25.    The Anchor Protocol attracted many retail and institutional investors, driving Luna's market cap to over $40 billion and making UST the third-largest stablecoin by market capitalization. The company raised over $200 million from prominent investors and entered high-profile partnerships, such as a sponsorship deal with the Washington Nationals baseball team. Kwon, who was named Terraform Labs' CEO, became a well-known figure in the crypto space, promoting confidence in Terra's algorithmic model despite warnings from critics about its sustainability.

26.    The Anchor Protocol's success depended on an inflow of UST depositors and funds. The more money that was deposited into the system, the more it could lend to its borrowers, and the longer it continued to offer UST depositors such exceptional return. The financial success of UST depositors was dependent on the abilities of Anchor's designers to successfully implement the protocol and on the abilities of those promoting and selling UST to continue to increase the inflow of investment to the protocol.

**Digital Wallets and Banking Rails for UST Investors**

27.    Investors interested in UST had the option to invest in it through several different Wallet App entities in the cryptocurrency industry.

28.    Intellabridge, for example, was a Wallet App that offered its users a service called a Kash wallet. When a Kash user deposited U.S. dollars (or other assets) into their Kash wallet, the dollars could be used in a digital checking account as a means of exchange or deposited into the equivalent of a digital interest-bearing savings account. The interest Kash users earned came from converting the dollars into UST and staking them in the Anchor Protocol.

29.    Other similar Wallet App services that used UST and the Anchor Protocol to earn interest on UST investments included Alice, Abra, Coinflex, and Kado. They functioned as user-friendly

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

interfaces that made it easy for everyday investors to access decentralized finance, or "DeFi," opportunities without deep technical knowledge.

30.     These Wallet Apps integrated UST into their products, allowing users to buy the stablecoin and deposit it into the Anchor Protocol to receive yields much higher than traditional savings accounts. By leveraging the yield UST generated in the Anchor Protocol, Wallet Apps provided a way for investors to grow crypto assets through interest payments rather than speculative investing.

31.     Even though UST was pegged in value to the U.S. dollar, it was still a digital asset. Traditional banks generally shied away from servicing transactions for such assets. Wallet Apps, therefore, required special banking services. The bank of choice for essentially all U.S.-based Wallet App companies was a Nevada-based trust company called Prime Trust.

32.     Rather than avoiding digital assets, Prime Trust focused its business on this market—especially stablecoins. As of 2021, Prime Trust served as a trustee for approximately 30 stablecoins traded in U.S. markets.

33.     When an investor using a cryptocurrency exchange bought an asset, Prime Trust was often the bank that linked the investor's bank account to the market where the asset was sold, moved funds out of the investor's bank account, and moved the asset into the investor's digital wallet where it remained in custody. Similarly, when a cryptocurrency investor received investment dividends or sold an asset, Prime Trust facilitated the release of the asset from custody, the connection with the investor's bank account, and the deposit of funds into the account.

34.     Prime Trust established agreements with several Wallet Apps, including all the Wallet Apps used by the Plaintiffs and the Class Members, whereby Prime Trust agreed to provide custody and account services for investors' UST transactions. Prime Trust was responsible under the terms of these agreements to provide an array of services that including establishing various types of accounts, escrow services, transaction engines, funds processing, know your customer ("KYC") services, anti-money laundering ("AML") compliance services, and "Bad Actor" checks. Prime Trust also agreed to execute UST token purchase and sale orders for Wallet App

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

users. Wallet App users consented to allow Prime Trust to create accounts for their benefit wherein Prime Trust would hold assets, including both U.S. dollars and UST tokens, in custody, and provide escrow services for UST transaction orders.

35.    When a Wallet App user wished to deposit funds into their digital wallet, it was Prime Trust that linked to the user's bank account, withdrew the funds, made the dollars-to-digital asset transaction, and held the funds in trust. When a wallet user wished to withdraw funds from their wallet, it was again Prime Trust that processed the request, converted the digital asset back to dollars, and deposited the funds in the user's bank account.

36.    As of May 2022, several thousand Wallet App users' UST holdings, totaling tens of millions of U.S. dollars, were held in Prime Trust custody accounts.

