KOBRE & KIM LLP
Jonathan D. Cogan (admitted *pro hac vice*)
Steven W. Perlstein (admitted *pro hac vice*)
Igor Margulyan (admitted *pro hac vice*)
Mathew T. Elder (admitted *pro hac vice*)
Daisy Joo (admitted *pro hac vice*)
800 Third Avenue
New York, NY 10022
Tel.: +1 212 488 1200
jonathan.cogan@kobrekim.com
steven.perlstein@kobrekim.com
igor.margulyan@kobrekim.com
mathew.elder@kobrekim.com
daisy.joo@kobrekim.com

Daniel A. Zaheer (Bar ID 237118)
150 California Street, 19th Floor
San Francisco, CA 94111
Tel.: (415) 582-4800
daniel.zaheer@kobrekim.com

*Attorneys for Defendants*
*Jump Trading, LLC and*
*Jump Crypto Holdings LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD, individually and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>JUMP TRADING, LLC; JUMP CRYPTO HOLDINGS LLC; and DOES 1-10<br><br>Defendants. | Case No. 3:25-cv-03989-PHK<br><br>**DEFENDANTS JUMP TRADING, LLC AND JUMP CRYPTO HOLDINGS LLC'S MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION AND STAY LITIGATION**<br><br>Hearing Date: October 9, 2025<br>Time: 1:30 p.m.<br>Place: Courtroom F, 15th Floor<br><br>Judge: Hon. Peter H. Kang |

1

**NOTICE OF MOTION AND MOTION**

2      **PLEASE TAKE NOTICE** that on October 9, 2025 at 1:30 p.m., or at such other date as

3  may be agreed upon or ordered in the United States District Court for the Northern District of

4  California, Courtroom of the Honorable Peter H. Kang, Courtroom F, 15th Floor, 450 Golden Gate

5  Avenue, San Francisco, CA 94102, Defendant Jump Trading, LLC ("Jump Trading") and Jump

6  Crypto Holdings LLC ("Jump Crypto," and together with Jump Trading, the "Defendants" or the

7  "Jump Defendants"), will and hereby do move this Court to dismiss the Complaint or, in the

8  alternative, compel arbitration and stay the action.   The Jump Defendants also move to stay

9  discovery until this motion is fully resolved.

10      This Motion is based upon this Notice of Motion, the Declaration of Matthew Hinerfeld, the

11  Declaration of Jonathan D. Cogan, the accompanying Proposed Orders, arguments to be made by

12  counsel, any other matter properly considered by the Court, and the following points and authorities

13  in support of the Motion.

14

**STATEMENT OF ISSUES TO BE DECIDED**

15      1.      Whether Plaintiffs' Complaint should be dismissed under Fed. R. Civ. P. 12(b)(2)

16  because this Court lacks personal jurisdiction over Jump Trading and Jump Crypto.

17      2.      Whether Plaintiffs' Complaint should be dismissed for improper venue under Fed.

18  R. Civ. P. 12(b)(3), or alternatively, the first-to-file rule.

19      3.      In the alternative, whether Plaintiffs must be compelled to arbitrate pursuant to the

20  agreements they seek to enforce as third party beneficiaries and the action stayed.

21      4.      To the extent the Court reaches the legal sufficiency of the pleadings, whether the

22  Complaint should be dismissed for failure to plead a claim under Fed. R. Civ. P. 12(b)(6).

23      5.      Whether the Court should stay the proceedings during the pendency of these motions.

24

25

26

27

28

ii

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   STATEMENT OF FACTS .......................................................................... 2

    A.    THE PARTIES ................................................................................... 2

    B.    PLAINTIFFS' NON-SPECIFIC AND VAGUE ALLEGATIONS OF BREACH OF CONTRACT ...................................................................... 3

    C.    THE "SUBJECT CONTRACTS" CONTAIN NO LIQUIDITY OBLIGATION ...................................................................................... 4

    D.    PLAINTIFFS' DUPLICATIVE CLAIMS IN NEVADA ........................ 7

III.   ARGUMENT ............................................................................................ 8

    A.    THE JUMP DEFENDANTS ARE NOT SUBJECT TO PERSONAL JURISDICTION ................................................................................... 8

        1.    General Jurisdiction Cannot Be Established Because Jump Trading And Jump Crypto Are Not "At Home" In California ................................... 9

        2.    Specific Jurisdiction Cannot Be Established Because Plaintiffs' Claims Have No Connection To Any Alleged Contact With California ................................................................................... 11

            a.    Plaintiffs' Claims Have No Relation To Forum-Related Conduct .......................................................................... 11

            b.    Plaintiffs Fail To Allege Purposeful Availment or Purposeful Direction ........................................................................ 13

        3.    Jump Trading's Participation In Other Northern District Of California Litigation Does Not Subject The Jump Defendants To Personal Jurisdiction In This Case .................................................................. 14

    B.    DISMISSAL IS WARRANTED UNDER RULE 12(b)(3) AND THE FIRST-TO-FILE RULE .................................................................... 17

        1.    This Case Should Be Dismissed For Improper Venue ................................. 17

        2.    The Case Is Duplicative of Plaintiffs' Pending Class Action Against Prime Trust And Should Be Dismissed ....................................................... 18

iii

C. THE COURT MUST, IN THE ALTERNATIVE, COMPEL PLAINTIFFS TO ARBITRATE BECAUSE ANY POTENTIALLY APPLICABLE AGREEMENT GOVERNING THE DISPUTE REQUIRES ARBITRATION ............................................................................... 21

   1. The Agreements Require Mandatory Arbitration And Delegate All Questions Of Arbitrability To The Arbitrator ................................ 21

   2. Plaintiffs Are Estopped From Avoiding Arbitration .................................. 23

   3. This Dispute Squarely Falls Within The Scope Of The Agreements' Arbitration Clauses ................................................................. 26

D. TO THE EXTENT THE COURT DOES NOT COMPEL ARBITRATION, THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6) ................................................ 27

   1. Plaintiffs' Third-Party Beneficiary Breach Of Contract Claim Should Be Dismissed ................................................................. 28

      a. The Jump Defendants Are Not Parties To The Subject Contracts And, Therefore, Could Not Have Breached Them ......... 28

      b. Plaintiffs Fail To Allege Breach of Any Contractual Term ........... 29

      c. The Agreements Referred To In The Complaint Are Devoid of Any Purported Obligation To Provide Liquidity ....................... 30

      d. Any Alleged Breach Of Oral Contract Claim Should Be Dismissed ................................................................. 32

      e. Plaintiffs Fail To Allege Third Party Beneficiary Standing ........... 34

   2. Plaintiffs' Remaining State and Common Law Claims Should Be Dismissed ................................................................. 35

      a. Plaintiffs' Civil Theft And UCL Claims Are Impermissibly Extraterritorial And Should Be Dismissed With Prejudice ............. 36

      b. Plaintiffs' Remaining Common Law Claims Must Also Be Dimissed ................................................................. 38

E. THE COURT SHOULD STAY DISCOVERY PENDING RESOLUTION OF DEFENDANTS' MOTIONS ................................................ 38

   1. Defendants' Motions Are Dispositive Of The Entire Case .................... 39

iv

2.      Defendants' Motions May Be Decided Absent Discovery ......................... 40

3.      A Stay Of Discovery Will Preserve Judicial And Party Resources And Impose No Undue Prejudice On Plaintiffs .................................................... 41

IV.    CONCLUSION.................................................................................................................. 41

1

**TABLE OF AUTHORITIES**

2
**Page(s)**

3
**<u>Cases</u>**

4
*American Bureau of Shipping v. Tencara Shipyard S.P.A.*,
170 F.3d 349 (2d Cir. 1999) ........................................................................... 24

5

6
*AM Trust v. UBS AG*,
681 F. App'x 587 (9th Cir. 2017) .................................................................... 15

7
*Amiri v. DynCorp International, Inc.*,
No. 14-cv-03333 SC, 2015 WL 166910 (N.D. Cal. Jan. 13, 2015) ............... 10

8

9
*Apollo Computer, Inc. v. Berg*,
886 F.2d 469 (1st Cir. 1989) ........................................................................... 23

10
*Aqua Connect, Inc. v. SHI International Corp.*,
No. CV 19-05662-AB (JPR), 2019 WL 8883452 (C.D. Cal. Dec. 16, 2019) ............ 19

11

12
*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................. 11, 27

13

14
*Aych v. University of Arizona*,
No. 24-4710, 2025 WL 1641876 (9th Cir. June 10, 2025) ............................. 11

15
*Balsam v. Tucows Inc.*,
627 F.3d 1158 (9th Cir. 2010) ........................................................................ 35

16

17
*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 27

18

19
*Belzberg v. Verus Investments Holdings Inc.*,
21 N.Y.3d 626 (2013) ..................................................................................... 24

20
*Bergstein v. Stroock & Stroock & Lavan LLP*,
187 Cal. Rptr. 3d 36 (Ct. App. 2015) ............................................................. 34

21

22
*Bernson v. Browning-Ferris Industries*,
30 Cal. Rptr. 2d 440 (1994) ............................................................................ 33

23

24
*Boschetto v. Hansing*,
539 F.3d 1011 (9th Cir. 2008) ................................................................... 13, 16

25

26
*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ........................................................................ 22

27
*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ........................................................................................ 16

28

*Calvary Chapel San Jose v. Cody*,
   No. 20-cv-03794-BLF, 2021 WL 5353883 (N.D. Cal. Nov. 12, 2021) ...................................... 40

*Cannon v. Wells Fargo Bank N.A.*,
   917 F. Supp. 2d 1025 (N.D. Cal. Jan. 9, 2013) ................................................................. 37, 38

*Caremark, LLC v. Chickasaw Nation*,
   43 F.4th 1021 (9th Cir. 2022) ......................................................................................................... 23

*Carter v. Oath Holdings, Inc.*,
   No. 17-cv-07086-BLF, 2018 WL 3067985 (N.D. Cal. June 21, 2018) ...................................... 40

*CC/Devas (Mauritius) Ltd. v. Antrix Corp.*,
   145 S. Ct. 1572 (2025) ..................................................................................................................... 12

*Cellwitch, Inc. v. Tile, Inc.*,
   No. 4:19-cv-01315, 2019 WL 5394848 (N.D. Cal. Oct. 22, 2019) ............................... 39, 40, 41

*Cheery Way (USA), Inc. v. Ngoc Diep Duong*,
   No. C12-0486 JSC, 2012 WL 1670172 (N.D. Cal. May 14, 2012) .......................................... 17

*Christ v. Lipsitz*,
   160 Cal. Rptr. 498 (Ct. App. 1979) .............................................................................................. 33

*Coast Plaza Doctors Hospital v. Blue Cross of California*,
   99 Cal. Rptr. 2d 809 (Ct. App. 2000) .......................................................................................... 26

*Coinbase, Inc. v. Bielski*,
   599 U.S. 736 (2023) ........................................................................................................ 39, 40, 41

*Comer v. Micor, Inc.*,
   436 F.3d 1098 (9th Cir. 2006) ...................................................................................................... 24

*Commodity Futures Trading Commission v. Ooki DAO*,
   No. 3:22-cv-05416-WHO, 2023 WL 5321527 (N.D. Cal. June 8, 2023) .................................. 15

*Core-Vent Corp. v. Nobel Industries AB*,
   11 F.3d 1482 (9th Cir. 1993) ........................................................................................................ 16

*Coronavirus Reporter v. Apple, Inc.*,
   85 F.4th 948 (9th Cir. 2023) ......................................................................................................... 31

*Cummings v. Cenergy International Services, LLC*,
   258 F. Supp. 3d 1097 (E.D. Cal. 2017) ....................................................................................... 34

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ........................................................................................................... 1, 9, 10

*Davenport v. GMAC Mortg.*,
   No. 56697, 2013 WL 5437119 (Sep. 25, 2013) ................................................................... 28, 30

ii

*De Rocha Express, Inc. v. Combined Resources, Inc.*,
   No. 24-cv-02037-JST, 2024 WL 4504536 (N.D. Cal. Oct. 15, 2024) ........................................ 32

*Dfinity USA Research LLC v. Bravick*,
   No. 22-cv-03732-EJD, 2023 WL 2717252 (N.D. Cal. Mar. 29, 2023) ................................ 36, 37

*DocuSign, Inc. v. Clark*,
   No. 21-cv-04785-WHO, 2022 WL 225623 (N.D. Cal. Jan. 25, 2022) ........................................ 20

*DotC United, Inc. v. Google Asia Pacific Pte. Ltd.*,
   No. 22-cv-04990-JSC, 2023 WL 3202663 (N.D. Cal. May 1, 2023) ........................................ 23

*Dow Chemical Co. v. Calderon*,
   422 F.3d 827 (9th Cir. 2005) ........................................................................................ 16

*EFund Capital Partners v. Pless*,
   59 Cal. Rptr. 3d 340 (Ct. App. 2007) ........................................................................ 26

*Elofson v. Bivens*,
   No. CV 15-6332, 2015 WL 13916655 (C.D. Cal. Aug. 21, 2015) ........................................ 18

*Esguerra-Aguilar, Inc. v. Shapes Franchising, LLC*,
   No. 20-CV-00574-BLF, 2020 WL 3869186 (N.D. Cal. July 9, 2020) ........................................ 7

*Casa Arena Blanca LLC v. Rainwater by Estate of Green*,
   No. 21-2037, 2022 WL 839800 (10th Cir. Mar. 22, 2022) ........................................ 23

*Ewert v. eBay, Inc.*,
   602 Fed. App'x 357 (9th Cir. 2015) ........................................................................ 28, 30

*Fli-Lo Falcon, LLC v. Amazon.com, Inc.*,
   97 F.4th 1190 (9th Cir. 2024) ........................................................................................ 22

*Fox v. Ethicon Endo-Surgery, Inc.*,
   110 P.3d 914 (2005) ........................................................................................................ 34

*Franklin v. HealthSource Glob. Staffing, Inc.*,
   No. 23-cv-0662-AGS-DEB, 2024 WL 1055996 (S.D. Cal. Mar. 11, 2024) ........................ 25

*Gjovik v. Apple Inc.*,
   No. 23-cv-04597-EMC, 2024 WL 4369656 (N.D. Cal. Oct. 1, 2024) ........................ 33

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ........................................................................................................ 10

*Grisham v. Philip Morris U.S.A., Inc.*,
   151 P.3d 1151 (2007) ........................................................................................................ 34

*Gross v. Hatcher*,
   No. 90-56203, 1991 WL 270741 (9th Cir. Dec. 17, 1991) ........................................ 16

iii

*Hamilton v. Greenwich Invs. XXVI, LLC,*
   126 Cal. Rptr. 3d 174 (Ct. App. 2011) ........................................................................... 28

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
   586 U.S. 63 (2019) ................................................................................... 21, 22, 23

*Hill v. Asset Acceptance, LLC,*
   No. 13CV1718–BEN (BLM), 2014 WL 1289578 (S.D. Cal. Mar. 27, 2014) .......................... 41

*Hill v. Workday, Inc.,*
   No. 23-cv-06558, 2025 WL 948006 ........................................................................ 36

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n,*
   747 F.3d 44 (2d Cir. 2014) ................................................................................... 35

*Holland Am. Line Inc. v. Wartsila N. Am., Inc.,*
   485 F.3d 450 (9th Cir. 2007) ................................................................................. 14

*Hopkins & Carley, ALC v. Thomson Elite,*
   No. 10-cv-05806-LHK, 2011 WL 1327359 (N.D. Cal. Apr. 6, 2011) ............................... 27

*In re Apple iPhone Antitrust Litig.,*
   846 F.3d 313 (9th Cir. 2017) ................................................................................. 27

*In re Bozic,*
   888 F.3d 1048 (9th Cir. 2018) ............................................................................... 17

*In re Ditropan XL Antitrust Litig.,*
   529 F. Supp. 2d 1098 (N.D. Cal. 2007) .................................................................... 38

*In re Google Advert. Antitrust Litig.,*
   No. 20-cv-03556-BLF, 2020 WL 7227159 (N.D. Cal. Dec. 8, 2020) ............................... 41

*In re Graphics Processing Units Antitrust Litig.,*
   No. C 06-07417 WHA, 2007 WL 2127577 (N.D. Cal. July 24, 2007) ............................. 41

