# EXHIBIT D

**Tai Mo Shan OTC Trading Agreement**

This agreement (the "**Agreement**") documents the cryptocurrency trading relationship between Tai Mo Shan Limited, a Cayman Islands exempted company ("**Tai Mo Shan**"), and __Prime Trust, LLC_____, a __LLC_____ ("**Counterparty**") (each a "**Party**" and collectively the "**Parties**").

1. Each Party invests in or otherwise acquires cryptocurrencies and has a general desire to consider entering spot cryptocurrency purchase and sale transactions ("**Transactions**") with the other Party.  The specific terms of any such Transactions will separately be agreed directly between the Parties, and the Parties will have no obligation to enter any Transactions with each other.  The Parties may agree to enter Transactions using electronic, written, or oral communications, and once Tai Mo Shan and Counterparty have agreed to the terms of a Transaction (size, price and cryptocurrency) the Transaction is binding and final unless both Parties agree in writing otherwise.

2. Unless otherwise agreed between the Parties, within 24 hours after either Party sends a settlement notice covering any previously executed Transactions, Counterparty must complete its settlement obligations on any Transactions covered by the settlement notice.  Within 24 hours after Counterparty makes these deliveries, Tai Mo Shan must complete its delivery obligations covered by the settlement notice.  If a Party is not able to deliver fiat currency because a 24 hour settlement deadline described in this paragraph falls outside of regular banking hours, then that Party's delivery deadline shall be extended until 2 hours after the beginning of the next available banking business day.  For the avoidance of doubt, banking hours and business days for these purposes refers to the general banking schedules in the country that issued the applicable fiat currency.

3. If the Parties enter into one or more Transactions, which in conjunction with one or more other outstanding Transactions, constitute Offsetting Transactions, then all such Offsetting Transactions will be netted into a single Transaction under which the Party obligated to deliver the greater amount will deliver the difference between the total amount it is obligated to deliver and the total amount to be delivered to it under the Offsetting Transactions.  Each single Transaction resulting under this paragraph shall be deemed part of the single, indivisible contractual arrangement between the Parties, and once such resulting Transaction occurs, outstanding obligations under the Offsetting Transactions which are satisfied by such offset shall terminate.  "Offsetting Transactions" mean any two or more outstanding Transactions in the same cryptocurrency pair (e.g., BTCUSD).

4. If a Party (a "**defaulting Party**") fails to settle the relevant Transaction(s) in accordance with paragraph 2 above, disavows or repudiates any Transactions, or becomes insolvent or files for or enters bankruptcy or receivership proceedings as the debtor, then the other Party (the "**non-defaulting Party**") may liquidate, close-out, cancel and/or terminate all Transactions (but not less than all).  Any proceeds obtained from the liquidation of Transactions shall be applied to the discharge of the defaulting Party's obligations to the non-defaulting Party.  In lieu of liquidating one or more positions, the non-defaulting Party may elect to reasonably determine in good faith its total losses and costs (or gains, in which case expressed as a negative number) in connection with such Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of the non-defaulting Party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing of any covering transaction, hedge or related trading position (or any gain resulting from any of them) and calculate amounts owed by the defaulting Party by taking into account such determination.  The non-defaulting Party may also set-off, net, and recoup any obligations (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the

1

obligation) to the defaulting Party against any obligations (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation) to the non-defaulting Party.

5. The Parties acknowledge and agree that when entering Transactions with each other, each Party will be transacting for its own account, in a principal capacity, and in an arm's-length role in relation to each other. Neither Party will be providing any service to the other Party. Each Party will enter Transactions solely for its own respective benefit and not for the purpose of benefiting the other Party, such as by providing a service to the other Party. The Parties will not act as each other's agent, fiduciary, or advisor and shall have no duties to each other, except to settle any agreed Transactions, and as otherwise specified in a written agreement signed by both Parties.