**Jump Trading's Partnerships with Terraform Labs and Prime Trust**

37.    Jump was one of the earliest backers of Terraform Labs. Key personnel at both companies had long-standing relationships and had deep knowledge of the markets for blockchain-based investments and digital assets. When Terraform Labs sought to develop and launch UST and the Anchor Protocol, Jump was a natural partner.

38.    Between January 2019 and July 2021, Jump entered a series of agreements with Terraform Labs and Prime Trust designed primarily to grow, stabilize, and support investment in UST. Jump specifically agreed to provide liquidity for UST investments in the U.S. market. In return for its support, Jump secured significant financial advantages, including receiving over 61 million Luna tokens at a steep discount—more than 99% below market price. These agreements effectively rewarded Jump for its role in stabilizing the ecosystem and allowed it to profit substantially as Luna's price surged. Overall, Jump sought to benefit from the Terra ecosystem's growth while providing liquidity and market support during volatile periods.

39.    Under these agreements, Terraform Labs agreed to provide a series of lump sum loans to Jump in amounts between 30 and 50 million UST tokens, which at the time were worth $30 to $50 million U.S. dollars based on UST's peg to the dollar. Jump was obligated under the agreement to deposit the loaned UST tokens into accounts with Prime Trust for the purpose of providing UST liquidity for investors using Wallet Apps that integrated with UST.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

40.     When a Wallet App investor placed an order to buy UST on a Wallet App, Prime Trust accessed the investor's banks account, withdrew U.S. dollars, and deposited the U.S. dollars into Jump's Prime Trust account. Jump was then obligated to provide UST tokens from the accounts it held with Prime Trust to fill the investors' orders. Once an order was filled, the investor saw the UST tokens appear in their Wallet App and it began earning interest.

41.     Also under these agreements, when a Wallet App investor placed an order to sell UST, the order was again routed to Prime Trust. Prime Trust would fill the sell order by withdrawing the UST tokens from the investor's Wallet App and depositing the UST back into Jump's Prime Trust account. Simultaneously, Prime Trust would, with Jump's authorization, debit Jump's U.S. dollars account and transfer the U.S. dollars to the Wallet App user's bank account.

42.     It was necessary for Jump to fulfill its obligations as a liquidity provider for Wallet App users to transact UST. If Jump withdrew its UST tokens or its U.S. dollars from its Prime Trust accounts or otherwise refused to provide liquidity for UST transactions, it would grind all Wallet App-based UST trading to an immediate halt.

43.     The terms of Jump's liquidity agreement were proposed by Terraform Labs to Jump on June 30, 2021 and the subject contracts were created and entered into on or around July 8, 2021. This agreement was preceded by similar arrangements entered into in 2019 and 2020.

44.     These agreements and Jump's role as a liquidity provider was closely held secrets between Jump, Terraform Labs, and Prime Trust.

**The May 2022 Run on the UST Stablecoin**

45.     Contrary to what many investors understood, UST was a highly unstable investment. It was uncollateralized, meaning it was theoretically pegged to the U.S. dollar in value but not backed by U.S. dollars held in a bank account. As a consequence, it was susceptible to the high risk of price volatility associated with other cryptocurrencies (and, arguably, not actually a stablecoin).

46.     That risk materialized in early May 2022. On May 7, 2022, UST's counterpart asset, the Luna, lost substantial value. The following day, UST started losing value, falling from its $1 target price. A collateralized stablecoin would have maintained its peg because it could always,

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

in theory, be exchanged one-to-one with the currency in which it was denominated. But with no collateral backing its price peg, UST had nothing to prop it up. Soon, mass quantities of UST were being sold off and, as UST started losing its value, Wallet App users rushed to sell their UST to preserve what remained of their savings.

47.    By May 9, 2022, UST was unpegged from the U.S. dollar. Its value was fluctuating around $0.90. Thousands of depositors who owned UST through Wallet Apps placed orders to sell their UST before the price fell further. The wallet systems, for their part, processed the orders, which were then submitted to Prime Trust. But Prime Trust was unable to complete the transactions. As Prime Trust's General Counsel later stated to U.S. regulators, "our UST liquidity provider stopped servicing Prime Trust, which terminated our ability to service UST requests and generated a liquidity crisis in the Alice/Kash/Terra/UST ecosystem."