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.,*
   933 F.3d 1136 (9th Cir. 2019) ............................................................................... 32

*In re Nexus 6P Prods. Liab. Litig.,*
   No. 17-cv-02185-BLF, 2017 WL 3581188 (N.D. Cal. Aug. 18, 2017) ......................... 39, 40

*InfoSpan, Inc. v. Emirates NBD Bank PJSC,*
   903 F.3d 896 (9th Cir. 2018) ............................................................................. 12, 13

*Intersearch Worldwide, Ltd. v. Intersearch Grp., Inc.,*
   544 F. Supp. 2d 949 (N.D. Cal. Mar. 19, 2008) .......................................................... 20

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,*
   206 F.3d 411 (4th Cir. 2000) ................................................................................. 25

iv

*Isernia v. Danville Reg'l Med. Ctr., LLC*,
  No. 4:22-cv-00022, 2022 WL 4076113 n.5 (W.D. Va. Sept. 6, 2022) ......................... 23

*Jarvis v. Regan*,
  833 F.2d 149 (9th Cir. 1987) ....................................................................................... 40

*Jolly v. Eli Lilly & Co.*,
  751 P.2d 923 (1988) ..................................................................................................... 33

*Jiangmen Kinwai Furniture Decoration Co. v. Int'l Mkt. Ctrs., Inc.*,
  No. 2:15-cv-1419 JCM (PAL), 2016 WL 697112 (D. Nev. Feb. 18, 2016) ......... 18, 19

*Jiangmen Kinwai Furniture Decoration Co. v. Int'l Mkt. Ctrs., Inc.*,
  719 Fed. App'x 556 (9th Cir. 2017) ................................................................ 7, 18, 20

*Kavehrad v. Vizio, Inc.*,
  No. 8:21-cv-01868-JLS-DFM, 2022 WL 16859975 (C.D. Cal. Aug. 11, 2022) ......... 38

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................................... 2, 28

*Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*,
  787 F.3d 1237 (9th Cir. 2015) ................................................................... 18, 19, 20

*Kyko Glob. Inc. v. Bhongir*,
  No. 20-17526, 2021 WL 4958989 (9th Cir. Oct. 26, 2021) ....................................... 34

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ......................................................................................... 7

*Lindora, LLC v. Isagenix Int'l, LLC*,
  198 F. Supp. 3d 1127 (S.D. Cal. 2016) ....................................................................... 10

*Lipshie v. Tracy Invs. Co.*,
  566 P.2d 819 (1977) ..................................................................................................... 35

*Little v. City of Seattle*,
  863 F.2d 681 (9th Cir. 1988) ....................................................................................... 39

*Lucas v. Hamm*,
  364 P.2d 685 (1961) ..................................................................................................... 35

*Mahamedi IP Law, LLP v. Paradice & Li, LLP*,
  No. 5:16-cv-02805-EJD, 2017 WL 2727874 (N.D. Cal. Feb. 14, 2017) .................... 40

*Marder v. Lopez*,
  450 F.3d 445 (9th Cir. 2006) ..................................................................................... 2, 5

*Martinez v. Aero Caribbean*,
  764 F.3d 1062 (9th Cir. 2014) ................................................................................. 9, 10

v

*Medimpact Healthcare Sys., Inc. v. IQVIA Holdings Inc.*,
   No. 19cv1865-GPC(LL), 2020 WL 1433327 (S.D. Cal. Mar. 24, 2020) ................................. 12

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) ................................................................................................................. 27

*MouseBelt Labs Pte. Ltd. v. Armstrong*,
   674 F. Supp. 3d 728 (N.D. Cal. 2023) ..................................................................................... 24

*Mujica v. Airscan, Inc.*,
   771 F.3d 580 (9th Cir. 2014) ................................................................................................... 40

*Murphy v. Schneider Nat'l, Inc.*,
   362 F.3d 1133 (9th Cir. 2004) ................................................................................................. 18

*Nelson v. F. Hoffinan-La Roche, Inc.*,
   No. 21-cv-10074-TLT, 2022 WL 19765995 (N.D. Cal. Nov. 2, 2022) ..................................... 39

*Nelson v. Levy*,
   No. 16-cv-03797-MMC, 2016 WL 6892713 (N.D. Cal. Nov. 23, 2016) ................................... 32

*Nguyen v. OKCoin USA Inc.*,
   No. 22-cv-06022-KAW, 2023 WL 2095926 (N.D. Cal. Feb. 17, 2023) ................................... 22

*OSRX, Inc. v. Anderson*,
   No. 23-1252, 2025 WL 1430648 (4th Cir. May 19, 2025) ............................................... 25, 26

*P & P Imports LLC v. OJCommerce, LLC*,
   No. SACV 19-00898, 2019 WL 8012690 (C.D. Cal. Oct. 4, 2019) ........................................ 18

*Patterson v. Jump Trading LLC*,
   710 F. Supp. 3d 692 (N.D. Cal. 2024) ..................................................................................... 23

*Pereda v. Gen. Motors*,
   No. 21-cv-06338-JST, 2022 WL 19692037 (N.D. Cal. Mar. 15, 2022) ................................... 41

*Picot v. Weston*,
   780 F.3d 1206 (9th Cir. 2015) ................................................................................................. 13

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
   388 U.S. 395 (1967) ................................................................................................................. 26

*Ranza v. Nike, Inc.*,
   793 F.3d 1059 (9th Cir. 2015) ................................................................................... 10, 11, 14

*Redondo Mgmt., LLC v. Bradley Arant Boult Cummings LLP*,
   No. 24-cv-06104-TLT, 2025 WL 826184 (N.D. Cal. Feb. 13, 2025) ...................................... 16

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   No. 20-cv-00363-BLF, 2020 WL 2843369 (N.D. Cal. Apr. 10, 2020) ............................... 38, 39

vi

*Romero v. Flowers Bakeries, LLC*,
   No. 14-cv-05189-BLF, 2016 WL 469370 (N.D. Cal. Feb. 8, 2016) .......................................... 38

*Ruff v. Del Monte Corp.*,
   No. 12–05251 JSW, 2013 WL 1435230 (N.D. Cal. Apr. 9, 2013) .......................................... 20

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004) ............................................................................................ 11, 13

*ScoreBlue, LLC v. Locum Tele PC*,
   No. 2:23-cv-00345 WLH-AS, 2024 WL 5372398 (C.D. Cal. Dec. 9, 2024) ........................... 32

*Sec. Inv. Prot. Corp. v. Vigman*,
   764 F.2d 1309 (9th Cir. 1985) ................................................................................................... 15

*Setty v. Shrinivas Sugandhalaya LLP*,
   3 F.4th 1166 (9th Cir. 2021) ..................................................................................................... 23

*Shaw v. Vircurex*,
   No. 18-cv-00067-PAB-SKC, 2019 WL 2636271 (D. Colo. Feb. 21, 2019) .............................. 12

*SiFi Networks Fullerton, LLC v. Berkshire Hathaway Specialty Co.*,
   No. 8:23-cv-01417-FWS-JDE, 2025 WL 1544099 (C.D. Cal. Apr. 25, 2025) ......................... 35

*Simula, Inc. v. Autoliv, Inc.*,
   175 F.3d 716 (9th Cir. 1999) ..................................................................................................... 27

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
   549 U.S. 422 (2007) ..................................................................................................................... 9

*Smith v. Spizzirri*,
   601 U.S. 472 (2024) ....................................................................................................... 27, 39, 40

*Steiner v. Apple Comput., Inc.*,
   No. C 07-4486 SBA, 2007 WL 4219388 (N.D. Cal. Nov. 29, 2007) ........................................ 40

*Sullivan v. Oracle Corp.*,
   254 P.3d 237 (2011) .................................................................................................................... 36

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ................................................................................................ 9, 11

*Swiger v. Rosette*,
   989 F.3d 501 (6th Cir. 2021) ..................................................................................................... 23

*Teleport Mobility, Inc. v. Sywula*,
   No. 21-cv-00874-SI, 2021 WL 2291807 (N.D. Cal. June 4, 2021) ........................................... 24

*Thomas P. Gonzalez Corp. v. Consejo Nacional De Produccion De Costa Rica*,
   614 F.2d 1247 (9th Cir. 1980) ................................................................................................... 12

vii

*United Comput. Sys., Inc. v. AT & T Corp.*,
   298 F.3d 756 (9th Cir. 2002) ................................................................................. 29

*U.S. Home Corp. v. Lanier*,
   No. 68692, 2018 WL 6264809 (Nov. 28,2018) ........................................................ 24

*Variscite, Inc. v. City of Los Angeles*,
   No. 2:22-cv-08685-SPG-SK, 2023 WL 3493557 (C.D. Cal. Apr. 11, 2023) ............. 19

*Walden v. Fiore*,
   571 U.S. 277 (2014) ........................................................................................... 11, 12

*Wash. Mut. Fin. Grp., LLC v. Bailey*,
   364 F.3d 260 (5th Cir. 2004) ................................................................................. 24

*Whitesides v. E\*TRADE Sec., LLC*,
   No. 20-cv-05803-JSC, 2021 WL 2590156 (N.D. Cal. June 24, 2021) ..................... 28

*Williams v. Visa, Inc.*,
   No. 24-cv-08708-JST, 2025 WL 1518044 (N.D. Cal. May 28, 2025) ............. 30, 31, 37

*Williams v. Yamaha Motor Co.*,
   851 F.3d 1015 (9th Cir. 2017) ............................................................................... 11

*Wilson v. Frito-Lay North America, Inc.*,
   961 F. Supp. 2d 1134 (N.D. Cal. 2013) ................................................................ 37

*Wyatt v. Bowers*,
   747 P.2d 881 (1987) .............................................................................................. 35

*Zoran Corp. v. DTS, Inc.*,
   No. C 08-4655 JF (HRL), 2009 WL 160238 (N.D. Cal. Jan. 20, 2009) .................. 26


**<u>Statutes</u>**

9 U.S.C. § 3 ............................................................................................................. 27

9 U.S.C. § 202 ......................................................................................................... 23

28 U.S.C. §1391(b)(2) ........................................................................................... 1, 17

Cal. Civ. Proc. Code § 410.10 .................................................................................. 10

U.S.C. § 3 ................................................................................................................ 39

1

**<u>Rules</u>**

Fed. R. Civ. P. 12(b)(2) ..................................................................................... 1, 8

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 27

Fed. R. Civ. P. 12(h)(2) ..................................................................................... 27

Fed. R. Civ. P. 26(c)(1) ..................................................................................... 39

Fed. R. Evid. 201(b) .......................................................................................... 7

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    PRELIMINARY STATEMENT

3        By their Complaint, Plaintiffs seek to shift to the Jump Defendants responsibility for losses

4   they purportedly sustained as the result of the collapse of a crypto asset known as "UST" based on

5   the outlandish theory that the Jump Defendants were contractually obligated to buy, apparently

6   without limitation and at pre-collapse prices, whatever amount of UST Plaintiffs and any similarly

7   situated person decided they wanted to sell during the collapse.

8        Plaintiffs' claims are based entirely on unidentified terms in unspecified contracts.  The

9   Complaint appears at times to be alluding to contracts that actually do exist involving a different

10  Jump entity.   But, those contracts (some of which are publicly available from other court

11  proceedings and should have been reviewed by Plaintiffs prior to filing suit), do not contain any

12  terms that obligate the Jump Defendants (or anyone else for that matter) to buy anything from

13  anyone. And, unsurprisingly, they certainly do not contain any commercially extraordinary terms

14  that obligate the Jump Defendants (or anyone) to buy unlimited amounts of UST from Plaintiffs

15  regardless of size or market conditions.  Moreover, as noted, neither Jump Defendant is even a party

16  to those agreements.   While Plaintiffs' failure to plead the existence of any such contractual

17  obligation by itself justifies dismissal under Rule 12(b)(6), *see infra* Section III.D, the Court need

18  not reach the merits because the Complaint has other, threshold, defects that mandate dismissal:

19        *First*, the Court lacks personal jurisdiction over each Jump Defendant.  *See* Fed. R. Civ. P.

20  12(b)(2).  Jump Trading and Jump Crypto—both of which were formed in Delaware and have their

21  principal place of business in Illinois—are not subject to general jurisdiction in California under the

22  Supreme Court's exacting test set forth in *Daimler AG v. Bauman*, 571 U.S. 117 (2014).  Nor are

23  they subject to specific jurisdiction in this District because (among other things) Plaintiffs'

24  allegations about the Jump Defendants are unrelated to this forum.

25        *Second*, even if there were personal jurisdiction over the Jump Defendants, this District is

26  an improper venue under 28 U.S.C. §1391(b)(2) because the alleged conduct that forms the basis

27  for this lawsuit all occurred outside this District.  Alternatively, Plaintiffs' prior pending class action

28

in the District of Nevada warrants dismissal under the first-to-file rule.  In that pending Nevada action, Plaintiffs purport to represent the same class against Prime Trust, LLC ("Prime Trust"), a Nevada trust company and bank, alleging markedly similar claims to those raised here.

*Third*, in any event, Plaintiffs must be compelled to arbitrate their claims against the Jump Defendants.  While none of the agreements alluded to in the Complaint requires the Jump Defendants to provide liquidity, they all contain valid and enforceable mandatory arbitration provisions.  They also require all gateway disputes as to arbitrability to be decided in arbitration. Accordingly, if the Complaint is not dismissed, then the Court should compel arbitration and stay the action.

Lastly, the Court should stay discovery pending resolution of this motion to dismiss or to compel arbitration because this motion sets forth multiple potentially dispositive grounds for dismissal (or to compel arbitration), Plaintiffs will not be prejudiced by a stay while this motion is adjudicated, and the action must in any event be stayed upon resolution of the motion to compel arbitration.

## II.    STATEMENT OF FACTS[1]

### A.    THE PARTIES

Plaintiffs Austin Ward, David Krevat, and Nabil Mohamad ("Plaintiffs") are investors in TerraUSD ("UST"), a cryptocurrency "developed and issued" by Terraform Labs PTE Ltd. ("Terraform Labs" or "TFL").  Compl. ¶¶ 2, 12–14.  UST was an algorithmic stablecoin—an asset designed to maintain a $1 value.  *Id.* ¶ 23.  In May of 2022, UST experienced a market event and lost its "peg" at $1, from which it did not recover.  *Id.* ¶¶ 46–50.  In this action, Plaintiffs—residents of California, Florida, and Washington—seek to represent a nationwide class of UST investors for

---

[1] For purposes of Defendants' motion to dismiss under Rule 12(b)(6), the well-pleaded allegations of the Complaint are assumed to be true.  The Court may also consider documents on which the Complaint relies.  *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  The Court may likewise consider materials that are in the public record and subject to judicial notice under the Federal Rule of Evidence 201.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Defendants respectfully request that the Court consider certain materials attached to the Declaration of Jonathan D. Cogan ("Cogan Declaration") and the Declaration of Matthew Hinerfeld ("Hinerfeld Declaration") and provide the bases for these requests as to each document and as relevant to each motion herein.

claims arising out of unprocessed transactions to sell UST during this market collapse.  *Id.* ¶ 12–14, 55.

Plaintiffs bring this action against Jump Trading and Jump Crypto based primarily on group-pleaded allegations about the "Jump umbrella of companies" and "Jump"—defined to include Defendants and unidentified John Doe defendants, including their related entities.  *Id.* ¶ 15; *id.* at 1. As to Jump Trading and Jump Crypto specifically, Plaintiffs allege that both were formed in Delaware and maintain their principal places of business in Illinois.  *Id.* ¶¶ 15–16.  Plaintiffs also allege that Jump Trading, through Jump Crypto and "other entities," "played a central role in the development of cryptocurrency investing worldwide . . . provid[ing] capital for the development of various cryptocurrency startups, including [TFL]," becoming "one of, if not the, most dominant investment firms in the cryptocurrency space," *id.* ¶ 15, although Plaintiffs do not explain how these facts are even remotely relevant to this case.  Plaintiffs do not otherwise allege any conduct by the Defendants specifically.