6. Each Party agrees to comply with all laws and regulations that apply to the Transactions. Each Party understands, acknowledges, represents, and agrees that (i) it is not the target of any sanction, regulation, or law promulgated by the Office of Foreign Assets Control, the Financial Crimes Enforcement Network or any other U.S. governmental entity ("**U.S. Sanctions Laws**"); (ii) it is not owned by, controlled by, under common control with, or acting on behalf of any person that is the target of U.S. Sanctions Laws; (iii) it is not a foreign shell bank and is not acting on behalf of a foreign shell bank under applicable anti-money laundering laws and regulations; (iv) it does not reside in or obtain funds from or through a jurisdiction designated to be non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization such as the Financial Action Task Force on Money Laundering; (v) its entry into this Agreement or consummation of the Transactions will not contravene U.S. Sanctions Laws or applicable anti-money laundering laws or regulations; (vi) it will promptly provide to the other Party or any regulatory or law enforcement authority such information or documentation as may be required to comply with U.S. Sanctions Laws or applicable anti-money laundering laws or regulations; (vii) it may provide to any regulatory or law enforcement authority information or documentation regarding, or provided by, the other Party for the purposes of complying with U.S. Sanctions Laws or applicable anti-money laundering laws or regulations; (viii) with respect to any cryptocurrency sold, it sells, transfers and delivers to the other Party good and marketable title thereto, and it has the absolute right to sell, assign, convey, transfer and deliver such cryptocurrency, and such cryptocurrency is free and clear of any and all security interest, liens, pledges, claims (pending or threatened), charges, escrows, encumbrances or similar rights; and (ix) it is the lawful owner of each wallet address and account that it uses for Transaction settlement, and has good title thereto, and each such wallet address and account is owned and operated solely for the benefit of the respective Party, and no other person has any right, title or interest in any such wallet or account.

7. The Parties agree to the terms specified in Appendix A regarding data protection. In the event of any conflict or inconsistency between Appendix A and the remainder of this Agreement or any other agreement between the parties, Appendix A shall control and govern.

8. For the term of this Agreement, and subject to Counterparty's compliance with this Agreement, Tai Mo Shan grants Counterparty a limited, non-exclusive, non-transferrable, non-assignable, non-sublicensable right to access and use Tai Mo Shan's quotation and/or trading system (the "**System**") only for the purpose described in this Agreement. All patent, copyright, trademark, trade secret, and other intellectual property rights in, to, and related to the System or any of its components (including feedback or suggestions provided by Counterparty regarding Tai Mo Shan's business), or any data submitted to or generated by Tai Mo Shan, are the sole and exclusive property of Tai Mo Shan, and Counterparty shall not obtain any such rights, except as explicitly specified in this paragraph.

9. It is Counterparty's sole responsibility to control, monitor, and restrict the methods it uses to access the System ("**Access Methods**"), including without limitation, all passwords and security devices. Counterparty shall be bound by all instructions communicated to the System using Counterparty's Access Methods, and Tai Mo Shan shall have no obligation to verify whether any such instruction has been duly authorized. If Counterparty learns that its Access Methods may have been compromised, Counterparty shall immediately notify Tai Mo Shan. Counterparty shall be responsible for any instructions sent using Counterparty's Access Methods until Counterparty notifies Tai Mo Shan and Tai Mo Shan has disabled the compromised Access Methods.

10. Counterparty is solely responsible for, and uses at its own risk, (a) any computer systems, applications, communications software, telecommunications equipment, and other equipment and software ("**Equipment**") used by Counterparty to access the System; and (b) any telecommunications services, Internet service, or other communications services used by Counterparty to connect to the System ("**Connectivity**"). Any Tai Mo Shan assistance with Counterparty Equipment or Connectivity is on an "as is" basis. Counterparty shall be fully responsible for any of its communications sent to Tai Mo Shan, including those impacted or altered by any malfunction of any Equipment or Connectivity, and Tai Mo Shan shall not be responsible for any of its communications to Counterparty impacted by any malfunction of any Equipment or Connectivity.