48.    Within a week, the value of UST had dropped to $0.09—a fall of over 90 percent. Wallet App users who had attempted to withdraw their funds when UST was at $0.90 or more were still told their orders were "pending." The downturn wiped out billions of dollars of market capital in a matter of days.

49.    Users inundated Wallet Apps and Prime Trust with demands for information. When Prime Trust responded, its customer service representatives instructed the users they would have to seek resolution from others. The frustration users faced here only compounded the distress they felt after having to idly watch their savings vanish.

50.    UST was essentially abandoned. It now trades under the name "TerraClassicUSD" (USTC) for approximately $0.0115 on mostly non-U.S. exchanges.

**Jump's Breach of Its Contractual Obligations Blocked Users from Selling UST**

51.    The anonymous "liquidity provider" Prime Trust identified in its statements to regulators was eventually revealed through investigation to be Jump. This relationship, and the agreement it was based on, were kept secret until June 2023 when Prime Trust disclosed Jump's identity as its liquidity provider for the first time in response to regulatory investigations and litigation demands.

52.     Moreover, Jump's agreements with Terraform Labs were kept secret until the SEC, in pursuing fraud charges against Terraform Labs and Do Kwon,[2] publicly revealed in court filings in 2023 that Jump had entered several agreements with Kwon and Terraform Labs as early as 2019 to artificially keep UST's value stable.

53.     Jump refused to provide the liquidity services it had promised under the contracts when the May 2022 run on UST caused investors to rush to sell. This conduct breached Jump's contractual obligation to fill the orders, accept investors' UST, and permit Prime Trust to debit U.S. dollars from its accounts to deposit them into the investors' banks. Instead, Jump simply refused to fill the orders, hoarding the investors' U.S. dollars in its accounts and refusing to take on UST tokens as they sank in value.

54.     By refusing to fulfill its obligations, Jump prevented Wallet App investors from mitigating their losses. It did so for its own enrichment, keeping the investors' U.S. dollars in its accounts and refusing to take on UST as its value plummeted.

## CLASS ALLEGATIONS

55.     Plaintiffs bring this action to seek relief as a class action, on behalf of themselves and the following Class ("the Class"):

> All persons who placed orders to sell UST on or after May 9, 2022, that were routed to Prime Trust, but that were not processed at the price of UST at the time of order.

56.     Plaintiffs reserve the right to amend the Class definition if discovery or further investigation demonstrate that it should be expanded or otherwise modified.

57.     The members of the Class are so numerous, counting over one thousand people, that joinder of all members would be impracticable.

---

[2] Terraform Labs was found liable for an unregistered, fraudulent offering for its conduct leading up to the collapse of the Terra ecosystem. *SEC v. Terraform Labs Pte. Ltd.*, 1:23cv01346 (JSR), Dkt. 229 (April 5, 2024) (Jury Verdict); *Terraform*, 708 F. Supp. 3d 450, 474-75 (S.D.N.Y. 2023) (granting summary judgment that defendants offered and sold unregistered securities). Terraform Labs filed for bankruptcy on January 21, 2024, and, on September 19, 2024, a bankruptcy court approved Terraform Labs' plan to wind down its operations.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

58.     There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including:

    a.  Whether Defendants breached contractual duties arising from agreements entered into with Terraform Labs, Prime Trust, or other entities;

    b.  Whether the Class Members were third-party beneficiaries of the contracts Defendants breached;

    c.  Whether Defendants stole, took away, converted, or appropriated the Class's property;

    d.  Whether Defendants' conduct were a substantial cause of the Class's losses and harm; and

    e.  The nature and quantity of damages suffered by members of the Class.

59.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs have no interests antagonistic to those of the Class and are not subject to any unique defenses.

60.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained attorneys experienced in class action and complex litigation.