Prime Trust, a Nevada trust company and bank, is not a party to this suit but a defendant in Plaintiffs' earlier filed and duplicative class action described *infra*.  The Complaint alleges that UST investors like Plaintiffs "consented to allow Prime Trust to create accounts for their benefit wherein Prime Trust would hold assets, including both U.S. dollars and UST tokens, in custody, and provide escrow services for UST transaction orders."  *Id.* ¶ 34.  They further allege that under agreements governing the custody of Plaintiffs' UST and related transactions, "Prime Trust also agreed to execute UST token purchase and sale orders."  *Id.*

## B.    PLAINTIFFS' NON-SPECIFIC AND VAGUE ALLEGATIONS OF BREACH OF CONTRACT

Plaintiffs admit that they did not have "direct privity of contract" with the Jump Defendants. *Id.* ¶ 66.  Rather, they claim—without citing any contractual provisions—that they are third-party beneficiaries of contracts that Defendants "entered into with Prime Trust or with Terraform Labs or with both entities."  *Id.* ¶ 64.  Under these unspecified contracts, the Jump Defendants were allegedly "obligated . . . to provide funding for and authorize the execution of investor sell orders, whereby UST investors placed orders to exchange their UST tokens for U.S. dollars, and which required

3

Jump to fund and authorize access to its accounts with Prime Trust and to debit U.S. dollars from those accounts in order to fill the orders." *Id.* ¶ 65; *see also id.* ¶ 64 (also alleging the Agreements "generally obligated Jump to provide liquidity for UST for the benefit of UST investors").

In other words, under Plaintiffs' vague theory, *whenever* an investor placed an order to sell their UST with Prime Trust, the Jump Defendants had an obligation directly to that investor to fulfill that order in U.S. dollars, regardless of the size or market conditions. *See id.* ¶¶ 40–44. Plaintiffs, however, do not point to any contractual provision that contains any such obligation. Plaintiffs are also inconsistent about the specifics of the alleged obligation: on the one hand, Plaintiffs allege that these orders were required to be filled by the Jump Defendants at market price, *see id.*, yet on the other hand, Plaintiffs seem to imply that the price those orders were required to be filled at should always have been $1, the value at which UST was pegged before the market collapse, *see id.* ¶¶ 3, 5, 67, 74. These claims are premised on purported contractual obligations in agreements, which Plaintiffs "belie[ve]" are "written" (the so-called "Subject Contracts"). *Id.* ¶ 69.

In May 2022, a "market event" caused UST to become "unpegged" from its $1 USD valuation. *Id.* ¶ 47. The Complaint alleges that "thousands of depositors" placed orders to sell their UST and that "Jump" did not provide liquidity to Prime Trust, and as a result, Prime Trust did not execute those orders, thereby breaching their purported contractual obligations. *Id.* ¶¶ 53–54.

### C.     THE "SUBJECT CONTRACTS" CONTAIN NO LIQUIDITY OBLIGATION

The Complaint alleges that the "Subject Contracts" were entered into between Prime Trust or TFL (or both) and "Jump" (including Jump Trading and Jump Crypto, and any of their related entities). *Id.* ¶¶ 17, 64. These "Subject Contracts" were purportedly "created and entered into on or around July 8, 2021," after the "terms of the liquidity agreement" were proposed by TFL in which "Jump" "promised" to provide "liquidity services." *Id.* ¶¶ 43, 53. Plaintiffs neither attach any of the alleged "Subject Contracts" nor quote their purported provisions. Based on the allegations in the Complaint, however, the Subject Contracts appear to be certain loan agreements with TFL, on the one hand, and certain account and trading agreements with Prime Trust, on the other.

Neither Jump Defendant is a party to any of these agreements. Rather, these contracts were made, in each case, by Tai Mo Shan Limited ("TMSL"), a Cayman Island subsidiary of Jump Crypto.

4

Hinerfeld Decl. ¶ 9.  Plaintiffs have chosen not to sue TMSL, despite being aware of its identity.  The same trial record Plaintiffs rely on to allege "Jump had entered several agreements" with TFL discloses these contracts, including one identifying TMSL as the signatory.  Compl. ¶ 52; *see also* Pls. Tr. Ex. 69(b), *SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-01346 (S.D.N.Y.), *available at* https://www.sec.gov/files/terraform-trial-exhibit-p-69b.pdf.

**TFL Loan Agreements**:[2]  While Plaintiffs' allegations regarding these agreements are inconsistent, the Complaint is clear that the agreements concerned loans of UST/LUNA[3] by TFL to "Jump" allegedly so that "Jump" could "deposit the loaned UST tokens into accounts with Prime Trust for the purpose of providing UST liquidity for investors."  Compl. ¶¶ 38–39.  The referenced "liquidity" agreements were allegedly "created and entered into on or around" a day in July of 2021.  *Id.* ¶ 43.  Accordingly, the Complaint appears to be referring to the following loan agreements made between TMSL and TFL:

- The Second Amended and Restated Loan Confirmation from July of 2021, between TFL and TMSL (the "July 2021 Loan Confirmation"); and

- The Master Loan Agreement between TFL and TMSL ("Master Loan Agreement"), incorporated in the July 2021 Loan Confirmation (together, the "TFL Loan Agreements").

Hinerfeld Decl. Exs. A & B.

**Prime Trust Agreements**:[4]  The "Subject Contracts" also include purported unspecified agreements between "Jump" entities and Prime Trust.  *Id.* ¶ 64.  Other than a standard non-disclosure agreement, the only two agreements entered into by any Jump entity with Prime Trust (together, the "Prime Trust Agreements") are as follows:

- Prime Trust New Account Agreement from August of 2021, between TMSL and Prime Trust, (the "Prime Trust Account Agreement"); and

---

[2] The Court may consider these agreements in ruling on the motions, attached as Exs. A and B of the Hinerfeld Declaration, as they are referred to in the Complaint and central to Plaintiffs' claims.  *See Marder*, 450 F.3d at 448.

[3] LUNA is UST's counterpart cryptocurrency used to "stabilize UST's value without direct dollar backing," in what is called a "burn and mint" mechanism. Compl. ¶ 23.

[4] The Court may likewise consider these agreements in ruling on these motions, attached as Exs. C and D of the Hinerfeld Declaration, as they are also referred to in the Complaint and central to Plaintiffs' claims.

5

- OTC Trading Agreement from August of 2021, between TMSL and Prime Trust (the "Prime Trust OTC Trading Agreement").

Hinerfeld Decl. Exs. C & D.  Nowhere do any of these agreements with TFL or Prime Trust require Defendants or TMSL to buy UST (or anything else), much less at a set price.  In fact, their provisions directly state the contrary.  For example:

- The Prime Trust Account Agreement reflects a standard agreement upon opening an account with the bank, permitting the account holder to buy and sell investments as desired, subject to limitations imposed by law or Prime Trust as custodian.  *See* Prime Trust Account Agreement § 2 ("This Account is a self-directed Account that is managed by Account Holder and/or Account Holder's Agents."); *see also id.* (TMSL "appoint[ed] Prime Trust to be custodian of and to hold or process *as directed* all assets in the account" (emphasis added)).  The Prime Trust Account Agreement creates no obligation on the account holder to trade or even fund any account.

- The Prime Trust OTC Trading Agreement is an agreement pursuant to which Prime Trust could submit indications of trading interest to TMSL.  *See* Prime Trust OTC Trading Agreement § 1.  This agreement grants TMSL complete discretion over whether to enter into any transactions.  *See id.* ("[T]he Parties will have no obligation to enter any Transactions with each other.").  TMSL explicitly was not "providing any service to Prime Trust" under the Prime Trust OTC Agreement.  *Id.*  Moreover, all transactions were made by each party "solely for its own respective benefit and not for the purpose of benefiting the other Party." *Id.* § 5.

Each of these agreements between TMSL on one hand and TFL and Prime Trust on the other also includes a mandatory arbitration provision, referring all disputes to the American Arbitration Association ("AAA") to resolve under its arbitral rules.  Master Loan Agreement § XI ("[A] dispute aris[ing] out of or relat[ing] to this Agreement, or the breach thereof . . . shall be finally resolved by binding arbitration . . . by the [AAA] under its Commercial Arbitration Rules"); Prime Trust OTC Trading Agreement § 18(b) ("[A]ll claims or controversies arising out of or relating to this agreement, or the breach thereof, or in any way arising out of or relating to the transactions . . . shall be settled by arbitration . . . administered by the [AAA] in accordance with its commercial arbitration rules"); Prime Trust Account Agreement § 16 ("Any claim or dispute arising under this Agreement may only be brought in arbitration . . . pursuant to the rules of the American Arbitration

6

1   Association.").  The AAA Commercial Rules delegate arbitrability issues to the arbitrator.  *See also*

2   Cogan Decl. Ex. A (AAA Commercial Rule 7(a)).[5]

### D.    PLAINTIFFS' DUPLICATIVE CLAIMS IN NEVADA

In 2022, these same Plaintiffs filed a class action against Prime Trust and unknown "John Doe" defendants on behalf of an identical class to the class at issue in this case (the "Nevada Action"), which remains pending in the U.S. District Court for the District of Nevada.  Cogan Decl. Ex. B (Complaint, *Ward v. Prime Trust, LLC*, No. 2:22-cv-02034 (D. Nev. filed Dec. 7, 2022) ("Nev. Compl."); *see also* Cogan Decl. Ex. C.[6]  The Nevada Action has been stayed since August 2023, when Prime Trust filed for Chapter 11 bankruptcy.  Cogan Decl. Ex. D.

In the Nevada Action, Plaintiffs sued Prime Trust for breach of fiduciary duty, along with other state law claims, based on its alleged failure to protect Plaintiffs' UST holdings during the time of the market crash.  Nev. Compl. ¶¶ 3, 59–72.  There, they assert that Prime Trust had a duty to ensure UST would be "collateralized one-to-one with the U.S. dollar," *see, e.g.*, *id.* ¶ 39, and to "redeem [user] orders 'instantly,'" *id.* ¶ 7.  Plaintiffs brought the Nevada Action against unknown "John Doe" defendants (in addition to Prime Trust) for the purpose of "amend[ing] [the Nevada] complaint to add the true names when they are ascertained." *Id.* ¶ 13.

Plaintiffs now bring claims here on behalf of an identical putative class.  *Compare* Nev. Compl. ¶ 51 (defining the class as "[a]ll persons who placed orders to sell TerraUSD (UST) on or after May 9, 2022, that were routed to Prime Trust, but that were not processed or settled by Prime Trust at UST's market value at the time they were placed"), *with* Compl. ¶ 55 (defining the class as

---

[5] The Court may take judicial notice of the AAA Commercial Rules, a copy of which is attached as Ex. A of the Cogan Declaration.  *See, e.g.*, *Esguerra-Aguilar, Inc. v. Shapes Franchising, LLC*, No. 20-CV-00574-BLF, 2020 WL 3869186, at *2 (N.D. Cal. July 9, 2020) (taking judicial notice of AAA "Commercial Arbitration Rules and Mediation Procedures").

[6] With respect to Defendants' motion to dismiss based on the first-to-file rule, Defendants request that the Court consider Plaintiffs' complaint and a court order filed in the Nevada Action and its civil docket, attached as Exs. B through D to the Cogan Declaration, because it has a "direct relation to matters at issue."  *See also Jiangmen Kinwai Furniture Decoration Co. v. Int'l Mkt. Ctrs., Inc.*, 719 Fed. App'x 556, 558 (9th Cir. 2017) (affirming dismissal of later-filed action).

With respect to Defendants' Rule 12(b)(6) motion, the Court may also properly take judicial notice of Plaintiffs' pleadings, as the Court need not consider the documents for the "truth of the facts recited therein."  *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001); *see also* Fed. R. Evid. 201(b).

"[a]ll persons who placed orders to sell UST on or after May 9, 2022 that were routed to Prime Trust, but that were not processed at the price of UST at the time of order").  In the Nevada Action, Plaintiffs asserted that Prime Trust "point[ed] the blame at an unidentified 'UST liquidity provider,'" Nev. Compl. ¶ 47, and now in this action, Plaintiffs lodge substantially identical claims against Defendants purporting that they are the unidentified liquidity provider referred to in their pending Nevada lawsuit.

Plaintiffs purportedly learned the identity of Prime Trust's "liquidity provider" in June of 2023.  *See* Compl. ¶ 51.  Despite the nearly two years since that alleged disclosure, Plaintiffs' Complaint against the Jump Defendants contains substantially identical allegations that have been "cut-and-pasted" from the allegations against Prime Trust in Nevada.  Many of the allegations are only slightly modified to attribute legal responsibility for their unexecuted UST sell orders from Prime Trust to the Jump Defendants.  For example, in Nevada, Plaintiffs claim Prime Trust has liability for its "*refus[al]* to complete the transactions" (*i.e.*, the refusal to fulfill Plaintiffs' sell orders while UST was collapsing).  Nev. Compl. ¶ 42.  In this action, Plaintiffs modify that same allegation only to allege that Prime Trust was "*unable* to complete the transactions" because of the Jump Defendants' failure to provide liquidity.[7]  Compl. ¶ 47.

## III. ARGUMENT

### A.  THE JUMP DEFENDANTS ARE NOT SUBJECT TO PERSONAL JURISDICTION

The Complaint is woefully deficient on a plethora of grounds.  As an initial matter, it should be dismissed pursuant to Fed. R. Civ. P. 12(b)(2) because neither Jump Trading nor Jump Crypto is subject to personal jurisdiction in this Court.  Although "there is no mandatory 'sequencing of

---

[7] *Compare* Nev. Compl. ¶ 42 ("The wallet systems, for their part processed the orders, which were then submitted to Prime Trust.  Prime Trust did not complete the transactions . . . In fact, Prime Trust refused to complete the transactions at all."), *with* Compl. ¶ 47 (identical paragraph except to allege "Prime Trust was unable to complete the transactions" purportedly because their "UST liquidity provider," who Plaintiffs assert are Defendants, "stopped servicing Prime Trust"); *compare e.g.* Nev. Compl. ¶ 9 ("Plaintiff . . . attempted to redeem the UST he held in exchange for U.S. dollars.  His order was routed to Prime Trust and denied.  His redemption order is still pending and has never been filled."), *with* Compl. ¶ 12 ("Plaintiff . . . attempted to redeem the UST he held in exchange for U.S. dollars.  His order was routed to Prime Trust *and denied because Jump refused to provide the liquidity necessary to fill the order*.  His redemption order was never filled." (emphasis added)).

8

jurisdictional issues,'" and "a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits," a dismissal for lack of personal jurisdiction is a preferred remedy for a pleading with multiple merits- and non-merits-related deficiencies.  *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (citations omitted).

The Complaint is devoid of any relevant jurisdictional fact and comes nowhere close to establishing that either Jump Defendant is "at home" in California or has engaged in the "purposeful direction" or "availment" necessary to support either general or specific jurisdiction.  Plaintiffs' "'bare bones' assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations" fail to "satisfy a plaintiff's pleading burden" and warrant dismissal.  *See Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007); *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1066 (9th Cir. 2014).

### 1.      General Jurisdiction Cannot Be Established Because Jump Trading And Jump Crypto Are Not "At Home" In California.

Neither Jump Trading nor Jump Crypto are subject to general jurisdiction in California under the Supreme Court's "demand[ing]" standard in *Daimler*, 571 U.S. at 139, because neither was formed in California and neither has its principal place of business in California.  *See Martinez*, 764 F.3d at 1070.