11. Unless there is malicious conduct, Tai Mo Shan may limit, suspend, or terminate all or part of the System or Counterparty's access to the System with a seven (7) day prior written notice. For the avoidance of doubt, Tai Mo Shan shall not have any obligation to send any price stream to, or enter any trades on, the System. Counterparty understands that it is solely responsible for maintaining any alternative arrangements that may be needed or desirable if any or all of the System becomes unavailable or disrupted.

12. The Parties agree that the "clearly erroneous" Transaction procedures set forth in Appendix B shall govern all Transactions executed on the System. Counterparty agrees to pay Tai Mo Shan the maintenance fees described in Appendix C, to the extent applicable. All such fees shall be due on a monthly basis no later than 15 days after Counterparty has received an invoice from Tai Mo Shan.

13. THE SYSTEM IS PROVIDED "AS IS." TAI MO SHAN EXPRESSLY DISCLAIMS ALL WARRANTIES—EXPRESS, STATUTORY, OR IMPLIED—REGARDING THE SYSTEM (AND ANY RESULTS TO BE OBTAINED FROM THE USE OF THE SYSTEM), INCLUDING BUT NOT LIMITED TO ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE, AND ALL WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, AND USAGE OF TRADE OR THEIR EQUIVALENTS UNDER THE LAWS OF ANY JURISDICTION. TAI MO SHAN DOES NOT WARRANT OR GUARANTEE THE ACCURACY, AVAILABILITY, SECURITY, SPEED, ACCESSIBILITY, COMPATIBILITY, DELIVERY, OR COMPLETENESS OF THE SYSTEM, OR THAT THE SYSTEM WILL BE FREE FROM ERROR OR DELAY.

14. UNDER NO CIRCUMSTANCES SHALL TAI MO SHAN OR ANY OF ITS AFFILIATES, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, OR OTHER REPRESENTATIVES ("**OPERATOR PARTIES**") BE LIABLE TO COUNTERPARTY OR ANY OTHER PARTY FOR INDIRECT, SPECIAL, PUNITIVE, OR INCIDENTAL DAMAGES OF ANY CHARACTER. IN NO EVENT SHALL THE LIABILITY OF TAI MO SHAN OR THE OPERATOR PARTIES EXCEED $200,000, REGARDLESS OF THE FORM OF ACTION AND DAMAGES SUFFERED (EXCEPT FOR FRAUD OR BREACH OF THIS AGREEMENT). UNDER NO CIRCUMSTANCES SHALL TAI MO SHAN OR THE OPERATOR

PARTIES BE LIABLE FOR ANY DAMAGES DIRECTLY CAUSED BY ANY COUNTERPARTY ERROR OR MALFUNCTION.

15. Counterparty agrees to indemnify and hold harmless Tai Mo Shan and the Operator Parties from and against any costs, damages, or other liabilities (including reasonable legal fees) ("**Losses**") arising from Counterparty's use of the System, except to the extent such Losses directly resulted from Tai Mo Shan's recklessness, gross negligence, fraud or willful misconduct.

16. Either Party may terminate this Agreement at any time and for any reason by providing written notice to the other Party at least 24 hours in advance of the termination. For the avoidance of doubt, termination of this Agreement will not cancel or modify any Transaction executed or liability incurred before such termination.

17. Any notices to be given to Tai Mo Shan must be sent in writing to bitcoin@jumptrading.com. Copies of notices may also be sent to Tai Mo Shan at:
    Tai Mo Shan Limited, 600 W. Chicago Ave, Suite 825, Chicago, IL 60654
    Tel: 312-205-8900 (for confirmation of receipt only)

    Any notices to be given to Counterparty, must be sent in writing to _legal@primetrust.com_____. Copies of notices may also be sent to Counterparty at:
     _tony@primetrust.com,roger@primetrust.com,and sean@primetrust.com_____

    Either Party may update its contact details by providing notice to the other Party as specified above.

18. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of New York, without giving effect to the principles of conflict of laws.

    a. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY (I) CONSENTS TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATES OF ILLINOIS AND NEW YORK, AND OF THE UNITED STATES OF AMERICA AND TO THE JURISDICTION OF THE RELEVANT ARBITRAL FORUM LOCATED IN COOK COUNTY IN THE STATE OF ILLINOIS AND NEW YORK COUNTY IN THE STATE OF NEW YORK, FOR ANY ACTION, SUIT, ARBITRATION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT; (II) WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUCH ACTION, SUIT, ARBITRATION OR PROCEEDING IN ANY SUCH COURT; AND (III) WAIVES AND AGREES NOT TO PLEAD OR CLAIM THAT ANY SUCH ACTION, SUIT, ARBITRATION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

    b. SUBJECT TO THE PARTIES' RIGHTS TO SEEK EMERGENCY, TEMPORARY AND/OR PRELIMINARY RELIEF IN COURT, ALL CLAIMS OR CONTROVERSIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH THEREOF, OR IN ANY WAY ARISING OUT OF OR RELATING TO THE TRANSACTIONS SHALL BE SETTLED BY ARBITRATION BEFORE A PANEL OF THREE (3) ARBITRATORS AND ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION IN ACCORDANCE WITH ITS COMMERCIAL ARBITRATION RULES, AND JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. IF ARBITRATION BEFORE ANY OTHER FORUM IS MANDATORY, THEN THE ARBITRATION SHALL BE SETTLED INSTEAD BY SUCH OTHER MANDATORY ARBITRATION FORUM IN ACCORDANCE WITH ITS RULES. THE ARBITRATION SHALL BE CONDUCTED

IN EITHER CHICAGO, ILLINOIS OR NEW YORK, NEW YORK, AND TAI MO SHAN SHALL HAVE SOLE DISCRETION TO CHOOSE WHETHER THE ARBITRATION WILL BE CONDUCTED IN CHICAGO OR NEW YORK. THE RULES OF THE ARBITRATION FORUM IN WHICH THE CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT. THE PARTIES HEREBY AGREE TO WAIVE THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY.

19. This Agreement sets forth the entire agreement and understanding between the Parties relating to the subject matter herein and supersedes all prior agreements, discussions, understandings, or representations, either oral or in writing, relating to this subject matter. No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the Party to be charged. There are no oral statements, representations, inducements, warranties, or undertakings modifying or affecting the terms set forth herein. No waiver of a breach of any provision of this Agreement shall operate or be construed as a waiver of any subsequent breach of the same or any other provision hereof. If any provision or portion of this Agreement shall be held to be prohibited or invalid under applicable law, such provision or portion shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting the remainder of this Agreement.

20. Neither Party may assign this Agreement without the written consent of the other party, except that Tai Mo Shan may assign this Agreement to any affiliate of Tai Mo Shan by providing written notice to Counterparty. For purposes of this paragraph, an affiliate of Tai Mo Shan includes any entity that directly or indirectly controls, is controlled by, or is under common control with Tai Mo Shan.

21. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. A signed copy of this Agreement executed electronically and delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Agreed by:**

Tai Mo Shan Limited

By: _____

Title: Director _____

Date: 24 August 2021 _____

Takashi Fujishima

Prime Trust, LLC

By: _____
C177B7B421E44F4...

Title: CFO _____

Date: 8/20/2021 _____

Rodrigo Vicuna

5

**APPENDIX A—DATA PROTECTION**

1. All capitalized terms used in this Appendix and not otherwise defined in this Appendix or the remainder of this Agreement, shall be defined by the General Data Protection Regulation (EU 2016/679) or applicable laws and regulations pertaining to the processing of Personal Data (collectively, "Data Protection Laws").

2. Each party shall comply with all applicable Data Protection Laws. For the purposes of this Agreement, each party may be an independent Controller or Processor of Personal Data shared by the other party.

3. Each party shall maintain appropriate technical and organizational security measures for the integrity and protection of Personal Data. Each party shall ensure that the Processing of Personal Data from the other party is done in accordance with the terms of this Appendix and the Data Protection Laws.