61.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons:

    a.  It is economically impractical for members of the Class to prosecute individual actions;

    b.  The Class is readily ascertainable and definable;

    c.  Prosecution as a class action will eliminate the possibility of repetitious litigation; and

    d.  A class action will enable claims to be handled in an orderly and expeditious manner, will save time and expense, and will ensure uniformity of decisions.

62.     Plaintiffs do not anticipate any difficulty in the management of this litigation.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**CAUSES OF ACTION**

**First Cause of Action**

**Breach of Contract (Third Party Beneficiary)**

63.     Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

64.     Jump entered into contracts with Prime Trust or with Terraform Labs or with both entities (the "Subject Contracts"). The Subject Contracts generally obligated Jump to provide liquidity of UST for the benefit of UST investors who used Wallet Apps.

65.     Specifically, the Subject Contracts obligated Jump to provide funding for and authorize the execution of investor sell orders, whereby UST investors placed orders to exchange their UST tokens for U.S. dollars, and which required Jump to fund and authorize access to its accounts with Prime Trust and to debit U.S. dollars from those accounts in order to fill the orders.

66.     UST investors who used Wallet Apps had no direct privity of contract with Jump. The investors were, nevertheless, third-party beneficiaries of the Subject Contracts. The primary intent and motivating purpose of the Subject Contracts and Jump's obligations thereunder was to provide beneficial services to UST investors who used Wallet Apps to buy and sell UST by giving them liquidity for their investments. The sole purpose and utility of UST liquidity that Jump provided was to allow UST investors to place buy and sell orders for UST through Wallet Apps and to financially gain from their investments. Jump and the parties to the Subject Contracts did or reasonably should have appreciated at the time they entered into the Subject Contracts that UST investors who used Wallet Apps would seek to enforce the Subject Contracts in the event that Jump breached its obligations to provide liquidity for buy and sell orders, as conduct that prevented such orders to be filled would, and in fact did, cause investors substantial losses in connection their investments in UST.

67.     Jump breached its obligations under the Subject Contracts by refusing to fund its Prime Trust accounts and by refusing to authorize Prime Trust to debit its account when UST investors placed orders to sell UST, thereby preventing Prime Trust from filling sell orders from investors

holding UST on Wallet Apps. Jump breached this obligation for its own gain, refusing to accept new deposits of UST and keeping UST investors' U.S. dollars as UST's price fell.

68.     Jump's breach was a substantial factor in causing harm to Plaintiffs and the Class. Jump's refusal to fill orders to sell UST in exchange for U.S. dollars at the time the orders were placed was the cause in fact of Plaintiffs' and the Class's harm because it was a necessary antecedent of the loss of their funds. If Jump had filled the investors' orders, as was it was required to do under the Subject Contracts, Plaintiffs and the Class would not have suffered losses associated with the refusal to fill their orders. Jump's breach was also the proximate cause of Plaintiffs' and the Class's harm because Jump was responsible for filling UST investor orders and the consequences of its breach was the denial of investors sell orders as the UST was collapsing in value. This breach caused Plaintiffs and the Class to lose as much as 90 percent of their investments. Many investors, including Plaintiffs, lost tens or hundreds of thousands of dollars.

69.     Plaintiffs allege based on information and belief that all relevant contractual obligations referenced herein were written contracts. To the extent any contractual obligations that Plaintiffs herein allege were breached by Defendants were obligations arising under oral contracts, Plaintiffs seek relief from California Code of Procedure, section 339(1) based on the fact that the identity that Defendants and their role as the liquidity provider for UST was a fact that was not known or, based on reasonable diligence, knowable to Plaintiffs until June 20, 2023, at which time Prime Trust disclosed for the first time that Jump Trading was its liquidity provider at the time of the collapse of UST.

**Second Cause of Action**

**Conversion**

70.     Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

71.     Plaintiffs and members of the Class allowed Prime Trust to withdraw funds from their Wallet App accounts and to deposit them into Defendants' Prime Trust accounts to effectuate the purchase of digital assets on their behalf. Plaintiffs and members of the Class were the rightful

owners of the digital assets that were purchased and of the funds that were held in custody in Defendants' Prime Trust accounts.