In *Daimler*, the Court confirmed that only in an "exceptional case" does general jurisdiction exist over a company in "a forum other than its formal place of incorporation or principal place of business."  *Daimler*, 571 U.S. at 139 n.19; *id.* at 119 (applying corporation's paradigmatic test to a Mercedez-Benz USA, LLC subsidiary).  Reversing the Ninth Circuit, the Court concluded that general jurisdiction was improper over a Mercedez-Benz manufacturer based outside of California, despite the fact that its exclusive U.S. Mercedez-Benz importer and sales agent (a wholly-owned subsidiary) had "multiple offices, continuous operations, and billions of dollars' worth of sales" in the state.  *Id.* at 772 (Sotomayor, J., concurring).  In other words, even though Mercedes-Benz did billions of dollars of business in California, its contacts with the state were not considered "so continuous and systematic as to render [it] *essentially at home* in the forum State" as necessary for

9

general jurisdiction to attach. *Id.* at 749 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)) (emphasis added).[8]

Plaintiffs cannot meet this exacting standard. Plaintiffs acknowledge that neither Jump Defendant is formed or has its principal place of business in California. *See* Compl. ¶ 15 (Jump Trading is "incorporated in Delaware" with its "principal place of business and headquarters" in Chicago, Illinois); *id.* ¶ 16 (same allegations for Jump Crypto). Nor is this an "exceptional case" where, despite being domiciled outside the forum, either defendant is "at home" here. *Daimler*, 571 U.S. at 139 n.19; *see also Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015). In *Daimler,* the Supreme Court identified that the "textbook case" of exceptional circumstances was when a Philippine mining company ceased operations during Japanese occupation in World War II and its president oversaw all company activities from Ohio. *Daimler*, 571 U.S. at 129. There, Ohio had become "the corporation's principal, if temporary, place of business." *Id.* at 129–30 (quotations omitted). Unsurprisingly, in the "overwhelming majority of cases there will be no occasion to explore" whether this "exception might apply." *Amiri v. DynCorp Int'l, Inc.*, No. 14-cv-03333 SC, 2015 WL 166910, at *3, *5 (N.D. Cal. Jan. 13, 2015) (citation and quotations omitted); *see also Lindora, LLC v. Isagenix Int'l, LLC*, 198 F. Supp. 3d 1127, 1137 (S.D. Cal. 2016) (explaining exceptional circumstances may render a foreign company "at home" in another state only where "the magnitude of a corporation's business activities in the forum state substantially exceeds the magnitude of the corporation's activities in other places"). This case is no different. Plaintiffs have not alleged (and could not in good faith allege) that either Jump Trading or Jump Crypto are essentially managing its operations from within California as opposed to their headquarters in Chicago. *See* Compl. ¶¶ 15, 16.

The Complaint's conclusory allegations that "Defendants . . . have continuous and systematic contacts with the judicial district, [and] do substantial business in this State and within this judicial district," *id.* ¶ 10, are insufficient. Plaintiffs do not plead any facts in support of these

---

[8] The jurisdictional analyses under California's long-arm statute Cal. Civ. Proc. Code § 410.10 and federal due process are the same. *See Martinez*, 764 F.3d at 1066 (California's long-arm statute is "coextensive with federal due process requirements" (citation omitted)).

allegations—these are mere "'bare bones' assertions of minimum contacts" and "legal conclusions" that do not satisfy a pleading burden and need not be credited. *See Swartz*, 476 F.3d at 766; *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009). In any event, they do not establish that the Jump Defendants are "at home" in California, and as *Daimler* itself held, even "substantial" business contacts or relationships are "not pervasive enough to establish jurisdiction." *Ranza*, 793 F.3d at 1069 (foreign corporation not "at home" in California even where it had a U.S. affiliate with dozens of employees with evidence of extensive travel to the affiliate, and sold products in the forum state); *see also, e.g.*, *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (hiring California-based advertising and consulting services, and maintaining a website accessible to California residents insufficient to confer general jurisdiction).

Accordingly, Plaintiffs fail to meet the "exacting standard" required to "permit[] a defendant to be haled into court . . . to answer for any of its activities in the world." *Id.*

### 2. Specific Jurisdiction Cannot Be Established Because Plaintiffs' Claims Have No Connection To Any Alleged Contact With California.

Specific jurisdiction also does not exist. To establish specific jurisdiction, plaintiffs must demonstrate both (1) that the foreign defendant "purposefully directs its activities" or "purposefully avails itself of the benefits afforded by the forum's laws"; and (2) that their claims "arise[] out of or relate[] to the defendant's forum-related activities." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (quotations and citation omitted); *see also Schwarzenegger*, 374 F.3d at 802 (plaintiffs bear burden on these two prongs). Specific jurisdiction is defeated if either of these two elements is not established, and here, Plaintiffs fail to demonstrate both. *See Aych v. Univ. of Ariz.*, No. 24-4710, 2025 WL 1641876, at *1 (9th Cir. June 10, 2025).

### a. Plaintiffs' Claims Have No Relation To Forum-Related Conduct.

Plaintiffs cannot establish specific jurisdiction over either Jump Defendant because none of Plaintiffs' claims arise out of or relate to any alleged forum-related activities by Jump Trading or Jump Crypto. Specific jurisdiction requires Plaintiffs to show "suit-related conduct" by each Jump Defendant that "create[d] a substantial connection" with California. *Walden v. Fiore*, 571 U.S. 277,

1    284 (2014).  No such connection exists here.

2         As an initial matter, Plaintiffs do not allege that either Jump Defendant engaged in any

3    particular conduct in California whatsoever, let alone conduct that forms the basis of the claims in

4    this case.  Rather, Plaintiffs' claims are premised on alleged losses arising from the failure by Prime

5    Trust, a "Nevada-based trust company" and "bank," Compl. ¶ 31, to process Plaintiffs' orders to

6    redeem UST held in custody by Prime Trust, *id.* ¶ 33.  Plaintiffs simply allege that the Jump

7    Defendants, neither of whom is organized in the forum or has its principal place of business here,

8    are responsible based on purported contractual obligations made "through various subsidiary

9    arrangements" with Prime Trust (a Nevada company) or TFL (a Singapore company).  *Id.* ¶ 16; *see,*

10   *e.g.*, ¶¶ 2, 7, 38, 53.  The challenged conduct thus focuses exclusively on purported contractual

11   relationships among non-California companies.  Those allegations provide no basis to find forum-

12   related conduct by each Jump Defendant relevant to Plaintiffs' claims.  *See InfoSpan, Inc. v.*

13   *Emirates NBD Bank PJSC*, 903 F.3d 896, 903 (9th Cir. 2018); *Walden*, 571 U.S. at 289 ("[N]one of

14   [the] challenged conduct ha[s] anything to do with [California] itself.").

15        That one of three Plaintiffs allegedly resides in California and seeks to represent unidentified

16   putative class members who could hypothetically reside in the state is insufficient.  The law does

17   not permit specific jurisdiction to attach merely because a forum resident alleges some economic

18   injury to them.  *Walden*, 571 U.S. at 289-990 ("[M]ere injury to a forum resident is not a sufficient

19   connection to the forum."); *see also Thomas P. Gonzalez Corp. v. Consejo Nacional De Produccion*

20   *De Costa Rica*, 614 F.2d 1247, 1254 (9th Cir. 1980), *abrogated on other grounds by CC/Devas*

21   *(Mauritius) Ltd. v. Antrix Corp.*, 145 S. Ct. 1572 (2025); *see also Shaw v. Vircurex*, No. 18-cv-

22   00067-PAB-SKC, 2019 WL 2636271, at *4 (D. Colo. Feb. 21, 2019) (*sua sponte* dismissal of class

23   action brought by cryptocurrency investors unable to withdraw Bitcoin on an exchange because

24   "[t]he only alleged connection between defendants and [the forum]" was the "harm suffered by a

25   [forum] resident").  Further, the California-based Plaintiff does not (because he cannot) allege that

26   he is a customer of Defendants or had any contact with them.  And, even if he did, that would not

27   demonstrate a connection to the forum either.  *See, e.g., Medimpact Healthcare Sys., Inc. v. IQVIA*

28

*Holdings Inc.*, No. 19cv1865-GPC(LL), 2020 WL 1433327, at *5 (S.D. Cal. Mar. 24, 2020) (the district court "must look to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there" (quotations and citation omitted)).

### b.    Plaintiffs Fail To Allege Purposeful Availment Or Purposeful Direction.

Independently, Plaintiffs also fail to allege facts sufficient to show that either Jump Defendant purposefully availed itself of the benefits afforded by California's laws or purposefully directed activity toward California.

Plaintiffs have alleged no conduct by the Jump Defendants that suggests any action that "invoke[d] the benefits and protections" of the laws in the forum state. *Boschetto v. Hansing*, 539 F.3d 1011, 1018 (9th Cir. 2008). Further, nothing about the Jump Defendants' purported agreements with Prime Trust or TFL has anything to do with California. *See Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015) ("[Defendant's] actions did not connect him with California in a way sufficient to support the assertions of personal jurisdiction over him . . . . In short, none of [Defendant's] challenged conduct had anything to do with [California] itself" (citation omitted)). The agreements alluded to in the Complaint were not entered into by California counterparties, nor do they specify performance in the state.[9] *See* TFL Loan Agreements; Prime Trust Account Agreement; Prime Trust OTC Trading Agreement; *see also InfoSpan*, 903 F.3d at 903 (rejecting plaintiff's argument that UAE bank purposefully availed itself of California laws where bank "entered a contract with a Cayman Islands corporation to provide pre-paid cards in the UAE," and "[t]here is no indication that the Bank conducted any unilateral activities in California"). Nor do Plaintiffs allege any purposeful direction of activity into California by Jump Defendants. The Complaint refers only to a theory of purposeful availment, Compl. ¶ 10, and does not identify any conduct "expressly aimed" at California that would "cause[] harm" that the Jump Defendants "kn[ew] [wa]s likely to be suffered" in the state. *Picot*, 780 F.3d at 1214 (citing *Schwarzenegger*, 374 F.3d at 803).

---

[9] As noted, the Complaint appears to refer to contracts (1) between TMSL and TFL and (2) between TMSL and Prime Trust. None of these contractual counterparties is, or is alleged to be, a California entity. Compl. ¶ 2; Hinerfeld Decl. Exs. A–D.

To the extent Plaintiffs assert that the Jump Defendants purposefully directed their activities into California as an "institutional trading firm and cryptocurrency market maker," Compl. ¶ 4, the Complaint offers no basis for that assertion. As an initial matter, Plaintiffs wholly rely on group-pleaded allegations referring to "Jump"—defined to include Defendants and unidentified John Doe defendants, including their related entities. *Id.* at 1. Indeed, Plaintiffs expressly acknowledge that they are suing entities that may not even be parties to the alleged agreement(s) (*see id.* ¶ 16, referring to contractual obligations made "through various subsidiary arrangements"). But any alleged forum-related conduct must be alleged as to each defendant. *See, e.g.*, *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) ("It is well established that, as a general rule, where a parent and a subsidiary are separate and distinct corporate entities, the presence of one . . . in a forum state may not be attributed to the other[.]" (citation omitted)); *Ranza*, 793 F.3d at 1070. Even so, Plaintiffs fail to plead any particular forum-related conduct by any Jump entity, let alone those that they have sued here. Plaintiffs allege that "through" Jump Crypto, Jump Trading "provided capital for the development of various cryptocurrency startups," and "Jump Crypto and its subsidiaries" "fund[ed] and "partner[ed]" with TFL (a Singapore company), Compl. ¶¶15–16, the company that "developed and issued" the stable coin, *id.* ¶ 2. But none of these allegations support the inference that either Jump Defendant engaged in forum-related conduct, to say nothing of forum-related conduct pertaining to the unspecified contract(s) at issue here.

Without allegations of any relevant forum contacts as to either Jump Defendant, Plaintiffs fail properly to allege specific jurisdiction against either Jump Trading or Jump Crypto.

### 3. Jump Trading's Participation In Other Northern District Of California Litigation Does Not Subject The Jump Defendants To Personal Jurisdiction In This Case.

Rather than allege any relevant jurisdictional facts, Plaintiffs' purported basis for personal jurisdiction seemingly rests on the counterfactual and legally irrelevant assertion that Defendants "have subjected themselves to personal jurisdiction . . . by actively engaging in litigation . . . [and] urg[ing] courts to permit them to litigate" in this Court. Compl. ¶ 10. But Defendants have not

consented to personal jurisdiction based on contacts with California in the two cases to which Plaintiffs point. (Jump Crypto is not even a defendant in one and was only recently added into the other.) Moreover, defending a lawsuit in this District that Plaintiffs themselves characterize as "*unrelated to this matter,*" Compl. ¶¶ 10, 10 n.1 (emphasis added)—or moving to transfer a case for procedural efficiency—does not, as a matter of law, establish personal jurisdiction in this case.

*First,* neither Jump Defendant ever consented to or conceded personal jurisdiction in a case requiring contact with California. *Patterson v. Jump Trading LLC*, Case No. 5:22-cv-03600-PCP (N.D. Cal.), is an action in which Jump Crypto is not even a defendant, and involves alleged violations of the federal securities laws, which "confer[] nationwide service" and therefore permit the exercise of personal jurisdiction over a defendant so long as that defendant has minimum "contacts with the *United States, not any particular state.*" *Sec. Inv. Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985) (emphasis added and citation omitted). Contact with California was thus irrelevant to the jurisdictional analysis in that case.

Similarly, *Kim v. Jump Trading, LLC,* Case No. 1:23-cv-02921 (N.D. Ill.), is an action arising under the Commodities Exchange Act, a federal statute also requiring only nationwide contacts. *See Commodity Futures Trading Comm'n v. Ooki DAO*, No. 3:22-cv-05416-WHO, 2023 WL 5321527, at *4 (N.D. Cal. June 8, 2023). In *Kim*, Jump Trading (and not Jump Crypto) moved to transfer or consolidate with *Patterson* in the Northern District of California because *Patterson* was already underway and involved substantially similar claims (alleged market manipulation). But in so doing, Jump Trading never consented to personal jurisdiction in California for all cases, and the district court in *Kim* denied the motion to transfer in any event. *See* Cogan Decl. Ex. E at 4 (stating Jump Trading did not "*contest* personal jurisdiction *for the purposes of this case*" (emphasis added)); *see also* Cogan Decl. Ex. F at 7.

*Second,* even if it were true that Jump Trading (or somehow both Jump Defendants) "subjected themselves" to the forum in *Patterson* or *Kim*, as a matter of law, "any consent [the Jump Defendants] may have given to personal jurisdiction in California in other cases would not amount to consent to personal jurisdiction [here]." *See AM Tr. v. UBS AG*, 681 F. App'x 587, 589 (9th Cir.

2017).  Litigating in California—in a case Plaintiffs themselves characterize as "*unrelated to this matter*," Compl. ¶¶ 10, 10 n.1—cannot "subject [a party] to personal jurisdiction for all cases involving [the same party] in the same forum."  *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993); *see also Redondo Mgmt., LLC v. Bradley Arant Boult Cummings LLP*, No. 24-cv-06104-TLT, 2025 WL 826184, at *5-7 (N.D. Cal. Feb. 13, 2025); *Dow Chem. Co. v. Calderon*, 422 F.3d 827, 835 (9th Cir. 2005).

As such, the "jurisdictional inquiry ends and the case must be dismissed." *Boschetto*, 539 F.3d at 1016.  The Court need not reach the final question of whether the exercise of specific jurisdiction would be unreasonable. *See id.* ("[T]he exercise of jurisdiction must comport with fair play and substantial justice.").  However, to the extent the Court considers Plaintiffs' theory of jurisdiction, it would be unreasonable to apply it under the circumstances here.  It would violate due process to permit the exercise of jurisdiction in a forum on the basis that a defendant has been sued in an allegedly unrelated action (which, of course, a defendant cannot control) involving different jurisdictional thresholds, where the defendant's lack of forum contacts was irrelevant to the personal jurisdiction analysis. *See Dow Chem.*, 422 F.3d at 835 (no implied submission to jurisdiction where defendants only defended against two separate actions in the jurisdiction).[10]

Because Plaintiffs have not and cannot allege any sufficient basis for personal jurisdiction over the Jump Defendants, the Complaint should be dismissed.

---

[10] Even were this Court to find that specific personal jurisdiction attaches, it would be unreasonable to exercise jurisdiction here.  The relevant factors are: "(1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant; (3) the extent of conflict with the sovereignty of the defendant's home state; (4) the forum's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the dispute; (6) the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *Gross v. Hatcher*, 952 F.2d 406, No. 90-56203, 1991 WL 270741, at *1 (9th Cir. Dec. 17, 1991)  Together these factors weigh against permitting personal jurisdiction over Defendants.  Neither Jump Trading nor Jump Crypto purposefully directed any activity in the forum and therefore did not interject themselves into California's affairs. *Cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).  That the three named Plaintiffs—only one of whom allegedly resides in California—filed an identical lawsuit in a different forum, *see infra* Section III.B.2, makes clear that this forum has no particular "interest in adjudicating the dispute," is not important to Plaintiffs' "interest in convenient and effective relief," and does not have some unique connection to witnesses and evidence other courts outside this venue cannot reach. *Gross*, 1991 WL 270741, at *1.