4. When applicable, Personal Data shall only be Processed in accordance with the Controller's instructions and for the purpose and duration necessary for the purpose of the Personal Data, as agreed to by the parties. Neither party shall provide to a third-party any Personal Data received from the other party, without evaluating the security, privacy, and confidentiality practices of the third-party and, when necessary, entering into a binding, written agreement imposing data protection obligations at least as protective as those in this Appendix, unless required by law. Each party shall maintain and make available to the other party, upon request, a list of all third-parties to whom it has shared Personal Data disclosed by the other party. Each party and any associated third-party shall Process Personal Data fairly and lawfully and shall be subject to a strict duty of confidentiality by contract or applicable law.

5. Each party warrants and represents that it has obtained all necessary consents from the relevant Data Subjects to Process their Personal Data and that it will comply with, and promptly respond to, all Data Subjects' requests in accordance with applicable Data Protection Laws.

6. Each party agrees to provide assistance to the other party for compliance with Data Protection Laws pertaining to the subject matter herein, including, but not limited to, responding to a request, query, notice, or complaint from a Data Subject or regulator. Each party shall notify the other party without undue delay of a Personal Data breach that affects, or may affect, Personal Data provided by the other party and provide additional information and support as reasonably requested by the other party to comply with and enable the requesting party to meet its obligations under Data Protection Laws.

7. A party in breach of any of its obligations under this Appendix or Data Protection Laws shall indemnify the other party against any third-party claims, demand, or action and all liabilities, costs, expenses, damages, and losses suffered or incurred by the indemnified party arising out of or in connection with the breach of this Appendix or Data Protection Laws by the indemnifying party, provided that the indemnified party gives to the indemnifying party prompt notice of such claim, full information about the circumstances giving rise to it, reasonable assistance in dealing with, and sole authority to manage, defend, and/or settle the claim.

8. Each party shall be responsible for any breach of the terms of this Appendix, by their respective affiliates or employees.

9. Each Party agrees to keep confidential all documents and information provided by the other Party in connection with the receiving Party's know your counterparty or anti-money laundering compliance procedures.

## APPENDIX B—CLEARLY ERRONEOUS TRANSACTIONS

1. Either Party that follows the procedures described in paragraph 2 below shall be entitled to an adjustment of the price of any clearly erroneous Transactions. For these purposes, a Transaction or series of Transactions shall be considered to be clearly erroneous if (a) the Transaction prices are significantly different than prevailing market price at the time of execution, or (b) Counterparty contemporaneously both bought and sold the same instrument while the bid/offer spread quoted by Tai Mo Shan was inverted (i.e., while Tai Mo Shan's bid was greater than its offer).
2. To request remediation of one or more clearly erroneous Transactions, the affected Party must notify the other Party of the request and the basis for the request. An affected Party must provide this notification to the other Party no later than the next business day after the relevant executions.
3. After timely communication of a clearly erroneous remediation request, the Parties shall negotiate promptly and in good faith to determine whether any of the Transactions were in fact clearly erroneous, and whether and how any such Transactions should be adjusted or cancelled. If the parties cannot agree on a resolution of the request, then the Party initiating the request shall be entitled to require that any clearly erroneous Transaction price shall be adjusted. Off market transactions shall be adjusted to the prevailing market price at the time of the execution of the Transaction, and any inverted spread Transactions shall be adjusted to the prevailing midpoint price at the time of the execution.

DocuSign Envelope ID: C7D7879D-67C4-40A5-9BDB-8A5B117A5473

## APPENDIX C—MAINTENANCE FEE

1. Counterparty shall pay Tai Mo Shan a monthly maintenance fee (the "Fee") in order to compensate Tai Mo Shan for supporting Counterparty's connection to the System.  If Counterparty connects to the System only via GUI, then the Fee shall be $10,000 per calendar month.  If Counterparty connects to the System by API, then the Fee shall be $20,000 per calendar month.
2. Tai Mo Shan hereby waives its right to receive the Fee:
    a. For the remainder of the calendar month during which Counterparty first connects to the System, and for the full calendar months immediately following the calendar month during which Counterparty first connects to the System.
    b. For any month during which Counterparty's trading volume executed with Tai Mo Shan exceeds $10 million in notional value.
    c. For twelve(12) calendar months following which Counterparty first connects to the System.