72.     As alleged above, Defendants prevented transactions involving UST, denying Plaintiffs and Class Members from accessing and selling their UST. Plaintiffs and Class Members placed sell orders for UST that were routed to Prime Trust but were never filled because Defendants refused to make the funds available and refused to allow Plaintiffs and the Class to execute their trades. In so doing, Defendants effectively took possession and control of the U.S. dollars that rightfully belonged to Plaintiffs and Class Members.

73.     Plaintiffs and members of the Class did not consent to or authorize Defendants' restrictions or the control exercised over their funds.

74.     Instead of holding the U.S. dollars the demanded and that should have rightfully been retuned tot them, Plaintiffs and the Class were left holding UST that they could not sell. The value of the UST held by Plaintiffs and members of the Class has fallen since the time they placed orders to sell from nearly $1.00 per token to nearly $0.00 per token, resulting in significant economic losses.

75.     By taking possession of the funds of Plaintiffs and Class Members and then preventing them from transacting to recuperate those funds, Defendants substantially interfered with their property rights to those funds.

76.     As a direct and proximate cause of Defendants' unauthorized interference, Plaintiffs and members of the Class were damaged in an amount to be proven at trial.

**Third Cause of Action**

**Unjust Enrichment**

77.     Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

78.     Plaintiffs and members of the Class conferred a monetary benefit on Defendants by granting Prime Trust access to withdraw funds from their accounts and deposit them into Defendants' Prime Trust accounts.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

79.     Defendants enriched themselves by refusing to execute the transactions ordered by Plaintiffs and the Class, which would have exposed Defendants to financial risk or losses, and instead forced those losses onto Plaintiffs and the Class.

80.     Rather than executing the transactions ordered by Plaintiffs and the Class at a reasonable time and suffering any losses associated with their inability to fill sell orders at any price below $1.00 per token, Defendants instead calculated to avoid suffering losses at the expense of Plaintiffs and the Class by refusing to provide their promised liquidity services and refusing to execute any transactions in UST whatsoever. Plaintiffs and the Class, on the other hand, suffered significant losses as a direct and proximate result of Defendants' failure to execute the sell orders when made.

81.     Under the principles of equity and good conscience, Defendants should not be permitted to retain the funds belonging to Plaintiffs and the Class because Defendants failed to perform their contractual obligations to execute the transactions ordered by Plaintiffs and the Class.

82.     Defendants acquired the monetary benefit through inequitable means in that they refused to execute Plaintiffs and the Class's orders, thereby retaining the funds that that were the rightful property of Plaintiffs and the Class.

83.     If Plaintiffs and members of the Class knew that Defendants would breach their contractual obligations to execute the transactions ordered by Plaintiffs and the Class, they would not have agreed to permit their funds to be transferred to Defendants.

84.     Defendants accepted and retained the monetary benefits conferred upon them by Plaintiffs and the Class under circumstances indicating Defendants would execute transactions ordered by Plaintiffs and the Class in a timely and effective manner, and it would, therefore, be inequitable for Defendants to retain such benefit without repayment of the value thereof.

85.     As a direct and proximate result of Defendants conduct, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to the loss of their investments.

86.     Defendants should be compelled to disgorge any and all proceeds that they unjustly received from Plaintiffs and members of the Class

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**Fourth Cause of Action**

**Civil Theft**

**(Cal. Penal Code §§ 484 & 496)**

87.     Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

88.     Defendants' conduct described herein constitutes theft, in violation of California Penal Code sections 484 and 496.

89.     At all relevant times, Plaintiffs and the Class's funds had an intrinsic value.

90.     Defendants engaged in theft by taking possession of Plaintiff and the Class's funds by taking the funds from Plaintiff and the Class in exchange for UST tokens. At all relevant times, Plaintiff and the Class had the right of ownership, possession, control, access to their funds upon placing an order to sell the UST tokens they possessed in exchange for the funds held in Defendants' accounts, and did not consent to the retention of their funds or the termination of their ownership, possession, control, access of the funds. Defendants took possession of Plaintiffs and the Class's funds with full knowledge that their conduct would permanently deprive Plaintiffs and the Class of the rights and benefits of ownership, possession, control, access of the funds, and with the intent to so deprive them. Defendant's conduct was motivated, in part or in whole, by an intent to mitigate their own losses caused by the fall in value of UST at the expense of Plaintiffs and the Class. Defendants' misconduct is continuing, as Defendants have failed or refused to return to Plaintiffs or the Class's funds or provide Plaintiffs and the Class with access to or use of the funds. This conduct constituted theft by larceny.