1

2

**B.    DISMISSAL IS WARRANTED UNDER RULE 12(b)(3) AND THE FIRST-TO-FILE RULE**

3    Even if this Court had personal jurisdiction, the Court should dismiss under Rule 12(b)(3)

4    for improper venue.  In the alternative, the Court should dismiss this action pursuant to the first-to-

5    file rule, in light of Plaintiffs' substantially identical pending class action in Nevada.

6                    **1.    This Case Should Be Dismissed For Improper Venue.**

7    This District is an improper venue under 28 U.S.C. § 1391(b)(2), the sole basis on which

8    Plaintiffs rely.  Plaintiffs assert that "occurrences central to the litigation occurred within this

9    district" or "a substantial part of the underlying dispute occurred in this judicial district."  Compl. ¶

10    11.  But these allegations are both conclusory and, in any event, contradicted by the facts actually

11    alleged in the Complaint.

12    As discussed above, Plaintiffs have not alleged any plausible nexus between Plaintiffs'

13    claims and this District (indeed, there is not even a properly alleged nexus with the state of

14    California) because neither Jump Defendant is a resident of the forum and the alleged agreements

15    and transactions at issue likewise occurred outside the forum.  *See supra* Section II.A; *cf. Cheery*

16    *Way (USA), Inc. v. Ngoc Diep Duong*, No. C12-0486 JSC, 2012 WL 1670172, at *3 (N.D. Cal. May

17    14, 2012) (contacts giving rise to venue in district where "contracts at issue . . . were signed in San

18    Francisco and some payments to Defendants issued from San Francisco").  Nor, as a matter of law,

19    can Plaintiffs establish venue by claiming that "at least one Plaintiff and likely a substantial number

20    of class members were caused injury while residing in this judicial district."  Compl. ¶ 11.  The law

21    in the Ninth Circuit is clear that injuries of unidentified class members are not part of the venue

22    calculus.  *See In re Bozic*, 888 F.3d 1048, 1053 (9th Cir. 2018) ("Whether before or after class

23    certification, the claims of unnamed class members can never make permissible an otherwise

24    impermissible venue.").  That one named plaintiff, out of three, resides in this District does not

25    change the fact that the alleged transactions took place and are located outside of it.  A "conclusory

26    allegation in the Complaint that venue is proper in this Court" and "an allegation that [a] [p]laintiff

27    resides within the [District]" are insufficient to establish venue under section 1391(b)(2) where

28

17

"most if not all of the events and omissions alleged in the Complaint" occurred outside of the District. *Elofson v. Bivens*, No. CV 15-6332, 2015 WL 13916655, at *1-2 (C.D. Cal. Aug. 21, 2015); *see also, e.g.*, *P & P Imports LLC v. OJCommerce, LLC*, No. SACV 19-00898, 2019 WL 8012690, at *3 (C.D. Cal. Oct. 4, 2019) (holding venue is improper under section 1391(b)(2) where "[o]ther than [p]laintiff's California residence and [d]efendants' alleged internet sales to California, this case has little connection to the state"). Accordingly, this Court is not a proper venue.

### 2. The Case Is Duplicative Of Plaintiffs' Pending Class Action Against Prime Trust And Should Be Dismissed.

In the alternative, the Court should dismiss this action under the first-to-file rule. This doctrine of federal comity permits a district court to decline jurisdiction where a "similar case with substantially similar issues and parties was previously filed in another district court." *Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1239 (9th Cir. 2015). The Ninth Circuit has stated that the rule "should not be disregarded lightly," and affords district courts discretion to dismiss a later-filed action. *Jiangmen Kinwai*, 719 Fed. App'x at 558 (affirming dismissal of later-filed action).

The relevant factors considered—chronology of the lawsuits, similarity of the issues, and similarity of the parties—all weigh in favor of dismissal here. *See Kohn Law Grp.*, 787 F.3d at 1240. Plaintiffs first filed a class action against Prime Trust in Nevada state court, which was removed to the District of Nevada in December of 2022. *See* Cogan Decl. Ex. B. The Nevada Action has been stayed since August of 2023 because Prime Trust filed for bankruptcy. *See* Cogan Decl. Exs. C & D.[11]

The issues in both actions are substantially similar and, in fact, a comparison of the two complaints shows a "substantial number of allegations" in the Complaint against Jump Defendants were "cut and pasted" from the Nevada complaint. *Jiangmen Kinwai Furniture Decoration Co. v.*

---

[11] As noted above, the Court may properly take judicial notice of the Nevada Action complaint, civil docket, and court order on this motion. *See Jiangmen Kinwai*, 719 Fed. App'x at 558 (quotations and citation omitted) (affirming dismissal under the first-to-file rule); *cf. Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004) (a court may properly consider material extrinsic to the pleadings on a Rule 12(b)(3) motion).

18

*Int'l Mkt. Ctrs., Inc.*, No. 2:15-cv-1419 JCM (PAL), 2016 WL 697112, at *4 (D. Nev. Feb. 18, 2016).  In both actions, Plaintiffs bring state law contractual or quasi-contractual claims, claims for conversion, unjust enrichment, and unfair business practices.  *Compare* Nev. Compl. ¶¶ 59–100, *with* Compl. ¶¶ 63–98.  They are premised on the same alleged injury and transactions as well as substantially similar alleged occurrences and events.  Plaintiffs purport to represent an identical putative class of UST investors in both actions for losses arising from the same UST redemption orders when the value of UST declined.[12]  Plaintiffs' case against the Jump Defendants essentially repleads facts to attribute liability to the Jump Defendants for what they allege in the Nevada Action were Prime Trust's breaches of an alleged fiduciary duty.  For example, allegations in the Nevada Action about Prime Trust's failure to execute trades are modified here simply to extend liability to the Jump Defendants.  *Compare* Nev. Compl. ¶ 42 ("The wallet systems, for their part, processed the orders, which were then submitted to Prime Trust.  Prime Trust did not complete the transactions . . . .  In fact, Prime Trust refused to complete the transactions at all."), *with* Compl. ¶ 47 (identical paragraph except to allege "Prime Trust was unable to complete the transactions" purportedly because of the Jump Defendants).[13]  The issues are indisputably similar and the claims nearly identical.

There is also substantial party similarity here.  Parties are "substantially similar" under the first-to-file rule "if they represent the same interests."  *Variscite, Inc. v. City of Los Angeles*, No. 2:22-cv-08685-SPG-SK, 2023 WL 3493557, at *11 (C.D. Cal. Apr. 11, 2023) (quoting *Aqua Connect, Inc. v. SHI Int'l Corp.*, No. CV 19-05662-AB (JPR), 2019 WL 8883452, at *3 (C.D. Cal. Dec. 16, 2019)).  This factor "does not require exact identity of the parties."  *Kohn Law Grp.*, 787 F.3d at 1240 (citations omitted).  As noted above, Plaintiffs seek to represent an identical class of

---

[12] *Compare* Nev. Compl. ¶ 51 ("All persons who placed orders to sell . . . [UST] on or after May 9, 2022, that were routed to Prime Trust, but that were not processed or settled by Prime Trust at UST's market value at the time they were placed"), *with* Compl. ¶ 55 ("All persons who placed orders to sell UST on or after May 9, 2022, that were routed to Prime Trust, but that were not processed at the price of UST at the time of order.").

[13] As yet another example, Plaintiffs allege in the Nevada Action that Prime Trust "blam[ed]" its failure to execute UST sell orders on a "liquidity provider."  Nev. Compl. ¶¶ 8, 47.  In the case against the Jump Defendants, Prime Trust's statements about a "UST liquidity provider" are used to allege that the Jump Defendants are liable for Plaintiffs' harms.  Compl. ¶¶ 47–50, 51 ("The anonymous 'liquidity provider' . . . was eventually revealed through investigation to be Jump. This relationship, and the agreement it was based on, were kept secret until June 2023.").

plaintiffs in both their Nevada Action and the action filed against Defendants, which satisfies this element as to plaintiffs in putative class actions. *See, e.g.*, *Ruff v. Del Monte Corp.*, No. 12–05251 JSW, 2013 WL 1435230, at *3 (N.D. Cal. Apr. 9, 2013).  In addition, in the Nevada Action, Plaintiffs lodged claims against Prime Trust and additional John Doe defendants asserting that they have allegedly "proximately caused" their damages from failed efforts to sell UST during the market collapse.  Nev. Compl. ¶ 13.  The defendants in the Nevada Action and Jump Defendants therefore represent the same interests and defense—Plaintiffs' losses on unredeemed UST holdings were not "proximately caused" by any obligation to exchange UST for dollars but as a result of economic conditions.

Because each of the factors is met, the first-to-file rule applies (even if the first-filed action is not a proper forum or itself lacks jurisdiction).  *See, e.g.*, *DocuSign, Inc. v. Clark*, No. 21-cv-04785-WHO, 2022 WL 225623, at *6 (N.D. Cal. Jan. 25, 2022) (collecting decisions within this District which reject arguments by a party objecting to application of the rule by asserting that the first-filed action is in an improper venue); *Intersearch Worldwide, Ltd. v. Intersearch Grp., Inc.*, 544 F. Supp. 2d 949, 958, 962 (N.D. Cal. Mar. 19, 2008) (rejecting argument that the rule should not apply because the first-filed action lacks personal jurisdiction over party objecting to application of first-to-file rule).  Under the circumstances, the proper remedy is dismissal.  Plaintiffs' strategic initiation of a new lawsuit in a different forum, apparently intended to evade the bankruptcy stay in Nevada, is precisely the kind of "gamesmanship" that the first-to-file rule was meant to prevent. *Jiangmen Kinwai*, 719 Fed. App'x at 558 (quoting *Kohn Law Grp.*, 787 F.3d at 1240).  Plaintiffs assert that they discovered that Prime Trust's "liquidity provider" was "Jump" in June of 2023. Compl. ¶ 51.  But, even though at that time the Nevada Action had not yet been stayed, Plaintiffs did not seek to amend their Complaint to attempt to add the Jump Defendants to that action. Plaintiffs instead filed a separate action on behalf of the same putative class in a different forum two years later.  Those circumstances strongly suggest that this duplicative action is a thinly veiled attempt to avoid the bankruptcy stay and revive the same claims in a different action.  Such tactics, which "multiply[] court proceedings" and "increas[e] court costs," are all reasons that dismissal is

1  warranted. *Jiangmen Kinwai*, 719 Fed. App'x at 558.

2      **C.**     **THE COURT MUST, IN THE ALTERNATIVE, COMPEL PLAINTIFFS TO**

3          **ARBITRATE**    **BECAUSE**    **ANY**    **POTENTIALLY**    **APPLICABLE**

4          **AGREEMENT GOVERNING THE DISPUTE REQUIRES ARBITRATION**

5      The agreements alluded to in the Complaint show that Jump Trading and Jump Crypto are

6  not even a party to the contracts Plaintiffs seek to enforce and that, in any event, no Jump-related

7  entity ever contractually bound itself to provide liquidity as alleged. *See* TFL Loan Agreements;

8  Prime Trust Account Agreement; and Prime Trust OTC Trading Agreement. Regardless, those

9  same agreements all contain arbitration clauses. Thus, to the extent the case is not dismissed for its

10 patent jurisdictional or venue defects, the Court should compel Plaintiffs to arbitrate their claims.

11     *First*, each agreement has a mandatory arbitration provision that incorporates a clear and

12 unmistakable "delegation" clause providing that gateway arbitrability questions are for the arbitrator

13 (not the Court) to decide. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019)

14 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not

15 override the contract.").

16     *Second*, even if this Court were to decide the gateway arbitrability questions on the merits,

17 Plaintiffs are estopped from evading arbitration under the agreements that they seek to enforce

18 against the Jump Defendants. Because the dispute is within the scope of these arbitration provisions,

19 the Court should compel arbitration.

20         **1.**     **The Agreements Require Mandatory Arbitration And Delegate All**

21            **Questions Of Arbitrability To The Arbitrator.**

22     All the agreements contain mandatory arbitration provisions that clearly and unmistakably

23 delegate threshold questions of arbitrability to the arbitrator. Each agreement contains a mandatory

24 arbitration provision requiring resolution by arbitration administered by the AAA under its rules:

25       •    Section XI, Master Loan Agreement.

26          "[A] dispute aris[ing] out of or relat[ing] to this Agreement, or the breach thereof . . .
         *. shall be finally resolved by binding arbitration . . . by the American Arbitration*

27          *Association under its Commercial Arbitration Rules.*"

28       •    Section 16, Prime Trust Account Agreement.

"Any claim or dispute arising under this Agreement may only be brought in arbitration . . . *pursuant to the rules of the American Arbitration Association.*"

- Section 18(b), Prime Trust OTC Trading Agreement.

"[A]ll claims or controversies arising out of or relating to this agreement, or the breach thereof, or in any way arising out of or relating to the transactions . . . shall be settled by arbitration . . . *administered by the American Arbitration Association in accordance with its commercial arbitration rules.*"

Courts throughout the country consistently find that similar arbitration provisions that incorporate the AAA rules, including the Commercial Rules, provide clear and unmistakable evidence of an intent to delegate arbitrability issues to the arbitrator. *See, e.g.*, *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) ("[V]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" (citation omitted).); *cf. Henry Schein*, 586 U.S. at 66 ("The rules of the American Arbitration Association provide that arbitrators have the power to resolve arbitrability questions.").[14]  This is because Rule 7(a) of the AAA Commercial Rules gives the arbitrator the power to rule on "any objections with respect to the existence, scope, or validity of the arbitration agreement *or to the arbitrability* of any claim or counterclaim, without any need to refer such matters first to a court."  AAA Commercial Rule 7(a) (emphasis added).[15]

Upon such a finding of intent to delegate arbitrability, the only remaining question for the Court to decide is whether the agreements themselves are valid.  *See Henry Schein,* 586 U.S. at 69 ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." (citations omitted)).  Here, Plaintiffs concede that the agreements (of which the arbitration provisions are a part) are valid because they seek to enforce them against the Jump Defendants.  Because there is a valid arbitration agreement delegating arbitrability questions to an arbitrator, the Court need not, and is not empowered to, consider gateway questions of arbitrability,

---

[14] *See, e.g.*, *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1199 (9th Cir. 2024) ("incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability") (quoting *Brennan*, 796 F.3d at 1130).

[15] The AAA Commercial Rules are also incorporated into the Prime Trust Account Agreement because it is a commercial contract, and no other AAA rules are applicable.  *See Nguyen v. OKCoin USA Inc.*, No. 22-cv-06022-KAW, 2023 WL 2095926, at *4 (N.D. Cal. Feb. 17, 2023) (rejecting argument that delegation is unclear because the "AAA maintains 56 different sets of active rules" and applying consumer AAA rules to consumer contract dispute).

including questions of enforcement against non-signatories, and whether the scope of the arbitration provisions cover this dispute. *See Henry Schein,* 586 U.S. at 68–69; *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029–30 (9th Cir. 2022) (stating that "[t]he presence of a delegation clause further limits the issues that a court may decide" and "all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance").[16] The Court should accordingly compel arbitration.

### 2. Plaintiffs Are Estopped From Avoiding Arbitration.

As demonstrated above, the Court lacks the power to determine whether the scope of the various arbitration provisions obligate Plaintiffs to arbitrate their claims. But if this Court were to take on the arbitrator's role of assessing the scope, then this Court should find that Plaintiffs must arbitrate. That is because Plaintiffs are estopped from avoiding arbitration under the TFL Loan Agreements and Prime Trust Account and OTC Agreements, which Plaintiffs, although non-signatories, purport to seek to enforce under a third-party beneficiary theory. Under federal law (or any potentially applicable state law), equitable estoppel applies here to estop Plaintiffs from resisting arbitration.