91.     In the alternative, Defendants committed theft by having in their possession, or exercising control over funds that were rightfully the property of Plaintiffs and the Class and that were taken from them in the manner described herein. Defendants concealed, withheld, or aided in concealing or withholding the funds that Plaintiffs and the Class provided in exchange for UST, preventing Plaintiffs and the Class from accessing or using their funds. Defendants knew that the funds were stolen from Plaintiffs and the Class at the time it was in Defendants' possession

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

because it was Defendants' conduct that caused the funds to be stolen from Plaintiff and the Class. This conduct constituted receipt of stolen property.

92.     Defendants' theft deprived Plaintiffs and the Class of the value of their funds and Plaintiff and the Class are entitled to recover three times the amount of the full value of the property Defendants wrongfully took, punitive damages pursuant to California Civil Code section 3294(c), and costs of the suit and reasonable attorney fees.

**Fifth Cause of Action**

**Unfair Business Practices**

**(Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"))**

93.     Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

94.     By engaging in the above-described acts and practices, Defendants committed and continue to commit one or more acts of unlawful and unfair conduct within the meaning of the UCL. These acts and practices constitute a continuing and ongoing unlawful business activity, as defined by the UCL, and justify the issuance of an injunction and any other equitable relief pursuant to the UCL.

95.     Defendants' acts and practices constitute a continuing and ongoing unlawful business activity defined by the UCL. Defendants interfered with Plaintiffs and the Class's right to possess their funds, and unlawfully retained funds belonging to Plaintiffs and the Class in a manner that constituted theft. Defendants also failed and continue to fail to reimburse losses due to their refusal to execute Plaintiffs and the Class's sell orders, all in violation of, *inter alia*, the following California laws:

      a.  California Penal Code section 484(a); and

      b.  California Penal Code section 496.

96.     Defendants' acts and practices constitute a continuing and ongoing unfair business activity defined by the UCL. Defendants' conduct is contrary to the public welfare as it transgresses statutes of the State of California designed to protect individuals' right to possession of property, violates established public policy, and has been pursued to attain an unjustified

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

monetary advantage for Defendants by creating personal disadvantage and hardship to Plaintiffs and the Class. As such, Defendants' business practices and acts have been immoral, unethical, oppressive, and unscrupulous and have caused injury to customers far greater than any alleged countervailing benefit.

97.    As a direct and proximate consequence of the actions as identified above, Plaintiffs and the Class suffered and continue to suffer harms and losses including but not limited to economic loss, the loss of property, harm to their constitutional right to possess property, and emotional distress, anxiety, worry, and shock caused by the retention of their funds.

98.    As a consequence of Defendants' unlawful and unfair business practices, Plaintiffs and the Class were deprived of their funds and are entitled to restitution for their loss. Plaintiffs further seek an order of this Court awarding injunctive relief and any other relief allowed under the UCL, including interest and attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5, and to such other and further relief as this Court may deem just and proper.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment against Defendants as follows:

A.    For an order certifying the proposed Class;

B.    For an order appointing Plaintiffs and their counsel to represent the Class;

C.    For actual and compensatory damages according to proof pursuant to code and all other applicable laws and regulations;

D.    For restitution to the extent permitted by applicable law;

E.    For punitive damages to the extent permitted by applicable law;

F.    For pre-judgment and post-judgment interest;

G.    For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

H.    For such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

Dated this 7th of May 2025.          ERICKSON KRAMER OSBORNE LLP


*/s/ Kevin M. Osborne*
Julie C. Erickson
Elizabeth A. Kramer
Kevin M. Osborne

*Attorneys for Plaintiffs*
*AUSTIN WARD, DAVID KREVAT, and*
*NABIL MOHAMAD*