As a threshold matter, federal common law applies to assess the arbitrability questions of scope or enforceability of the arbitration provisions in the TFL Loan Agreements because the signatories to these commercial agreements are not citizens of the United States, and therefore the agreements fall under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").[17] *See* 9 U.S.C. § 202 (arbitration agreement arising out of

---

[16] *See, e.g., Casa Arena Blanca LLC v. Rainwater by Est. of Green*, No. 21-2037, 2022 WL 839800, at *3 (10th Cir. Mar. 22, 2022) (concluding that contract was formed between signatories and issue of whether agreement could be enforced against nonsignatory was a question for the arbitrator); *Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021) (finding whether nonsignatory could enforce arbitration clause was an issue delegated to the arbitrator because "[w]hether a nonsignatory can enforce the arbitration agreement is a question of the enforceability of the arbitration clause, as to that defendant" (citation omitted)); *Apollo Comput., Inc. v. Berg*, 886 F.2d 469, 472–74 (1st Cir. 1989) (finding arbitrator must resolve whether assignment of right to arbitrate was valid); *Isernia v. Danville Reg'l Med. Ctr., LLC*, No. 4:22-cv-00022, 2022 WL 4076113, at *5, *7 n.5 (W.D. Va. Sept. 6, 2022) (concluding that "an arbitrator . . . must decide whether [nonsignatories] . . . can enforce [the] arbitration provision . . . under either a theory of equitable estoppel or as third-party beneficiaries").

[17] *See Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021) ("In cases involving the New York Convention, in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement, we apply 'federal substantive law,' for which we look to 'ordinary contract and agency principles'" (citations omitted).); *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 709 (N.D. Cal. 2024), *aff'd*, No. 24-2489, 2025 WL 215519 (9th

23

1    commercial agreement falls under New York Convention unless it "is entirely between citizens of

2    the United States" and does not reasonably relate to one or more foreign states); *see also, e.g.*,

3    *MouseBelt Labs Pte. Ltd. v. Armstrong*, 674 F. Supp. 3d 728, 734 (N.D. Cal. 2023).  Compl. ¶ 2

4    (TFL is Singapore-based); Hinerfeld Decl. ¶ 9 (TMSL incorporated under laws of the Cayman

5    Islands).  While federal common law also applies to TMSL's agreements with Prime Trust, the

6    Court need not in any event make a choice-of-law determination as to those contracts.  All potential

7    forum laws (federal common law, California, Nevada, and New York) on equitable estoppel

8    standards require Plaintiffs, non-signatories, to arbitrate pursuant to the agreements that they

9    themselves seek to enforce.[18]

10        Plaintiffs are estopped from claiming that their non-signatory status allows them to evade

11   arbitration under the "Subject Contracts."  Equitable estoppel "precludes a party from claiming the

12   benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes."

13   *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (quoting *Wash. Mut. Fin. Grp., LLC v.

14   Bailey*, 364 F.3d 260, 267 (5th Cir. 2004) (federal common law)).  A non-signatory may be

15   compelled to arbitration when they seek to "enforce the terms of the [underlying] agreement] [or]

16   otherwise take advantage of them."  *Id.* at 1102; *see also Teleport Mobility, Inc. v. Sywula*, No. 21-

17   cv-00874-SI, 2021 WL 2291807, at *2 (N.D. Cal. June 4, 2021) (applying California law to estop a

18   non-signatory who knowingly exploits a contract containing arbitration clause).[19]

19        Here, because they are seeking to benefit from the very agreements that contain the

20   arbitration provisions, Plaintiffs cannot evade arbitration by claiming non-signatory status.  *Comer*,

21

22   _____

23   Cir. Jan. 16, 2025) (applying federal substantive law where the arbitration agreement is governed by the New York
     Convention).  And even where all claims are brought under state law, "federal substantive law [still] governs the

24   arbitrability question in this action brought under the New York Convention given 'the need for uniformity in the
     application of international arbitration agreements.'"  *DotC United, Inc. v. Google Asia Pac. Pte. Ltd.*, No. 22-cv-04990-
     JSC, 2023 WL 3202663, at *3 (N.D. Cal. May 1, 2023) (citation omitted).

25   [18] *See* Prime Trust OTC Trading Agreement § 18 (New York law); Prime Trust Account Agreement § 16 (Nevada law).

26   [19] *See also, e.g.*, *U.S. Home Corp. v. Lanier*, 431 P.3d 38, No. 68692, 2018 WL 6264809 (Nov. 28, 2018) (under Nevada
     law, non-signatory compelled to arbitrate despite no signed document produced where they asserted breach of contract);

27   *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999) (applying direct-benefit estoppel to
     compel a non-signatory to arbitrate); *Belzberg v. Verus Invs. Holdings Inc.*, 21 N.Y.3d 626, 630 (2013) (explaining New

28   York courts have applied direct-benefits test derived from federal law).

436 F.3d at 1101. "The ability to sue for breach of a contract to which one is allegedly not a party is as direct a benefit as [a court] can envision." *OSRX, Inc. v. Anderson*, No. 23-1252, 2025 WL 1430648, at *5 (4th Cir. May 19, 2025) (federal common law and noting California law is consistent). Although Plaintiffs do not attach the "Subject Contracts," given the contents of the Complaint, the Subject Contracts appear to be the TFL Loan Agreements and Prime Trust Agreements. *See* Section II.C, *supra*.[20] Plaintiffs claim a right to enforce those agreements, despite being a non-signatory to them, under an explicit third-party beneficiary theory. Compl. ¶¶ 63–69 (asserting that Plaintiffs are "third-party beneficiaries of the Subject Contracts"). Because Plaintiffs "maintain[] that other provisions of the same contract should be enforce[d] to benefit them," they may not avoid the burden of arbitration that these same agreements impose. *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000).

Nor can Plaintiffs "draw a line" by claiming they are not equitably estopped with respect to their non-contractual claims. *See OSRX, Inc.*, 2025 WL 1430648, at *5. Here, "[w]ithout the underlying [agreements], Plaintiffs would have "no ground upon which to complain." *Id.* Plaintiffs' conversion, unjust enrichment, civil theft, and unfair business practices claims all presume that Defendants were contractually required to provide funding for UST investors' sell orders—but nevertheless "never filled" such orders and "refused to make such funds available," Compl. ¶ 72 (conversion); that they "refus[ed] to execute the transactions ordered by Plaintiffs," *id.* ¶ 79 (unjust enrichment); that they allegedly infringed on some purported "right" of Plaintiffs to receive "funds held" in the Jump Defendants' accounts, *id.* ¶¶ 90–91 (civil theft); and that they "fail[ed] to reimburse losses," *id.* ¶¶ 95–97 (unfair business practices). Each of these claims depends on the existence of the same obligation, which Plaintiffs assert is found in these agreements. Compl. ¶ 39. While Plaintiffs may not ultimately be able to bootstrap their purported breach of contract claim into other claims, "[a]t the end of the day," because Plaintiffs "claims stem from [Defendants']

---

[20] Plaintiff cannot resist arbitration here on unsupported factual assertions that other agreements (written or oral) may exist. *See Franklin v. HealthSource Glob. Staffing, Inc.*, No. 23-cv-0662-AGS-DEB, 2024 WL 1055996, at *9 (S.D. Cal. Mar. 11, 2024) (rejecting argument that the "hypothetical existence of other agreements" should defeat enforcement of a squarely applicable arbitration agreement). In any event, to the extent Plaintiffs rely on their pleadings to allege the existence of other contracts, those assertions are implausible as set forth *infra* Section III.D.1.

purported breach," they are equitably estopped with respect to each of them.  *See OSRX, Inc.*, 2025 WL 1430648, at *5.[21]

### 3.    This Dispute Squarely Falls Within The Scope Of The Agreements' Arbitration Clauses.

Although the delegation provision properly delegates to the arbitrator the authority to resolve any dispute about the scope of those arbitration provisions, even were this Court to reach this question itself, it should conclude that the dispute is within the scope of the arbitration provisions of all of the agreements.

The Master Loan Agreement and the Prime Trust OTC Agreement each contain expansive arbitration clauses that cover disputes "arising out of or relating to" the contracts.[22]  *See Zoran Corp. v. DTS, Inc.*, No. C 08-4655 JF (HRL), 2009 WL 160238, at *2 (N.D. Cal. Jan. 20, 2009); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967) (calling "broad" an arbitration clause covering disputes "arising out of or relating to this Agreement").  The arbitration provision in the Prime Trust Account Agreement applies to "[a]ny claim or dispute arising under this Agreement," *see id.* ¶ 16, which is likewise interpreted as a broad arbitration clause warranting a presumption favoring arbitration.  *See, e.g., Coast Plaza Drs. Hosp. v. Blue Cross of Cal.*, 99 Cal. Rptr. 2d 809, 815 (Ct. App. 2000) (characterizing contractual language requiring arbitration of "*any problem or dispute*" arising under or concerning the terms of the agreement as "very broad"); *see also EFund Cap. Partners v. Pless*, 59 Cal. Rptr. 3d 340, 353 (Ct. App. 2007) (explaining all federal circuit courts broadly construe "arising under" language in arbitration provisions).  Accordingly, the factual allegations in the complaint "need only 'touch matters' covered by the contract . . . and all

---

[21] Moreover, the fact that Plaintiffs sued the wrong Jump entity is almost certainly a deliberate attempt to avoid their obligation to arbitrate.  The Complaint itself refers to the SEC trial against TFL, *see* Compl. ¶ 52, and the SEC has published the July 2021 Loan Confirmation identifying TMSL as the relevant Jump subsidiary entity.  *See* Pls. Tr. Ex. 69(b), *available at* https://www.sec.gov/files/terraform-trial-exhibit-p-69b.pdf.  They therefore knew which entity to sue if they had a claim.  The only obstacles were the arbitration provision in the TFL Loan Agreements and the fact that the contracts provide no basis for, and, in fact, contradict Plaintiffs' fundamental breach of contract claim.  Equity does not countenance such unjust behavior.

[22] *See* Master Loan Agreement, ¶ XI ("[A] dispute aris[ing] out of or relat[ing] to this Agreement, or the breach thereof . . ."); Prime Trust OTC Trading Agreement, ¶ 18(b) ("[A]ll claims or controversies arising out of or relating to this agreement, or the breach thereof, or in any way arising out of or relating to the transactions . . .").

1  doubts are to be resolved in favor of arbitrability." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721

2  (9th Cir. 1999) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614,

3  624 n.13 (1985)).

4       Here, Plaintiffs' allegations surely "touch matters" cover by the agreements with TFL and

5  Prime Trust. *See, e.g.*, Compl. ¶¶ 64, 66, 69. Plaintiffs' contractual claim and their bootstrapped

6  tort and common law claims  all center on their purported theory that they should benefit from some

7  obligation owed by Defendants founded in these agreements. *See supra* Section III.C.2. As alleged

8  in the Complaint, these claims are therefore "intimately related to the contract and its

9  performance"—none of these claims would have arisen but for the alleged contractual obligation,

10  and they depend on the actual agreements and the asserted obligations to perform under them.

11  *Hopkins & Carley, ALC v. Thomson Elite*, No. 10-cv-05806-LHK, 2011 WL 1327359, at *5–7 (N.D.

12  Cal. Apr. 6, 2011). Plaintiffs' tort and common law claims therefore do not constitute an

13  independent wrong from any breach of the agreements. *Id.* Accordingly, each of Plaintiffs' claims

14  require reference to the purported contractual obligations founded in these contracts.

15       In sum, to the extent the Court does not dismiss the action, it should compel Plaintiffs to

16  arbitrate their lawsuit and stay the action. *See* 9 U.S.C. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 476

17  (2024) (the "plain statutory text [of FAA § 3] requires a court to stay the proceeding").

18      **D.**    **TO THE EXTENT THE COURT DOES NOT COMPEL ARBITRATION,**

19               **THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A**

20               **CLAIM UNDER RULE 12(B)(6)**[23]

21       This Court neither has personal jurisdiction over the Defendants, nor is it the appropriate

22  forum for this dispute. However, to the extent the Court reaches the legal sufficiency of the pleading,

23  Plaintiffs' claims must be dismissed for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). "To

24  survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to

25  'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl.*

26

27  [23] The Jump Defendants expressly reserve all rights to assert other failure-to-state-a-claim defenses not asserted
here. *See* Fed. R. Civ. P. 12(h)(2); *see also In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 317–18 (9th Cir. 2017),

28  *aff'd sub nom. Apple Inc. v. Pepper*, 587 U.S. 273 (2019).

1  *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In assessing the sufficiency of the Complaint, the

2  Court is not required to accept as true "allegations that are merely conclusory, unwarranted

3  deductions of fact, or unreasonable inferences."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

4  988, 1008 (9th Cir. 2018) (citation omitted).

5          **1.      Plaintiffs' Third-Party Beneficiary Breach Of Contract Claim Should Be**

6                  **Dismissed.**

7          Plaintiffs' third-party beneficiary breach of contract claim should be dismissed.  *First*,

8  Plaintiffs fail to allege that the Jump Defendants are the specific "parties" that breached the

9  purported contractual obligations.  *Second*, Plaintiffs fail to allege specific facts or identify any

10  specific contractual terms from the contracts they allege on "information and belief" are "written"

11  to plausibly impose any obligation on the Jump Defendants to provide liquidity.  Compl. ¶ 69.[24]

12  *Third*, the actual agreements corresponding to the "Subject Contracts" contain no such obligations

13  and establish that the allegations of the Complaint are implausible.  *Fourth*, even assuming there

14  were some obligation on "Jump" in the agreements to provide liquidity for all UST redemption

15  orders, Plaintiffs have not pleaded sufficient facts to establish their third-party standing to enforce

16  them.

17          **a.  The Jump Defendants Are Not Parties To The Subject Contracts And,**

18              **Therefore, Could Not Have Breached Them.**

19          As a threshold matter, neither Jump Defendant is even a party to the Subject Contracts

20  referenced in the Complaint.  Rather, those contracts are (variously) between TFL, Prime Trust, and

21

22  _____

23  [24] While Plaintiffs appear to allege that California law is applicable, *see infra* Section III.D.1(d), to the extent they dispute the applicable choice of law with respect to any of the alleged agreements at issue, fundamental contract principles require an adequately alleged obligation and breach.  *See, e.g.*, *Whitesides v. E\*TRADE Sec., LLC*, No. 20-

24  cv-05803-JSC, 2021 WL 2590156, at \*3 (N.D. Cal. June 24, 2021) (under New York law, failure to allege plausible existence of contractual terms that were allegedly breached by defendant's conduct where plaintiff did not establish how

25  "E\*TRADE'S trading system failure … was a breach of either provision" in agreement attached to complaint); *Ewert v. eBay, Inc.*, 602 Fed. App'x 357, 359 (9th Cir. 2015) (affirming 12(b)(6) dismissal of breach of contract claim under

26  California law due to inadequately alleged contractual provision that was breached) (citing *Hamilton v. Greenwich Invs. XXVI, LLC*, 126 Cal. Rptr. 3d 174, 183–84 (Ct. App. 2011)); *Davenport v. GMAC Mortg.*, 129 Nev. 1109, No.

27  56697, 2013 WL 5437119, at \*6 (Sep. 25, 2013) (failure to allege breach of contract where plaintiff did not identify what contract was allegedly breached, alleging instead he "had one or more contracts with . . . Lender, orally and/or in

28  writing," nor did he "identify what provisions of these alleged contracts were breached").

TMSL (which is an affiliate of the Jump Defendants but which Plaintiffs have chosen not to sue). For this reason alone, the breach of contract claim must be dismissed. *See United Comput. Sys., Inc. v. AT & T Corp.*, 298 F.3d 756, 761 (9th Cir. 2002) ("[O]nly a signatory to a contract may be liable for any breach" (citation omitted)).

### b. Plaintiffs Fail To Allege Breach of Any Contractual Term.

Plaintiffs also fail to allege the breach of any contractual term. Plaintiffs claim that the Jump Defendants were supposedly obligated to provide "liquidity" to Prime Trust whenever a UST investor initiated a transaction to convert their UST into US dollars. Compl. ¶ 10 n.1. But the Complaint fails to identify any contractual provision—written or oral—that plausibly establishes this purported obligation.

Plaintiffs generically assert that a set of "Subject Contracts" both "*generally obligated* Jump to provide liquidity of UST," and "*[s]pecifically*," "*obligated Jump* to provide funding for and authorize the execution of investor sell orders." *Id.* ¶¶ 64-65 (emphasis added). But nowhere do Plaintiffs allege the contours of any agreement in which this obligation is based, referring only to a group of "contracts with Prime Trust or with [TFL] or with both entities," *id.* ¶ 64, potentially entered into by the Defendants "[t]hrough various subsidiary arrangements," *id.* ¶ 16. Plaintiffs do not identify any terms or provisions or other factual basis to support the conclusion that the Jump Defendants had an obligation to provide liquidity on demand. Plaintiffs' allegations amount to nothing more than wishful thinking. Wishful thinking is not sufficient to state a claim.

Similarly, the Complaint describes generally that Prime Trust's ability to execute UST sell orders "required Jump's cooperation," *id.* ¶ 7, which entailed "accept[ing] investors' UST" and "permit[ting] Prime Trust to debit U.S. dollars from [Jump's] accounts." *Id.* ¶ 53. Yet again, Plaintiffs have not alleged how or where the Jump Defendants promised them in any form or manner to *always* agree to *cooperate* with Prime Trust or *permit and authorize* the bank to fulfill all UST sell orders so that Prime Trust could fulfill services it owed to Plaintiffs.

Indeed, as explained more fully below, even a cursory review of the agreements shows that they do not, in fact, contain any provision with any of these obligations. *See infra* Section III.D.1(c).

29

1    The failure to identify the contours of the alleged obligation that the Jump Defendants assertedly

2    breached dooms Plaintiffs' claim.  *See Ewert*, 602 Fed. App'x at 359; *Davenport*, 2013 WL

3    5437119, at *6 (allegation that "one of more contracts with . . . Lender, orally and/or in writing"

4    failed to identify "what contract" was allegedly breached or "what provisions of these alleged

5    contracts were breached, much less what breaches were attributable to defendant sued").

6              **c.  The Agreements Referred To In The Complaint Are Devoid Of Any**

7                   **Purported Obligation To Provide Liquidity.**

8              The actual agreements on which the Complaint seemingly relies do not in fact establish any

9    purported liquidity obligation.  Plaintiffs have therefore failed to plausibly allege the requisite

10   breach by either Jump Trading or Jump Crypto.  *Williams v. Visa, Inc.*, No. 24-cv-08708-JST, 2025

11   WL 1518044, at *4 (N.D. Cal. May 28, 2025) (granting motion to dismiss third-party beneficiary

12   breach of contract claim where plaintiff could not identify contractual terms imposing obligation on

13   Visa).  As explained *supra*, the "Subject Contracts" averred in the Complaint appear to be the Prime

14   Trust Account Agreement, the Prime Trust OTC Trading Agreement, and the July 2021 Loan

15   Confirmation whereby TFL loaned 65 million LUNA tokens (which also incorporates a Master Loan

16   Agreement providing for an initial loan of UST), all of which the Court may properly consider on

17   this motion, *see supra* fn. 2.   None of these agreements with Prime Trust and TFL, respectively,

18   contains anything remotely resembling the alleged contractual obligations that Plaintiffs claim that

19   Jump Defendants undertook.   In fact, the provisions in these Agreements conflict with any

20   requirement to provide liquidity at all times and in all amounts.

21             Consider the Prime Trust OTC Trading Agreement: far from obligating TMSL to provide

22   liquidity, this agreement expressly states to the contrary that "***the Parties will have no obligation to***

23   ***enter any Transactions with each other***," and that by way of that agreement, TMSL was also not

24   "***providing any service to [Prime Trust]***."  OTC Trading Agreement § 1 (emphasis added); *see also*

25   *id.* § 5 (transactions were made by each party "***solely for its own respective benefit and not for the***

26   ***purpose of benefiting the other Party***" (emphasis added)).   These provisions are sharply

27   inconsistent with Plaintiffs' alleged theory that Defendants were contractually obligated to act as a

28

                                          30

1    liquidity provider for Prime Trust.  Plaintiffs cannot as a matter of law allege a breach of an

2    obligation under a contract that expressly permits the asserted failure to perform.  *See Coronavirus*

3    *Rep. v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023) (affirming dismissal of breach of contract

4    claim where "the [agreement] specifically states that Apple has 'sole discretion' to approve or deny

5    requests to distribute apps on the App Store").

6         Next, the Prime Trust Account Agreement is likewise devoid of any supposed liquidity

7    obligation, and is, again, clear on its face that any actions with respect to assets in TMSL's account

8    are wholly at TMSL's direction.  *See* Prime Trust Account Agreement § "2. Self-Directed

9    Investments" ("This Account is a self-directed Account that is managed by Account Holder and/or

10   Account Holder's Agents"); *see also id.* § 1 (TMSL "appoint[ed] Prime Trust to be custodian of and

11   to hold or process ***as directed*** all" assets in the account (emphasis added)).  Under this agreement

12   as well, Plaintiffs cannot plausibly allege that Defendants failed to "permit" or "authorize" Prime

13   Trust to access TMSL's account to complete Plaintiffs' UST transactions.  *See id.*

14        Finally, the TFL Loan Agreements are also bereft of any provisions even bordering on any

15   obligation to ensure available funds with respect to all transactions to buy and sell UST.  These

16   contracts also reflect standard terms, in this case related to loan arrangements, defining obligations

17   for TMSL's repayment of the loaned UST and LUNA to TFL.  *See* July 2021 Loan Confirmation

18   (LUNA) (repayment USD set at $0.40); *see also* Master Loan Agreement (UST) (repayment USD

19   set at $1.00).  The purported obligation to provide liquidity appears in none of these agreements.  In

20   the absence of a contractual provision obligating the Jump Defendants to provide liquidity, there

21   can be no breach by them.  *See, e.g.*, *Visa*, 2025 WL 1518044, at *4.[25]

22

23

24   ───────────────

     [25] In *Visa*, a plaintiff sought to enforce alleged contracts between Visa and merchants for surcharges imposed on him
25   by various merchants.  *Visa*, 2025 WL 1518044, at *4.  The alleged breach was a failure by Visa to "enforce" its "No
     Surcharge Rule" based on the conclusory assertion that Visa was obligated to "ensure that merchants who accept Visa-
26   branded cards did not impose surcharges on debit transactions."  *Id.*  But the plaintiff there pointed to "no provision of
     the contract imposing that obligation," and the allegations belied that the relevant contractual party in breach were the
27   merchants.  *Id.*  The relevant contract had no "promise" to "enforce the rules at issue" to ensure the plaintiff's services
     with merchants were compliant.  *Id.*  As in *Visa*, none of the agreements Plaintiffs seek to enforce "contain[] any promise"
28   by the Jump Defendants to ensure Prime Trust could execute Plaintiffs' UST sell orders.  *Id.*  Here, too, Plaintiffs
     apparently seek to rely on agreements that do not include such a contractual "liquidity" obligation.

### d.  Any Alleged Breach Of Oral Contract Claim Should Be Dismissed.

Presumably recognizing that the Jump Defendants never undertook the obligations Plaintiffs allege in any written contracts with Prime Trust or TFL, they half-heartedly plead, in the alternative, that the contractual obligations on which they predicate their entire case may have been oral contracts.  Compl. ¶ 69.  But that Hail Mary cannot save their Complaint for at least two reasons.

*First*, Plaintiffs have not alleged any facts concerning the terms of any such oral agreement (including, for example, what additional consideration the Jump Defendants received for this supposed oral commitment that was not already provided for in the written contracts described herein).  This threadbare assertion of a potential oral agreement lacks both factual detail as well as plausibility, *see id.*, particularly because the purported oral obligations directly conflict with the terms of the written contracts as explained above.  It is simply conjectural—wishful thinking in the extreme—which is not sufficient to state a claim.  *See, e.g.*, *ScoreBlue, LLC v. Locum Tele PC*, No. 2:23-cv-00345 WLH-AS, 2024 WL 5372398, at *8 (C.D. Cal. Dec. 9, 2024) (dismissing breach of oral agreement because "Plaintiff has not alleged facts to demonstrate that an oral contract . . . was reasonably certain" (citing *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019))); *De Rocha Express, Inc. v. Combined Res., Inc.*, No. 24-cv-02037-JST, 2024 WL 4504536, at *2 (N.D. Cal. Oct. 15, 2024) (granting motion to dismiss on breach of oral contract claim where complaint was devoid of any facts regarding the terms of the agreement); *Nelson v. Levy*, No. 16-cv-03797-MMC, 2016 WL 6892713, at *5 (N.D. Cal. Nov. 23, 2016).

*Second*, Plaintiffs effectively concede that to the extent the agreement was an "oral contract," the claim would be untimely under the two-year statute of limitations under California law.  *See* Cal. Code. Proc. § 339(1).  In an effort to avoid dismissal for untimeliness, they state that, "[t]o the extent any contractual obligations" were "obligations arising under oral contracts, Plaintiffs seek relief" (seemingly) based on the discovery rule.  Compl. ¶ 69.  Plaintiffs assert that relief is proper because "the *identity*" and the Jump Defendants' "*role as the liquidity provider for UST was a fact* that was not known or, based on reasonable diligence, knowable to Plaintiffs until June 20, 2023." *Id.* (emphases added).  But these assertions do not permit Plaintiffs to rely on the discovery rule.

32

"[T]he discovery rule" only delays the start of a "statute of limitations" until "the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 927 (1988).

The two-year statute of limitations runs from "the discovery of the damage suffered." *Christ v. Lipsitz*, 160 Cal. Rptr. 498, 501 (Ct. App. 1979). In the case at bar, Plaintiffs would have a factual basis for their claim once they suspected that their injury—the losses from their UST holdings—were due to a breach of an obligation to ensure sufficient funds to execute their UST sell orders. Plaintiffs' own allegations confirm they were on notice of the factual basis for their alleged breach of contract claim at the time of their alleged losses in early 2022. The Complaint alleges that, in 2018, Prime Trust—curiously referred to as a "Jump partner company"—stated that "if everybody who owned a stablecoin decided to do a run and liquidate and get their money back, then that should be possible," because "[a]ll of the money should be available." Compl. ¶ 5; Nev. Compl. ¶ (alleging "a senior vice president at the company" said the same). Following the decline in value of UST in early 2022, investors were allegedly instructed by Prime Trust's "customer service representatives" that "they would have to seek resolution from others." Compl. ¶ 49.

Were more needed, Plaintiffs certainly knew of these elements by November 2022, when they filed their class action against Prime Trust, seeking recovery for the same losses in this action. *See supra* Section III.B.2. In that action, Plaintiffs alleged that their injuries were caused by a breach of a duty owed by Prime Trust and that they also knew or suspected that this failure could have been caused by an "unidentified 'UST liquidity provider.'" Nev. Compl. ¶ 47. Thus, Plaintiffs' breach of oral contract claim began to run no later than November 2022—regardless of whether they knew or could not have reasonably discovered the identity of the alleged wrongdoer.

Plaintiffs assert only that the claim should be tolled on the basis that they could not have known the *identity* or Defendants' purported role as Prime Trust's "liquidity provider" until June 20, 2023. Compl. ¶ 69. But the "ignorance of the *identity* of the defendant is not essential to a claim and therefore will not toll the statute." *Gjovik v. Apple Inc.*, No. 23-cv-04597-EMC, 2024 WL 4369656, at *15 (N.D. Cal. Oct. 1, 2024) (quoting *Bernson v. Browning-Ferris Indus.*, 30 Cal. Rptr.

2d 440, 443 (1994)) (emphasis added); *see also Kyko Glob. Inc. v. Bhongir*, No. 20-17526, 2021 WL 4958989, at *1 (9th Cir. Oct. 26, 2021) (affirming dismissal of untimely claim where the plaintiff "knew about its injury . . . when it discovered the fraudulent accounts"). Plaintiffs do not "need to know the exact legal claim" they could "bring against a specific defendant." *Kyko Glob. Inc.*, 2021 WL 4958989, at *1. The discovery rule tolls the statute of limitations only until the plaintiff is on inquiry notice of the *injury*, not until he has gathered all the facts needed to pursue a claim. *See, e.g.*, *Bergstein v. Stroock & Stroock & Lavan LLP*, 187 Cal. Rptr. 3d 36, 57 (Ct. App. 2015) (rejecting plaintiff's claim that "the discovery rule must prevent the statute of limitations from running until [they] had sufficient evidence to support their prima facie case" as "unsupported by any pertinent legal authority"); *see also Grisham v. Philip Morris U.S.A., Inc.*, 151 P.3d 1151, 1156 (2007) ("[S]uspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." (cleaned up)).[26]

Because Plaintiffs were indisputably aware of the purported cause of their injuries by at least November 2022, their alleged breach of oral contract is untimely and should be dismissed with prejudice.

### e.  Plaintiffs Fail To Allege Third Party Beneficiary Standing.

Finally, although Plaintiffs assert that they are third beneficiaries of the "Subject Contracts," *see* Compl. ¶ 66, they also fail to allege sufficient facts to establish third party beneficiary standing. A contract cannot be enforced by third parties who are "only incidentally or remotely benefitted" by the contract they seek to enforce. *Cummings v. Cenergy Int'l Servs., LLC*, 258 F. Supp. 3d 1097,

---

[26] Even were the exact identity of Prime Trust's purported liquidity provider considered an essential element of their breach of contract claim, Plaintiffs fail to "specifically plead facts to show . . . the inability to have made earlier discovery despite reasonable diligence." *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920–21 (2005) (cleaned up). When a plaintiff receives enough information to suspect wrongdoing prior to filing suit, a plaintiff is "required to conduct a reasonable investigation" and is imputed with knowledge that would have been revealed by the investigation. *Id.* at 920. Plaintiffs' conclusory allegations on this front fail to allege why between November 2022 and June 2023 they were unable to make an earlier discovery. At most, the Complaint alleges that the "relationship, and the agreement it was based on, were kept secret" until the identity was disclosed "for the first time in response to regulatory investigations and litigation demands." Compl. ¶ 51. But in the same paragraph, Plaintiffs inconsistently assert that Prime Trust's liquidity provider was previously "identified in its statements to regulators," which was later then "eventually revealed through investigation to be Jump." *Id.* Nowhere do Plaintiffs allege why or how the first disclosure to regulators should not be imputed to Plaintiffs, nor what reasonable efforts were taken after it.

34

1  1110 (E.D. Cal. 2017) (citing *Lucas v. Hamm*, 364 P.2d 685, 688-89 (1961)).[27]

2          Plaintiffs have not alleged that the alleged contractual counterparties—here, "Jump," TFL,

3  or Prime Trust—"intended to benefit the third party" through "terms of the contract" that "make

4  that intent evident." *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1161 (9th Cir. 2010).  Just as Plaintiffs

5  fail to describe any contractual obligation founded in the provisions of any agreement, they have

6  also not sufficiently alleged any contractual terms suggesting any agreement was made to benefit

7  them.  Rather, the Complaint's allegations concerning the "intent and motivating purpose" of the

8  "Subject Contracts" are "legal conclusions that merely parrot the language" for third-party

9  beneficiary status and "fail to plausibly demonstrate" the intent of any single alleged agreement.

10 *SiFi Networks Fullerton, LLC v. Berkshire Hathaway Specialty Co.*, No. 8:23-cv-01417-FWS-JDE,

11 2025 WL 1544099, at *18 (C.D. Cal. Apr. 25, 2025) ("[a]bsent any contractual language,"

12 conclusory allegations of third party beneficiary status "fail[ed] to plausibly demonstrate"

13 agreement intended to benefit plaintiff).  Moreover, none of the agreements referred to in the

14 Complaint reflects any intent to benefit UST investors by their terms: they are commercial contracts,

15 make no mention of UST investors, and do not suggest (explicitly or otherwise) any creation of a

16 third-party interest.  *See* Section II.C.  Plaintiffs cannot "bypass[] the language of the agreements,

17 identifying no provision evidencing an intent to benefit" them, and without "deriving the alleged

18 purpose without reference to any terms."  *SiFi Networks Fullerton*, 2025 WL 1544099, at *18.

19          In sum, Plaintiffs fail to adequately allege a breach of either a written or oral contract by the

20 Jump Defendants and their third-party standing.  The third-party beneficiary breach of contract

21 claim must therefore be dismissed.

22          **2.      Plaintiffs' Remaining State And Common Law Claims Should Be**

23                    **Dismissed.**

---

[27] To the extent Plaintiffs argue that the Court should apply the law identified in the Prime Trust Agreements, as opposed to California state law, those refer to Nevada and New York law, which are all consistent.  *See Wyatt v. Bowers*, 747 P.2d 881, 882–83 (1987) (*citing Lipshie v. Tracy Invs. Co.*, 566 P.2d 819 (1977)) (Nevada law) ("[T]hird-party beneficiaries are only entitled to seek remuneration if it can be clearly discerned" that the contracting parties intended to benefit the third party when the agreement was formed—incidental beneficiaries lack the right to claim relief.); *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014) ("It is ancient law in New York . . . that to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed." (citation omitted)).

Plaintiffs' remaining claims for conversion (Count II), unjust enrichment (Count III), civil theft (Count IV), and Unfair Business Practices ("UCL") (Count V) all rest on the existence of a purported contractual obligation or duty to provide liquidity, which they have insufficiently pleaded and should be dismissed on that basis. *See supra* Section III.D.1. They should be dismissed for the additional reasons that (1) their claims under California law are impermissibly extraterritorial and (2) they fail to allege the law applicable to their common law claims.

### a. Plaintiffs' Civil Theft And UCL Claims Are Impermissibly Extraterritorial And Should Be Dismissed With Prejudice.

Plaintiffs—including two non-residents—purport to assert California state law claims (civil theft under the California Penal Code and unfair business practices under the California Business and Professions Code) on behalf of a nationwide class, without alleging any challenged conduct occurring in or arising out of the state. *See supra* Section III.A. The California Supreme Court has made clear that there is a strong presumption against the extraterritorial application of California law. *See Sullivan v. Oracle Corp.*, 254 P.3d 237 (2011). And as this Court has held, this presumption applies with respect to California statutory claims as well as to intentional tort claims under California law brought by non-residents. *See Hill v. Workday, Inc.*, No. 23-cv-06558, 2025 WL 948006, at *13 (Kang, J.) (N.D. Cal. Mar. 28, 2025); *see also Dfinity USA Rsch. LLC v. Bravick*, No. 22-cv-03732-EJD, 2023 WL 2717252, at *5 (N.D. Cal. Mar. 29, 2023) (concluding California legislature did not intend for section 496 civil penalties claim based on alleged theft and conversion to have extraterritorial reach). Where, as here, a pleading fails to provide any basis at all for extraterritorial application of California law, a claim may be appropriately dismissed on these grounds. *See Hill*, 2025 WL 948006, at *13.

The Court should dismiss (1) the civil theft and UCL claims of the non-resident Plaintiffs and (2) all class claims brought on behalf of a nationwide class. The UCL and civil theft claims brought by the two non-resident Plaintiffs must be dismissed. The factors considered in assessing extraterritoriality of a plaintiff's UCL claim focus on whether alleged unlawful conduct occurred in California, and here, no forum-related conduct is alleged: Defendants are located outside of the

forum, and there are no allegations that non-resident Jump Trading and Jump Crypto's "decisions and actions" concerning the challenged conduct "were made in California." *See Visa*, 2025 WL 1518044, at *6 (non-resident bringing UCL claim has no standing due to extraterritorial application even where plaintiff generically alleged "decisions and actions" occurred in the forum); *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025 (N.D. Cal. Jan. 9, 2013) (same).   For these same reasons, Plaintiffs have likewise failed to allege sufficient facts to permit extraterritorial application of California's civil theft and penalties statutes.   The alleged "wrongful withholding" of funds purportedly occurred in connection with Defendants' failure to permit Prime Trust to debit its account, none of which is alleged to have occurred in California.   *See Dfinity USA Rsch. LLC*, 2023 WL 2717252, at *5 (dismissing civil penalties claim based on alleged theft and conversion because the "basis for the claim—*i.e.*, the wrongful withholding of [plaintiff's] equipment—took place solely in Michigan").

        The Court should also dismiss Plaintiffs' California law class claims on these grounds. Courts in this District dismiss claims brought on behalf of a nationwide class—prior to class certification—where, as here, the pleadings reveal on their face that they cannot be maintained because they are impermissibly extraterritorial.   *See, e.g.*, *Wilson v. Frito-Lay North America, Inc.*, 961 F. Supp. 2d 1134, 1147 (N.D. Cal. 2013) (on Rule 12(b)(6) motion, dismissing with prejudice California law claims brought by plaintiffs on behalf of a "nationwide putative class of consumers" based on presumption against extraterritoriality).   Non-California residents' claims are foreclosed because, again, "none of the alleged misconduct or injuries occurred in California." *Id.* (quotations omitted) (addressing UCL and other statutory claims).   The Complaint's sparse allegations about forum contact, as explained *supra* Section III.A, "amount to nothing more than conclusions of law without any supporting facts." *Wilson*, 961 F. Supp. 2d at 1148.   It is therefore not plausible that any "unlawful conduct emanated" from California, and the mere possibility that any suit-related conduct occurred in the forum does not create a plausible inference to withstand dismissal. *Cannon*, 917 F. Supp. 2d at 1056 (collecting cases).   These nationwide class claims therefore fail "as a matter of law" because "nothing" in the pleadings suggest any challenged conduct was "directed from

California or had anything to do with California. *See id.*

### b. Plaintiffs' Remaining Common Law Claims Must Also Be Dismissed.

Plaintiffs' remaining claims for conversion and unjust enrichment must also be dismissed.[28] Courts in the Ninth Circuit repeatedly hold that the "failure to allege which state law governs a common law claim is grounds for dismissal." *Romero v. Flowers Bakeries, LLC*, No. 14-cv-05189-BLF, 2016 WL 469370, at *12 (N.D. Cal. Feb. 8, 2016) (collecting cases). The failure to allege governing state law prevents this Court from adjudicating whether the class claims are adequately pleaded. *See Kavehrad v. Vizio, Inc*., No. 8:21-cv-01868-JLS-DFM, 2022 WL 16859975, at *3 (C.D. Cal. Aug. 11, 2022) (citing *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1101 (N.D. Cal. 2007)) (dismissing class claims on behalf of nationwide class for failure to allege state law). Because Plaintiffs' common law causes of action are "not asserted under" any state law, and the Complaint is utterly devoid of any jurisdictional facts concerning any alleged conduct, they cannot be adequately assessed or defended against. *See Kavehrad*, 2022 WL 16859975, at *3. The Court should not permit Plaintiffs to proceed on an extraordinarily broad (and uncertifiable) nationwide class definition without specifying what laws they purport to apply to their class. Plaintiffs' common law claims should therefore be dismissed.

### E. THE COURT SHOULD STAY DISCOVERY PENDING RESOLUTION OF DEFENDANTS' MOTIONS

The Court has already adjourned the initial case management conference and other deadlines in the Court's scheduling order. *See* Dkt. No. 14. The Court should grant a stay of discovery during the period that Defendants' motions are pending. Defendants' motions are each dispositive of the case and may be decided absent discovery, satisfying the District's two-pronged inquiry in support of a discovery stay pending these motions. *See Reveal Chat Holdco, LLC v. Facebook, Inc.*, No. 20-cv-00363-BLF, 2020 WL 2843369, at *2 (N.D. Cal. Apr. 10, 2020). Moreover, the fact that Defendants have moved to dismiss based on the lack of the power of this Court to adjudicate this

---

[28] To the extent the Court does not dismiss the third-party beneficiary claim for reasons stated *supra* Section III.D.1, it should dismiss this claim on this alternative basis.

case (due to a lack of personal jurisdiction and to an obligation to arbitrate) further supports the need for discovery to be stayed so that Defendants are not denied the very protections that they should be afforded.  To the extent the case is not dismissed and arbitration is compelled, the Court must, in any event, stay the action pursuant to the mandatory stay under section 3 of the Federal Arbitration Act ("FAA").  *See* 9 U.S.C. § 3; *Smith*, 601 U.S. at 476 (the "plain statutory text [of FAA § 3] requires a court to stay the proceeding"); *see also* Section III.C.  And, even if the Court were to deny Defendants' motion to compel arbitration, the case still should be stayed pursuant to the Supreme Court's decision in *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 744 (2023), which requires such a stay while an appeal from a motion to compel arbitration is pending.

A discovery stay will conserve judicial resources and promote judicial efficiency and will not impose any undue prejudice on Plaintiffs.  On the other hand, Defendants would be prejudiced absent a stay because, among other reasons, proceeding with discovery could cause the "benefits of arbitration," including "less intrusive discovery," to be "irretrievably lost." *Coinbase, Inc.*, 599 U.S. at 736–37.  The Court should therefore exercise its "wide discretion in controlling discovery" and grant a stay.  *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988) (affirming stay of discovery pending resolution of dispositive issue); *see also* Fed. R. Civ. P. 26(c)(1).

### 1.    Defendants' Motions Are Dispositive Of The Entire Case.

As discussed at length above, Defendants' motions are dispositive of the action, because they seek dismissal of the Complaint in its entirety based on multiple independent jurisdictional and merits-based deficiencies.  In assessing whether a motion is "potentially" dispositive, a court takes a "'preliminary peek' at the merits of the pending, dispositive motion." *Cellwitch, Inc. v. Tile, Inc.*, No. 4:19-cv-01315, 2019 WL 5394848, at *1 (N.D. Cal. Oct. 22, 2019).  The futility of Plaintiffs' claims is evident from even a "preliminary peek," *In re Nexus 6P Prods. Liab. Litig.*, No. 17-cv-02185-BLF, 2017 WL 3581188, at *1 (N.D. Cal. Aug. 18, 2017), surpassing the requirement that the arguments in the pending motions are merely plausible and "*potentially* dispositive."  *Id.* at *2 (emphasis added); *see Nelson v. F. Hoffman-La Roche, Inc.*, No. 21-cv-10074-TLT, 2022 WL 19765995, at * 1 (N.D. Cal. Nov. 2, 2022).

Further, even if the Court determines not to grant the motion to dismiss, Plaintiffs should be compelled to arbitration. *See supra* Section III.C. If the motion to compel arbitration is granted, the entire action would be stayed. *See Smith*, 601 U.S. at 476. And, even if the motion to compel arbitration were denied, the case would still be stayed pending appeal of the denial of the motion to compel. *Coinbase, Inc.*, 599 U.S. at 744. Courts thus "routinely grant" motions to stay discovery pending the determination of a motion to compel arbitration. *See Mahamedi IP Law, LLP v. Paradice & Li, LLP*, No. 5:16-cv-02805-EJD, 2017 WL 2727874, at *1-2 (N.D. Cal. Feb. 14, 2017) (courts "routinely grant" motions to stay discovery pending the determination of a motion to compel arbitration); *Steiner v. Apple Comput., Inc.*, No. C 07-4486 SBA, 2007 WL 4219388, at *1 (N.D. Cal. Nov. 29, 2007) (It is "common practice" to stay discovery while motions to compel arbitration are pending.).

### 2.    Defendants' Motions May Be Decided Absent Discovery.

No discovery is necessary where there are no "factual issues raised by a Rule 12(b) motion." *Jarvis v. Regan*, 833 F.2d 149, 155 (9th Cir. 1987); *see also Mujica v. Airscan, Inc.*, 771 F.3d 580, 593 (9th Cir. 2014). The arguments presented in Defendants' 12(b) motions can each be resolved solely based on the allegations in the Complaint, though the Court may also properly consider the limited number of documents that are referenced therein or provide judicially noticeable facts: these are (1) the agreements Plaintiffs purport to enforce and (2) filings in Plaintiffs' duplicative pending class action. Courts frequently stay discovery where they "only need[] to look at the pleadings in order to issue a decision about [a] motion to dismiss," *Cellwitch*, 2019 WL 5394848, at *2; *see, e.g.*, *Carter v. Oath Holdings, Inc.*, No. 17-cv-07086-BLF, 2018 WL 3067985, at *4 (N.D. Cal. June 21, 2018), or review materials extraneous to the pleadings to resolve questions of law. *Calvary Chapel San Jose v. Cody*, No. 20-cv-03794-BLF, 2021 WL 5353883, at *2 (N.D. Cal. Nov. 12, 2021); *see, e.g.*, *In re Nexus*, 2017 WL 3581188, at *2 (staying discovery based in part on a motion to dismiss relying on judicially noticeable documents). Because no other discovery is needed to resolve Defendants' motions to dismiss, both prongs of this District's standard for stay are satisfied.

1
2

**3.    A Stay Of Discovery Will Preserve Judicial And Party Resources And Impose No Undue Prejudice On Plaintiffs**.

3    A discovery stay would conserve judicial and party resources and promote judicial
4 efficiency.  In addition, Plaintiffs will not "suffer harm if the Court stays discovery briefly until after
5 the Court rules on [Defendants'] motion to dismiss." *Cellwitch*, 2019 WL 5394848, at *2.

6    Discovery pending resolution of the motions would prejudice Defendants.  Allowing
7 discovery to proceed pending the motion to compel arbitration, for example, would undermine the
8 federal policy in favor of arbitration.  As explained above, if discovery were to proceed, the "benefits
9 of arbitration" could be "irretrievably lost." *Coinbase, Inc.*, 599 U.S. at 736–37.  Discovery is
10 therefore premature and would occur at the risk of requiring the parties to "endure the expense of
11 discovery that "ultimately would not be allowed in arbitration." *See Hill v. Asset Acceptance, LLC*,
12 No. 13CV1718–BEN (BLM), 2014 WL 1289578 at *2 (S.D. Cal. Mar. 27, 2014) (citation omitted).

13    On the other hand, a brief stay would not impose any undue prejudice on Plaintiffs.  There
14 is no "urgent need for immediate discovery." *In re Graphics Processing Units Antitrust Litig.*, No.
15 C 06-07417 WHA, 2007 WL 2127577, at *5 (N.D. Cal. July 24, 2007).  The initial case management
16 conference and other deadlines in the Court's scheduling order are already adjourned, *see* Dkt. No.
17 14, and the Complaint was filed only recently.  *See In re Google Advert. Antitrust Litig.*, No. 20-cv-
18 03556-BLF, 2020 WL 7227159, at *3 (N.D. Cal. Dec. 8, 2020) (stay of "several months" did not
19 "unduly prejudice Plaintiffs"); *see also Pereda v. Gen. Motors*, No. 21-cv-06338-JST, 2022 WL
20 19692037, at *2 (N.D. Cal. Mar. 15, 2022) ("[A]ny prejudice to the Plaintiffs will be limited," where
21 a "motion to dismiss is scheduled to be heard in less than 60 days.").  There is also no colorable
22 reason why any evidence must be produced or shared immediately.  Accordingly, the Court should
23 stay discovery pending determination of Defendants' motions in the interest of judicial economy
24 and promote an efficient resolution of this case.

25 **IV.    CONCLUSION**

26    Based on the foregoing, the Jump Defendants respectfully request that the Court dismiss this
27 action for lack of personal jurisdiction against the Jump Defendants.  To the extent the Court

28

determines jurisdiction attaches, it should nevertheless dismiss the action based on improper venue or the first-to-file rule.  In all events, while the Complaint itself is legally insufficient and could be dismissed on that basis, the Court should nevertheless compel Plaintiffs to arbitration and stay this action.  Lastly, the Court should stay discovery pending resolution of Defendants' motions.

Dated:  July 9, 2025

Respectfully submitted,

KOBRE & KIM LLP

*/s/ Jonathan D. Cogan*

Jonathan D. Cogan (admitted *pro hac vice*)
Steven W. Perlstein (admitted *pro hac vice*)
Igor Margulyan (admitted *pro hac vice*)
Mathew T. Elder (admitted *pro hac vice*)
Daisy Joo (admitted *pro hac vice*)
800 Third Avenue
New York, NY 10022
Tel.: +1 212 488 1200
jonathan.cogan@kobrekim.com
steven.perlstein@kobrekim.com
igor.margulyan@kobrekim.com
mathew.elder@kobrekim.com
daisy.joo@kobrekim.com

Daniel A. Zaheer (Bar ID 237118)
150 California Street, 19th Floor
San Francisco, CA 94111
Tel.: (415) 582-4800
daniel.zaheer@kobrekim.com

Attorney for Defendants
Jump Trading, LLC and
Jump Crypto Holdings LLC