Julie C. Erickson, State Bar No. 293111 (julie@eko.law)
Elizabeth A. Kramer, State Bar No. 293129 (elizabeth@eko.law)
Kevin M. Osborne, State Bar No. 261367 (kevin@eko.law)
**Erickson Kramer Osborne LLP**
959 Natoma St.
San Francisco, CA 94103
Phone: 415-635-0631
Fax: 415-599-8088

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD, individually and on behalf of others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>JUMP TRADING, LLC; JUMP CRYPTO HOLDINGS LLC; and DOES 1-10<br><br>      Defendants. | Case No.: 3:25-cv-03989-PHK<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION**<br><br>Date:   October 9, 2025<br>Time:  1:30 p.m.<br>Dept:  Courtroom F, 15th Floor<br><br>Judge: Hon. Peter H. Kang |

# **TABLE OF CONTENTS**

I.    Introduction .................................................................................................... 1

II.   Factual and Procedural Background ............................................................... 2

    A.    Factual Basis of Plaintiffs' Claims ........................................................ 2

    B.    Procedural Status ................................................................................... 4

    C.    The Present Motion ................................................................................ 5

    D.    Other Class Action Cases Against Jump for Its Role in the Collapse of UST ................. 8

III.  This Court Has Personal Jurisdiction ........................................................... 10

    A.    Legal Standard .................................................................................... 10

    B.    Based on Reasonable Inferences Drawn from Public Information, Plaintiffs Plausibly Plead This Court Has Specific Jurisdiction Over Defendants .................................... 12

    C.    Further Evidence Suggests Plaintiffs' Claims Arise Out of Defendants' Forum-Related Activities ............................................................................ 13

    D.    Defendants' Litigation in this Court and Prior Demand that this Court Assume Jurisdiction Over Other Conduct Relating to UST's Collapse Cannot Be Ignored ................ 14

    E.    Plaintiffs Should Be Permitted Jurisdictional Discovery .................... 15

    F.    If the Court Finds It Lacks Jurisdiction, It Should Transfer the Matter to Defendants' Home Venue .......................................................................... 16

IV.   Defendants' Rule 12(b)(3) MOTION Should Be Denied .............................. 16

    A.    Legal Standard .................................................................................... 16

    B.    If Jurisdiction Is Proper in this District, Venue Is Proper in this District ......................... 16

V.    Defendants' Motion to Compel Arbitration Is Without Merit ...................... 17

    A.    Legal Standard .................................................................................... 17

    B.    Jump Fails to Establish the Existence of an Agreement to Arbitrate .............. 18

    C.    Defendants Make Unintelligible Arguments Regarding Which Arbitration Clause Applies and Which Law Controls ................................................................. 19

    D.    There Are No Effective Delegation Clauses in Any of the Contracts Defendants Cite ... 21

    E.    Defendants' Equitable Estoppel Argument Should Be Denied Based on Precedent Set by Defendants Themselves ..................................................................... 23

VI.   Motion to Dismiss Under Rule 12(b)(6) ...................................................... 25

    A.    Legal Standard .................................................................................... 25

    B.    All Documents on Which Defendants Rely Are Inadmissible Without Exception .......... 26

    C.    The Well-Pleaded Allegations in Plaintiffs' Complaint State Causes of Action.............. 27

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                   CASE NO.: 3:25-CV-03989-PHK

i

D.    If Defendants' Documents Are Admitted, this Motion Has Been Converted to a Motion for Summary Judgement and Should Be Denied Outright ....................................................... 28

E.    Plaintiffs' Statutory and Common Law Claims Should Be Permitted to Go Forward or Can Be Perfected Through Amendment ..................................................................................... 30

VII.  Conclusion ................................................................................................................................ 31

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                                                 CASE NO.: 3:25-CV-03989-PHK

ii

1

## **TABLE OF AUTHORITIES**

2

CASES                                                                                                    PAGE(S)

*Alexis v. Rogers*,

3   2016 WL 11707630 (S.D. Cal. Feb. 26, 2016) ........................................................ 12

4   *Aliano v. Quaker Oats Co.*,

5   2017 WL 56638 (N.D. Ill. Jan. 4, 2017) ................................................................. 16

6   *AM Tr. v. UBS AG*,

7   681 F. App'x 587 (9th Cir. 2017) ........................................................................... 15

8   *Ashcroft v. Iqbal*,

9   556 U.S. 662 (2009) ............................................................................................... 26

10  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*,

11  475 U.S. 643 (1986) ............................................................................................... 17

12  *Ballard v. Savage*,

13  65 F.3d 1495 (9th Cir. 1995) ................................................................................. 10

     *Bell Atl. Corp. v. Twombly*,

14  550 U.S. 544 (2007) ............................................................................................... 25

15  *Branch v. Tunnell*,

16  14 F.3d 449 (9th Cir. 1994) ................................................................................... 26

17  *Brennan v. Opus Bank*,

18  796 F.3d 1125 (9th Cir. 2015) .......................................................................... 21, 22

19  *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*,

20  582 U.S. 255 (2017) ............................................................................................... 11

21  *Butcher's Union Local No. 498 v. SDC Inv., Inc.*,

22  788 F.2d 535 (9th Cir. 1986) ................................................................................. 15

     *C. M. v. MarinHealth Med. Grp., Inc.*,

23  2024 WL 217841 (N.D. Cal. Jan. 19, 2024) .......................................................... 31

24  *Calix Networks, Inc. v. Wi-Lan, Inc.*,

25  2010 WL 3515759 (N.D. Cal. Sept. 8, 2010) ........................................................ 15

26  *Cervantes v. City of San Diego*,

27  5 F.3d 1273 (9th Cir.1993) .................................................................................... 26

28

*Cf. Payrovi v. LG Chem Am., Inc.,*
    491 F. Supp. 3d 597 (N.D. Cal. 2020) .................................................................. 13

*Coinbase, Inc. v. Bielski,*
    599 U.S. 736 (2023) ............................................................................................. 10

*Comer v. Micor, Inc.,*
    436 F.3d 1098 (9th Cir. 2006) ............................................................................. 25

*Connell v. ByteDance, Inc.,*
    2025 WL 1828472 (N.D. Cal., 2025) ............................................................. 17, 21

*Core-Vent Corp. v. Nobel Indus. AB,*
    11 F.3d 1482 (9th Cir. 1993) ............................................................................... 15

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014) ............................................................................................. 11

*Dfinity USA Rsch. LLC v. Bravick,*
    2023 WL 2717252 (N.D. Cal. Mar. 29, 2023) ..................................................... 30

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,*
    722 F.3d 81 (2d Cir. 2013) .................................................................................. 12

*Ehret v. Uber Techs., Inc.,*
    68 F. Supp. 3d 1121 (N.D. Cal. 2014) ................................................................ 30

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
    592 U.S. 351 (2021) ............................................................................................. 14

*G & C Auto Body Inc v. Geico Gen. Ins. Co.,*
    2008 WL 687371 (N.D. Cal. Mar. 11, 2008) ....................................................... 28

*Goldman v. KPMG LLP,*
    173 Cal. App. 4th 209 (2009) .............................................................................. 18

*Granite Rock Co. v. Int'l Brotherhood of Teamsters et al.,*
    561 U.S. 287 (2010) ............................................................................................. 17

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
    586 U.S. 63 (2019) ............................................................................................... 22

*In re Henson,*
    869 F.3d 1052 (9th Cir. 2017) ............................................................................. 18

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO
COMPEL ARBITRATION                                    CASE NO.: 3:25-CV-03989-PHK

*In re Theos Dark Chocolate Litig.*,
   750 F. Supp. 3d 1069 (N.D. Cal. 2024) ............................................................... 31

*Int'l Shoe v. Washington*,
   326 U.S. 310 (1945) ............................................................................................. 11

*Johnson v. Law*,
   19 F. Supp. 3d 1004 (S.D. Cal. 2014) .................................................................. 16

*Khoja v. Orexigan Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ............................................................................... 27

*Kim v. Jump Trading, LLC*,
   2025 WL 1359136 (N.D. Ill. May 9, 2025) .................................................... 10, 17

*Knutson v. Sirius XM Radio Inc.*,
   771 F.3d 559 (9th Cir. 2014) .......................................................................... 17, 19

*Kramer v. Toyota Motor Corp.*,
   705 F.3d 1122 (9th Cir. 2013) ........................................................................ 18, 20

*Laub v. U.S. Dep't of Interior*,
   342 F.3d 1080 (9th Cir. 2003) ............................................................................. 15

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) ............................................................................... 26

*Love v. Associated Newspapers, Ltd.*,
   611 F.3d 601 (9th Cir. 2010) ............................................................................... 10

*Marder v. Lopez*,
   450 F.3d 445 (9th Cir. 2006) ............................................................................... 26

*Martinez v. Choose Your Horizon, Inc.*,
   2025 WL 2498138 (N.D. Cal. Sept. 1, 2025) ...................................................... 12

*Meadows v. Dickey's Barbecue Restaurants Inc.*,
   144 F.Supp.3d 1069 (N.D.Cal., 2015) ................................................................ 22

*Murphy v. DirecTV, Inc.*,
   724 F.3d 1218 (9th Cir. 2013) ............................................................................. 23

*Murphy v. Schneider Nat'l, Inc.*,
   362 F.3d 1133 (9th Cir. 2004) ............................................................................. 16

*Panchenko v. Comenity Cap. Bank*,
  2025 WL 2374109 (N.D. Cal. Aug. 13, 2025) ........................................................ 30

*Patterson v. Jump Trading, LLC*,
  2025 WL 215519 (9th Cir. Jan. 16, 2025) .............................................. 10, 14, 20, 23

*Patterson v. Jump Trading LLC*,
  710 F. Supp. 3d 692 (N.D. Cal. 2024) .............................................................. 9,18

*Reva Payrovi v. LG Chem America, Inc.*,
  491 F. Supp. 3d 597 (N.D. Cal 2020) ...................................................................... 15

*Pebble Beach Co. v. Caddy*,
  453 F.3d 1151 (9th Cir. 2006) .................................................................................. 11

*Pokorny v. Quixtar, Inc.*,
  601 F.3d 987 (9th Cir. 2010) .................................................................................... 17

*Romero v. Flowers Bakeries, LLC*,
  2016 WL 469370 (N.D. Cal. Feb. 8, 2016) .............................................................. 31

*S.E.C. v. Ross*,
  504 F.3d 1130 (9th Cir. 2007) .................................................................................. 14

*Sanchez Mora v. U.S. Customs & Border Prot.*,
  2024 WL 5378335 (N.D. Cal. Nov. 4, 2024) ............................................................ 16

*Schwarzenegger v. Fred Martin Motor Co.*,
  374 F.3d 797 (9th Cir. 2004) ...................................................................... 11, 12, 13

*Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*,
  708 F. Supp. 3d 450 (S.D.N.Y. 2023)........................................................................ 4

*Setty v. Shrinivas Sugandhalaya LLP*,
  3 F.4th 1166 (9th Cir. 2021) .............................................................................. 24, 25

*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*,
  107 Cal. App. 4th 54 (2003) ...................................................................................... 4

*Shansby v. Edrington, USA, Inc.*,
  2023 WL 2456789 (N.D. Cal. Mar. 9, 2023)............................................................ 22

*Sullivan v. Oracle Corp.*,
  51 Cal. 4th 1191 (2011) ........................................................................................... 30

*Swarts v. Home Depot, Inc.*,
  689 F. Supp. 3d 732 (N.D. Cal. 2023) ............................................................ 11, 14

*Teleport Mobility, Inc. v. Sywula*,
  2021 WL 2291807 (N.D. Cal. June 4, 2021) ............................................................ 25

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ............................................................ 26

*Usher v. City of Los Angeles*,
  828 F.2d 556 (9th Cir. 1987) ............................................................ 26

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
  433 F.3d 1199 (9th Cir. 2006) ............................................................ 12

STATUTES

28 U.S.C. § 1404(a). ............................................................ 8, 16

28 U.S.C. § 1631 ............................................................ 16

9 U.S.C. § 202 ............................................................ 21

Cal. Bus. & Prof. Code § 17200 ............................................................ 30

Cal. Code Civ. P. § 1559 ............................................................ 4

Cal. Code Civ. P. § 410.10 ............................................................ 11

California Penal Code § 484 ............................................................ 30

California Penal Code § 496 ............................................................ 30

RULES

Civ. L.R. 3-4 ............................................................ 25

Civ. L.R. 3-12 ............................................................ 15

Fed. R. Civ. P. 56. ............................................................ 29

Fed. R. Civ. P. 12 ............................................................ 26

Fed. R. Evid. 201 ............................................................ 7

## Statement of Issues to Be Decided

Pursuant to the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California, Rule 7-4(a)(3), Plaintiffs ask the Court to rule on the following issues:

a. Whether Plaintiffs have plausibly pleaded this Court has specific jurisdiction over Defendants by virtue of Defendants' forum-related contacts and reasonable inferences drawn from public information;

b. Whether the Court should deny Defendant's motion to dismiss under Rule 12(b)(3) because Plaintiffs have properly pleaded jurisdiction and therefore venue is proper, regardless of Plaintiffs' case against third-party Prime Trust;

c. Whether, as the courts in *Kim* and *Patterson* have previously ruled on virtually identical motions, the Court should deny Defendants' motion to compel arbitration as neither Plaintiffs nor Defendants are parties to any of the contracts asserted by Defendants, including any purported delegation clauses;

d. Whether the Court should strike the numerous extraneous documents on which Defendants improperly rely in support of their Rule 12(b)(6) motion to dismiss because the documents are not referenced in the complaint in any way nor do they give rise to any of Plaintiffs' claims; and

e. Whether the Court should deny Defendants' Rule 12(b)(6) motion to dismiss because Plaintiffs adequately allege third party beneficiary standing and the extraterritorial application of their statutory UCL and civil theft claims.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                    CASE NO.: 3:25-CV-03989-PHK

viii

# I.     INTRODUCTION

This case concerns the catastrophic collapse of Terraform Lab's digital asset ecosystem, resulting in the loss of billions of dollars in savings for millions of Americans. Among those most responsible for the financial meltdown are Defendants Jump Trading and Jump Crypto Holdings, early backers and liquidity providers for the Anchor Protocol, a purportedly stable cryptocurrency platform whose failure wiped out investor savings. Plaintiffs, many of whom interacted with the Anchor Protocol through wallet apps akin to traditional savings accounts, now seek accountability through this class action.

Defendants move to dismiss, raising a host of procedural defenses, including lack of personal jurisdiction, improper venue, and an unfounded demand for arbitration. Not only do these efforts ignore established law, Defendants' arguments against personal jurisdiction contradict their own prior invocation of this Court's authority relating to the collapse of TerraUSD ("UST"), the purported "stablecoin" at the heart of the Anchor Protocol. Plaintiffs have alleged sufficient facts—through reasonable inferences drawn from public information—to plausibly establish general and specific jurisdiction over Defendants. Defendants' motion to compel arbitration is premised on the imaginative claim that any one of several contracts (Defendants never say which one) compels Plaintiffs to arbitration, even though neither Plaintiffs nor Defendants are parties to the contracts. Defendants then improperly rely on these same documents, which are extrinsic evidence never referenced in Plaintiffs' complaint, for their Rule 12(b)(6) motion to dismiss. Defendants' shifting positions regarding forum and reliance on inadmissible documents cannot mask their central role in the events at issue. Nor can they avoid litigation by relying on arbitration provisions in unspecified third-party contracts.

Plaintiffs respectfully submit that the motions should be denied. At minimum, jurisdictional discovery should be permitted. Should the Court ultimately conclude it lacks jurisdiction, the matter ought to be transferred to the appropriate venue, rather than dismissed. Plaintiffs have sufficiently stated claims for relief, and Defendants' motions, predicated on equivocal arguments and unsupported procedural maneuvers, should not foreclose adjudication

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                                   CASE NO.: 3:25-CV-03989-PHK

1

on the merits of claims arising from one of the most devastating collapses in recent financial history. The motions should be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Basis of Plaintiffs' Claims

This is a case about a financial meltdown that wiped out the savings of millions of Americans. Among the actors primarily responsible for the collapse are Defendants Jump Trading, LLC, and Jump Crypto Holdings LLC ("Defendants" or "Jump").

Defendants were early backers of the Anchor Protocol, a system of digital investment assets, or "cryptocurrencies," developed by Singapore-based Terraform Labs in or around 2018. Dkt. 1 at ¶¶ 4, 22-24, 37. One of the cryptocurrencies central to the Anchor Protocol was the TerraUSD, or "UST," which purported to maintain a one-to-one peg in value to the U.S. dollar. *Id.* at ¶ 23. The UST was designed to keep its peg to the dollar through its algorithmic relationship with another Terraform Labs cryptocurrency called the Luna. *Id.* In theory, an investor in UST could always exchange one UST for $1.00 worth of Luna, and vice versa, using a mint-and-burn mechanism that automatically adjusted supply. *Id.* When UST's price rose above $1.00, users could profit by burning Luna to mint new UST, increasing supply and lowering the price, whereas if UST fell below $1.00, holders could burn UST for Luna, reducing UST supply and raising the price. *Id.* To profit from UST, investors would "stake" their holdings in the Anchor Protocol. *Id.* at ¶¶ 24, 28. Staking involved depositing UST into the Anchor protocol, where it was locked up in exchange for high yields or interest, most notably up to 20% annual returns. *Id.* at ¶¶ 24, 28-30.

The Anchor Protocol offered an enticing deal. Rather than speculating on the boom or bust cryptocurrency market, UST investors could grow wealth through dependable pre-set interest yields. Dkt. 1 at ¶ 24. This security led retail and institutional investors to flock to the Anchor Protocol and invest hundreds of millions of dollars of capital in Terraform Labs.

Plaintiffs Austin Ward, David Krevat, and Nabil Mohamad ("Plaintiffs") were not stereotypical crypto investors ready and willing to risk their investments in a market defined by wild volatility. Dkt. 1 at ¶¶ 20. Rather, Plaintiffs were users of services called "wallet apps" that

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                    CASE NO.: 3:25-CV-03989-PHK

2

promised stable, annual percentage yield from interest earned on deposits. *Id.* at ¶¶ 3, 27-30. Wallet apps accepted investor funds and invested them in staking enterprises like the Anchor Protocol. *Id.* Wallet app users' investments grew as yields were added to their balances. *Id.* at ¶ 33. They also had the option to sell off their holdings and withdraw U.S. dollars. *Id.* In this way, Plaintiffs used the wallet apps as they would any other savings account at a traditional bank. *Id.* at ¶¶ 3, 28.

While Plaintiffs benefitted from the Anchor Protocol's savings account-style yields, Terraform Labs benefitted from the growth of the Protocol's ecosystem and the rising value of Luna. Dkt. 1 at ¶¶ 25-26. Between Plaintiffs and Terraform Labs, there were two other companies whose intermediary services were necessary to make investment in the Anchor Protocol possible. Prime Trust was a trust company that facilitated wallet app users' cash transfers, deposits, and withdraws. *Id.* at ¶ 31. Wallet app users depended on Prime Trust to provide these services, as traditional banks refused to service the digital asset market. *Id.* Prime Trust, in turn, depended on Jump as a market maker to provide liquidity for UST. *Id.* at ¶¶ 7, 42. This involved filling investor buy and sell orders using UST it acquired from Terraform Labs. *Id.* at ¶ 39. When an entity serves as a market maker, they are generally obligated to fill the orders investors place.

Defendants provided UST liquidity pursuant to a series of written or unwritten agreements they entered into with Terraform Labs and Prime Trust between 2019 and July 2021. Dkt. 1 at ¶¶ 5, 38, 41, 43, 64-69. Defendants' liquidity services were, in part, for the benefit of Plaintiffs and all similarly situated wallet app users. *Id.* at ¶ 65. Wallet app users were not, however, in privity with Jump in any manner whatsoever. *Id.* at ¶ 66.

When UST unexpectedly began to lose its value in May 2022, Plaintiffs and thousands of other investors called on their wallet apps to withdraw their funds. *Id.* at ¶¶ 45-46. The wallet apps, in turn, submitted sell orders to Prime Trust. *Id.* at ¶ 47. But Prime Trust would not fill the orders. *Id.* UST rapidly collapsed in value, costing investors billions in losses. *Id.* at ¶ 48. After the collapse, UST and Luna were found to be "securities" under federal securities laws. *Sec. &*

*Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 471 (S.D.N.Y. 2023) ("[t]here is no genuine dispute that UST, LUNA, wLUNA, and MIR are securities").

Wallet app users, seeking answers, demanded Prime Trust explain why it would not allow them to withdraw their funds. Dkt. 1 at ¶ 49. In response, Prime Trust publicly claimed that its "liquidity provider," which at that time remained unnamed, stopped servicing orders when the instability started. *Id.* at ¶ 47. Jump's agreements to serve as Prime Trust's liquidity provider for UST were closely held secrets. *Id.* at ¶ 51. In connection with other litigation, Prime Trust eventually revealed, in 2023, that Jump Trading was the unnamed liquidity provider. *Id.* This disclosure occurred around the same time that the SEC revealed, through an enforcement action against Terraform Labs, that Jump had a partnership with Terraform Labs. *Id.* at ¶¶ 44, 52. Thus, through the Prime Trust litigation and the SEC's enforcement action, Jump's secret agreements came to light. *Id.* at ¶¶ 52-53.

**B.    Procedural Status**

Plaintiffs filed their Class Action Complaint on May 7, 2025. Dkt. 1. Plaintiffs alleged that they were third-party beneficiaries of Jump's contractual promise to serve as a market maker for UST. *Id.* The complaint pleaded causes of action for breach of contract, conversion, unjust enrichment, civil theft in violation of California Penal Code sections 484 and 496, and unfair and unlawful business practices in violation of California Code of Procedure section 17200, *et seq.* (the "UCL"). *Id.* For their contract-related claims, Plaintiffs asserted they were intended third-party beneficiaries of the subject agreements and were harmed by Defendants' breach. *Id.* at ¶ 66; *see also* Cal. Civ. Code § 1559 (allowing third parties to enforce contracts); *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, 107 Cal. App. 4th 54, 79 (2003) ("[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it").

Plaintiffs have served discovery, but Defendants have refused to engage. On July 23, 2025, Plaintiffs served six initial Rule 34 requests seeking records of Defendants' agreements and partnerships relating to UST transactions. Dkt. 45-1 at p. 9. Defendants served only objections in response. Declaration of Kevin M. Osborne ("Osborne Decl."), filed herewith, ¶ 3.

On August 5, 2025, Plaintiffs served Jump Trading with interrogatories requesting information about Jump's business presence and commercial activity within California. Dkt. 45-1 at p. 16. Again, Defendants responded with only objections. Osborne Decl., ¶ 4. Plaintiffs filed a discovery dispute letter on August 27, 2025 to initiate the process of compelling responses. Dkt. 45-1. On July 9, 2025, Defendants moved to stay discovery.[1] Dkt. 32. In support of their motion to stay, Defendants argued that they intend to appeal any ruling denying their motion to compel arbitration, without even knowing the basis of the denial, just for the sake of a stay. *Id*. at 53-54.

## C.    The Present Motion

Defendants' Motion is based entirely on the claim that the agreements described in Plaintiffs' complaint "appear to be" (Dkt. 32 at p. 4) four contracts they attach as exhibits to the declaration of their General Counsel, Matthew Hinerfeld (Dkt. 33). The contracts purport to be:

- Exhibit A: "Second Amended and Restated Loan Confirmation" dated August 15, 2020, between Terraform Labs and Jump subsidiary Tai Mo Shan (Dkt. 31-1);

- Exhibit B: "Master Loan Agreement" dated July 21, 2021, between Terraform Labs and Tai Mo Shan (Dkt. 31-2);

- Exhibit C: "Prime Trust New Account Agreement" dated August 2, 2021, between Prime Trust and Tai Mo Shan (Dkt. 31-3); and

- Exhibit D: "Tai Mo Shan OTC Trading Agreement" dated August 24, 2021, between Prime Trust and Tai Mo Shan (Dkt. 31-4).

Mr. Hinerfeld, who, notably, is licensed to practice law in California but not in Illinois where Jump is headquartered, states in his declaration that he has "familiarity with the Jump Trading Group's regular business practices as it [*sic*.] relates to the storage of contracts." Dkt. 33 at ¶ 2. He further states Exhibit A is "the only agreement between any Jump entity and TFL [Terraform Labs] relating to the loans of UST or LUNA from July 2021." *Id*. at ¶ 8. Exhibits C

---

[1] Defendants moved for a stay of discovery in the present Motion. Dkt. 32. Because the motion to stay was not a part of the parties' stipulated briefing schedule (Dkt. 31), Plaintiffs filed an opposition to the motion to stay on July 23, 2025 (Dkt. 36) and do not repeat their arguments opposing the stay here.

1  and D, along with a non-disclosure agreement, are "the only contracts made between any Jump
2  entity and Prime Trust." *Id.* at ¶ 9.

3      Mr. Hinerfeld does not explain why he distinguishes between "agreements" and
4  "contracts" in his declaration. Dkt. 33 at ¶ 8 (referring to the Terraform Labs "agreements"); ¶ 9
5  (referring to the Prime Trust "contracts"). He does not explain how he knows that these are the
6  only agreements (or contracts) Jump "*made*" with these entities (*id.* at ¶ 9), given his testimony
7  of personal knowledge relates only to its "*storage* of contracts." *Id.* at ¶ 2 (emphasis added). He
8  does not rule out that there are other agreements (or contracts) Jump entered with Terraform
9  Labs to provide liquidity for UST, instead stating only that Exhibit A is the only agreement
10  "relating to the *loans* of UST." *Id.* at ¶ 8 (emphasis added). He does not rule out that there are
11  agreements (or contracts) that obligated Jump to provide liquidity for UST investors from other
12  times before or after July 2021. *Cf.* Dkt. 1, Plaintiffs' Complaint, at ¶ 5, 38, 43 (all stating Jump
13  entered a "series" of contracts between 2019 and 2021).

14      Mr. Hinerfeld is apparently aware, however, that other agreements exist. He signed one
15  of them. In an un-filed Rule 11 motion for sanctions that Defendants served on Plaintiffs,
16  Defendants revealed contracts and amendments signed by Mr. Hinerfeld that were not attached
17  with this Motion. Osborne Decl., ¶ 5. One exhibit, a "Master Digital Currency Loan Agreement"
18  from November 2019, describes a loan of 30 million Luna from Terraform Labs to Jump's
19  subsidiary, Tai Mo Shan. Ex. 1.[2] Despite its apparent relevance to the Motion and Plaintiffs'
20  allegations, Defendants did not include this contract in its filings with the Court.

21      Additionally, Mr. Hinerfeld's declaration fails to acknowledge a myriad of agreements
22  referenced in Plaintiffs' complaint. A January 2020 email from Do Kwon to the "Terra Investor
23  Relations" group says that Terraform Labs "*agreed* to enter a partnership with Jump Trading
24  whereby Jump will deploy its own resources to improve liquidity of Terra." Ex. 2 (emphasis

25
26
27
28

---

[2] Unless otherwise noted, all exhibits are attached to the Declaration of Kevin M. Osborne.

added).[3] An August 2020 email from the former President of Jump Crypto, Kanav Kariya, to Kwon stated:

> Worked on this proposal with our partners this morning, the whole team is really excited about *this partnership* and what it could mean for DeFi.
>
> […]
>
> *Gentleman's agreement* – We will support trading on terra stable coin pairs on all exchanges we're connected to and help maintain the peg.

Ex. 3 (emphasis added). Subsequent communications from Kwon to Kariya show further evidence of agreements between Jump and Terraform Labs for UST liquidity. In June 2021, Kwon emailed Kariya and, under the heading "PrimeTrust UST liquidity provision," stated:

> […] we need a third party market maker to keep UST in PrimeTrust's account to be able to satisfy user orders.
>
> […]
>
> 1) [Terraform Labs] will lend you inventory in 30-50M clips 2) You deposit this UST in PrimeTrust – when users buy UST from PrimeTrust, PT credits your account with USD and withdraws UST to send to users.

Ex. 4.

There are also indicia of additional agreements between Jump and Prime Trust. For example, the Tai Mo Shan OTC Trading Agreement (Ex. D) states that the parties—Tai Mo Shan and Prime Trust—intend to enter transactions for cryptocurrency and "the specific terms of any such Transactions will separately be agreed directly between the Parties." Dkt. 33-4 at p. 2. It goes on to say, "once Tai Mo Shan and Counterparty have agreed to the terms of a Transaction (size, price and cryptocurrency) the Transaction is binding and final unless both Parties agree in writing otherwise." It appears Tai Mo Shan and Prime Trust did, in fact, form such agreements as the evidence shows there were subsequent transactions. After the UST collapsed, Prime Trust stated on its website and to state regulators that it stopped filling wallet app users' sell orders for UST because "our UST liquidity provider [later identified as Prime Trust] stopped servicing

---

[3] This email along with Exhibits 2, 3, and 4, referenced *infra*, were all exhibits in the SEC's case against Terraform Labs, *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346-JSR (S.D.N.Y.), and are properly the subject of judicial notice insofar as they are not offered to prove the truth of the matters they assert. Fed. R. Evid. 201.

Prime Trust, which terminated our ability to service UST requests." Osborne Decl., Exs. 5 and 6.
If Jump Trading *stopped* servicing Prime Trust at the time of the UST collapse, the implication is
it *was* servicing Prime Trust before the collapse. This "servicing" indicates additional
transactions between Jump and Prime Trust. It stands to reason, therefore, that there were also
additional agreements.

**D.     Other Class Action Cases Against Jump for Its Role in the Collapse of UST**

Other UST investors have sued Jump for its conduct in manipulating the market for UST,
generally alleging that Jump knew that UST was built to fail and acted in secret to deceive
investors into believing that it was stable. These cases allege theories of liability and are based
on factual conduct that is unrelated to the claims here.

In *Patterson v. Terraform Labs, Pte. Ltd.*, No. 3:22-cv-03600 (N.D. Cal. filed June 17,
2022) ("*Patterson*"), the plaintiffs sued Terraform Labs, Jump Trading, Jump Crypto, and
various other entities for conduct in the years leading up to the UST collapse. The operative third
amended complaint alleges four causes of action, all for statutory violations of federal securities
laws. *Id*. at Dkt. 156.

In *Kim v. Jump Trading, LLC*, No. 23 CV 2921 (N.D. Ill. filed May 9, 2023) ("*Kim*"), the
plaintiffs assert statutory claims under the Commodity Exchange Act and a common law claim
of unjust enrichment based on allegations of market manipulation. The complaint was originally
filed against Jump Trading and Kanav Kariya but was amended on August 9, 2024, to add Jump
Crypto, among others, as a defendant. *Id*. at Dkt. 60.[4]

In June 2023, the defendants in the *Kim* matter, at the time Jump Trading and Kariya,
moved to transfer the case from the Northern District of Illinois to the Northern District of
California under 28 U.S.C. § 1404(a). *Kim*, Dkt. 28, Defendants' Motion to Transfer Venue to

---

[4] Plaintiffs attach the operative complaints in *Patterson* and *Kim* as Exhibits 7 and 8,
respectively, to the Declaration of Kevin Osborne, filed herewith, for the convenience of the
Court. As court records from other cases that are not submitted for the truth of the matters they
assert, the Court may take judicial notice of these materials. Fed. R. Evid. 201; *Hurd v. D.C.,
Gov't*, 864 F.3d 671, 686 (D.C. Cir. 2017).

the Northern District of California (N.D. Ill.).[5] The motion conceded that "jurisdiction and venue exist in the Northern District of California." *Id.* at p. 4. That motion was denied.

While both *Patterson* and *Kim* are based on the collapse of UST, the plaintiffs in those cases claim damages that arose from conduct unrelated to the conduct alleged in the present case. The plaintiffs in *Patterson* and *Kim* both allege Jump deceived UST investors and manipulated its market by secretly injecting funds into the Anchor Protocol to prevent it from collapsing, then covering up its conduct in collaboration with Terraform Labs to present UST as a functioning stablecoin. *See* Ex. 7, *Patterson*, Dkt. 156, Complaint, at p. 2 ("In a surreptitious agreement between Terraform and Kwon and Defendants, with intent to manipulate the price of UST through human intervention, Jump agreed to purchase UST—and did purchase, engaging in large UST trades—removing it from the market and causing UST to re-peg with the U.S. dollar"); Ex. 8 *Kim*, Dkt. 60, Complaint, at p. 1 ("Defendants schemed with Do Kwon ('Kwon') and his company Terraform Labs Pte. Ltd. ('TFL') to manipulate the market price for UST and to conceal their manipulation, for their own benefit").

Whether Jump secretly injected funds into the Anchor Protocol to prop up UST, whether it manipulated the market for UST, and whether it sought to conceal its conduct or deceive investors are immaterial questions in the case at bar, which focuses instead on whether Jump breached a contractual duty when it refused to fill investor sell orders. Other than a single claim for common law unjust enrichment asserted in both this case and *Kim*, there are no overlapping causes of action in Plaintiffs' case and the previously filed cases.

Jump has, however, used the same playbook for all three cases. In each case, it moved to compel arbitration and stay litigation based on contracts to which it was not party. In *Patterson*, Jump Trading argued that the lead plaintiff's service agreement with Terraform Labs required him to arbitrate his claims against Jump and that he was equitably estopped from arguing otherwise. *Patterson*, 710 F. Supp. 3d 692, 709 (N.D. Cal. 2024). When the district court rejected

---

[5] Plaintiffs attach Jump Trading's motion to transfer as Exhibit 9. As with other court filings Plaintiffs attach, this document is properly subject to judicial notice. Fed. R. Evid. 201.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                                    CASE NO.: 3:25-CV-03989-PHK

9

1  these arguments, Jump appealed and moved to stay based on the holding in *Coinbase, Inc. v.*
2  *Bielski*, 599 U.S. 736 (2023). The Ninth Circuit heard Jump Trading's appeal a year later and in
3  a one-page opinion affirmed the ruling of the district court. *Patterson v. Jump Trading, LLC*,
4  2025 WL 215519 (9th Cir. Jan. 16, 2025).

5      In *Kim*, Jump Trading and Jump Crypto again argued that an arbitration clause between
6  the plaintiffs and Terraform Labs compelled the plaintiffs to arbitrate their claims against Jump,
7  that an arbitrator should decide the enforceability of the arbitration clause, and that the plaintiffs
8  were equitably estopped from avoiding arbitration. *Kim v. Jump Trading, LLC*, 2025 WL
9  1359136, at *3 (N.D. Ill. May 9, 2025). When the district court decided against them, they
10  appealed and moved to stay under *Coinbase, Inc. v. Bielski*.

11      Defendants make the same arguments in the present motion as those that fell short in
12  *Patterson* and *Kim*. They transparently acknowledged in their motion that they will appeal any
13  loss on this Motion, no matter how frivolous the grounds and regardless of the rationale for the
14  decision. Dkt. 32 at p. 53 ("even if the Court were to deny Defendants' motion to compel
15  arbitration, the case still should be stayed pursuant to the Supreme Court's decision in *Coinbase,*
16  *Inc. v. Bielski*"). In other words, this case should be stayed just because Defendants *filed* a
17  motion to compel arbitration. The absurdity of this argument stretches *Coinbase, Inc. v. Bielski*
18  past its limits and is the subject of Plaintiffs' previously-filed opposition to the motion to stay.
19  Dkt. 36.

### III.    THIS COURT HAS PERSONAL JURISDICTION

**A.    Legal Standard**

22      A plaintiff bears the burden of establishing that a court has personal jurisdiction but must
23  make no more than a "*prima facie* showing of jurisdictional facts" when the determination is
24  made based on the papers (as opposed to in an evidentiary hearing). *Love v. Associated*
25  *Newspapers, Ltd.*, 611 F.3d 601, 608 (9th Cir. 2010). To make this showing, "the plaintiff need
26  only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v.*
27  *Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).

28

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO
COMPEL ARBITRATION                                              CASE NO.: 3:25-CV-03989-PHK

Federal courts recognize two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017). A court has general jurisdiction over a defendant "when [the defendant's] affiliations with the [s]tate are so 'continuous and systematic' as to render them essentially at home in the forum [s]tate." *Id.* (quoting *Int'l Shoe v. Washington*, 326 U.S. 310, 317 (1945)). Specific jurisdiction, meanwhile, arises when a defendant's contacts with the forum give rise to the claim in question. *Daimler AG v. Bauman*, 571 U.S. 117, 188 (2014). "[T]here must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation." *Id.* (cleaned up).

As a general rule, "personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154-55 (9th Cir. 2006). California's long-arm jurisdictional statute authorizes jurisdiction to the fullest extent permitted by the Constitution. Cal. Code Civ. P. § 410.10. Thus, the court's focus is whether the defendant has at least minimum contacts with California such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 739 (N.D. Cal. 2023). In *Schwarzenegger v. Fred Martin Motor Co.*, the Ninth Circuit articulated a three-part test to determine whether a court has specific personal jurisdiction over a defendant. 374 F.3d 797 (9th Cir. 2004). The test is:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Id.* at 802. "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* If the plaintiff does so, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

The first prong of the minimum contact test is often called the "purposeful availment" prong. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). A "purposeful availment analysis is most often used in suits sounding in contract." *Schwarzenegger*, 374 F.3d at 802.

To establish a defendant's purposeful availment, a plaintiff may refer to "affidavits and other evidence" to establish that jurisdiction is proper. *Martinez v. Choose Your Horizon, Inc.*, 2025 WL 2498138, at *3 (N.D. Cal. Sept. 1, 2025). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). "At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations. *Id.*; *accord Alexis v. Rogers*, 2016 WL 11707630, at *2 (S.D. Cal. Feb. 26, 2016). Moreover, the trial court has considerable leeway in deciding a challenge to personal jurisdiction and may "determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc.*, 722 F.3d at 84.

In performing this analysis, the complaint's uncontroverted allegations must be taken as true, and "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Schwarzenegger*, 374 F.3d at 800.

**B.     Based on Reasonable Inferences Drawn from Public Information, Plaintiffs Plausibly Plead This Court Has Specific Jurisdiction Over Defendants**

Plaintiffs concede Defendants are both incorporated in Delaware and headquartered in Illinois. Dkt. 1 at ¶¶ 15-16. Plaintiffs allege that this Court, nevertheless, has personal jurisdiction over Defendants because they had continuous and systematic contacts with this district, do substantial business in this district, purposely availed themselves of the privilege of conducting activities in this district, and subjected themselves to jurisdiction here by their conduct in other litigation. *Id.* at ¶ 10.

There is ample public information demonstrating Defendants maintain abundant business operations in California and in the Bay Area specifically. A cursory review of the online social

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO
COMPLE ARBITRATION                                        CASE NO.: 3:25-CV-03989-PHK

network LinkedIn reveals at least 30 individuals who currently claim they work for Jump Trading or Jump Crypto and who identify their location as being within California. Osborne Decl., ¶ 13; Ex. 10. This does not include Defendants' General Counsel, a member of the California State Bar.

As detailed more fully below, Defendants have affirmatively sought to avail themselves of the jurisdiction of this State by their conduct in other litigation involving the collapse of UST. Pages from Jump Trading's website show it provides travel grants for conferences in California (Ex. 11), issues fellowships to California researchers (Ex. 12), and designs specific website policies for online privacy (Ex. 13) and cookies (Ex. 14) tailored just for California users. Moreover, the reach of Jump's liquidity services undisputedly reached California, as shown by the fact that Plaintiff Austin Ward was, at all relevant times, a resident of this State. Dkt. 1 at ¶ 12.

Furthermore, Defendants have done little to nothing to establish they have *not* availed themselves of California jurisdiction. They have not, for example, offered any evidence that they did not conduct UST-related business in California or with California entities, that they do not own or lease property in California, that they have no employees in California, or that they are not registered to do business in California. *Cf. Payrovi v. LG Chem Am., Inc.*, 491 F. Supp. 3d 597, 608 (N.D. Cal. 2020) (court lacked jurisdiction where parent company presented uncontroverted evidence that it did not own or lease property in California, had no employees in California, was not registered to do business in California, and did not design products in question in California). Plaintiffs' showing of Defendants' forum-related conduct is, accordingly, uncontested.

## C.    Further Evidence Suggests Plaintiffs' Claims Arise Out of Defendants' Forum-Related Activities

The second fact Plaintiffs must establish to show the Court has personal jurisdiction is that their claim "arises out of or relates to the defendant's forum-related activities." *Schwarzenegger*, 374 F.3d at 802. "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                                CASE NO.: 3:25-CV-03989-PHK

13

causal showing." *Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 742 (N.D. Cal. 2023) (citing *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 360 (2021)).

There is no question that Jump's conduct reached into California and touched California investors. Plaintiff Ward made sell orders from California that were routed to Defendants for fulfillment. Dkt. 1 at ¶ 12. Jump refused to fill his orders, as is likely the case with countless other Californians. When the wrongful conduct alleged in the complaint is finally consummated in California, courts within this state have jurisdiction even if the conduct may have emanated from outside the State. *Swarts*, 689 F. Supp. 3d at 743 (non-California defendant was subject to jurisdiction because its contact with the forum, recording an online chat conversation with a California resident, established minimum contacts). Plaintiffs have requested through interrogatories additional evidence of Defendants' contacts with California, including the total number of UST transaction orders with California residents and the value of those orders. Dkt. 45-1 at p. 18. Defendants have refused to respond. Osborne Decl. at ¶ 4.

**D.    Defendants' Litigation in this Court and Prior Demand that this Court Assume Jurisdiction Over Other Conduct Relating to UST's Collapse Cannot Be Ignored**

In general, a party consents to personal jurisdiction when it takes an affirmative act, such as "accepting a forum selection clause, submitting a claim, filing an action—that fairly invited the court to resolve the dispute between the parties." *S.E.C. v. Ross*, 504 F.3d 1130, 1148-49 (9th Cir. 2007) (finding a third-party intervenor had not submitted to personal jurisdiction, but giving credence to the principle that "a party cannot simultaneously seek affirmative relief from a court and object to that court's exercise of jurisdiction").

In the past few years, Jump has both consented to this Court's jurisdiction and affirmatively sought to have this Court exercise jurisdiction over it in litigation involving UST's collapse. As mentioned above, the *Patterson* case was filed and remains pending in this district. At no point did Jump contest the district's jurisdiction over it, thereby effectively consenting to personal jurisdiction.

And when the plaintiffs in *Kim* filed their class action complaint in Illinois, Jump Trading called it "a belated attempt at forum shopping" and argued "there is no legally compelling

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                                    CASE NO.: 3:25-CV-03989-PHK

14

1  connection to Illinois, and nearly all of the relevant witnesses and documents either are located

2  outside Illinois or are just as easily accessed elsewhere." Ex. 9, *Kim*, Defendants' Motion to

3  Transfer, at p. 1. Its motion affirmatively sought the Northern District of California's exercise of

4  jurisdiction over a case involving the collapse of UST. While this case is not "related" to *Kim* in

5  the technical sense, *see* Civil L.R. 3-12 (defining "related cases"), Jump's recent affirmative

6  motion seeking to transfer a case involving UST to this judicial district is incompatible with its

7  current position that this Court lacks jurisdiction over a case involving UST.

8      Jump's consent and affirmative efforts to litigate cases related to UST's collapse in this

9  district renders it unlike the cases Defendants cite in support of their jurisdictional challenge.

10  Cases like *AM Tr. v. UBS AG*, 681 F. App'x 587 (9th Cir. 2017) and *Core-Vent Corp. v. Nobel*

11  *Indus. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993) did not involve defendants that affirmatively acted

12  to seek the court's jurisdiction based on associated facts.

13  **E.    Plaintiffs Should Be Permitted Jurisdictional Discovery**

14      If the Court finds the facts alleged in Plaintiffs' complaint and established here are

15  inadequate, the Court should grant Plaintiffs jurisdictional discovery. *See Payrovi*, 491 F. Supp.

16  3d at 608 (collecting cases and granting jurisdictional discovery against subsidiary defendant);

17  *Calix Networks, Inc. v. Wi-Lan, Inc.*, 2010 WL 3515759, at *3-4 (N.D. Cal. Sept. 8, 2010)

18  (courts may abuse discretion with denial of personal jurisdiction discovery where plaintiff has

19  shown a "colorable basis for jurisdiction or some evidence constituting a lesser showing than a

20  prima facie case"). Jurisdictional discovery "should ordinarily be granted where pertinent facts

21  bearing on the question of jurisdiction are controverted or where a more satisfactory showing of

22  the facts is necessary." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003)

23  (quoting *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986)).

24      Plaintiff served jurisdictional interrogatories on August 5, 2025. Dkt. 45-1 at p. 16.

25  Defendants responded with only objections. Osborne Decl., ¶ 4. Plaintiffs have already raised

26  this improper response in a discovery dispute letter filed with the Court on August 27, 2025. Dkt.

27  45-1. As argued in Plaintiffs' letter, the Court should compel Defendants to engage in discovery,

28  if for no other reason than to establish whether the Court has jurisdiction over this matter.

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO
COMPEL ARBITRATION                                         CASE NO.: 3:25-CV-03989-PHK

1

**F.      If the Court Finds It Lacks Jurisdiction, It Should Transfer the Matter to**

2

**Defendants' Home Venue**

3

When a court finds it lacks personal jurisdiction it can, as an alternative to dismissal,

4

transfer the matter to a district in which such jurisdiction and venue exist if a transfer is "in the

5

interest of justice." 28 U.S.C. § 1406(a); *see also* 28 U.S.C. 1631 (allowing "transfer to cure

6

want of jurisdiction"); *Johnson v. Law.*, 19 F. Supp. 3d 1004, 1010 (S.D. Cal. 2014) (class action

7

transferred to South Carolina "to spare [plaintiff] the delay and expense involved in re-filing this

8

action and re-serving Defendants").

9

While Defendants previously sought to escape the Northern District of Illinois in *Kim*,

10

they cannot contest that they are subject to jurisdiction in that district. If the Court is inclined to

11

grant Defendants' Motion without the benefit of discovery (it should not), then Plaintiffs urge the

12

Court to transfer rather than dismiss the matter in the interests of justice.

13

**IV.      DEFENDANTS' RULE 12(b)(3) MOTION SHOULD BE DENIED**

14

**A.      Legal Standard**

15

When considering a Rule 12(b)(3) motion, the court "may consider facts outside the

16

pleadings." *Sanchez Mora v. U.S. Customs & Border Prot.*, 2024 WL 5378335, at *2 (N.D. Cal.

17

Nov. 4, 2024). The court is, nevertheless, "obligated to draw all reasonable inferences in favor of

18

the non-moving party and resolve all factual conflicts in favor of the non-moving party." *Murphy*

19

*v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004). As with motions under Rule

20

12(b)(2), a motion under Rule 12(b)(3) allows the court to transfer a case to a different venue if it

21

could have been filed there in the first instance. *Id.* (transferring class action to District of

22

Columbia "under 28 U.S.C. 1631 and/or 28 U.S.C. 1406(a)").

23

**B.      If Jurisdiction Is Proper in this District, Venue Is Proper in this District**

24

As Jump Trading argued in its motion to transfer the *Kim* case to the Northern District of

25

California, "where Defendants are accused of making false representations nationwide (or, as

26

here, worldwide), Defendants' location is not significant." Ex. 9, *Kim*, Defendants' Motion to

27

Transfer, at p. 13 (citing *Aliano v. Quaker Oats Co.*, 2017 WL 56638 (N.D. Ill. Jan. 4, 2017)).

28

1   *Aliano* points out that, "[w]ith the advent of electronic discovery, where records are actually

2   stored is less of a factor." 2017 WL 56638 at *2.

3      Plaintiffs show Defendants employ dozens of individuals here (Osborne Decl., at ¶ 14;

4   Ex.10), issue fellowships to researchers here (Ex. 12), and breached obligations that harmed

5   investors here (Dkt. 1 at ¶ 12). Furthermore, Defendants have *sought* venue here, claiming there

6   is nothing tethering them to venue in the Northern District of Illinois. The Court should

7   accordingly, conclude venue is proper in this district.

8   **V.    DEFENDANTS' MOTION TO COMPEL ARBITRATION IS WITHOUT MERIT**

9   **A.    Legal Standard**

10     Where a party seeks to compel arbitration, "the basic role for courts is to determine (1)

11  whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

12  encompasses the dispute at issue." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 564-65 (9th

13  Cir. 2014). "[A]rbitration is a matter of contract and a party cannot be required to submit to

14  arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns

15  Workers of Am.*, 475 U.S. 643, 648 (1986). Moreover, it is well established law that "disputes

16  concerning contract formation are for courts to decide in the first instance, regardless of an

17  agreement to arbitrate." *Connell v. ByteDance, Inc.*, 2025 WL 1828472, at *3 (N.D. Cal., 2025)

18  (citing *Granite Rock Co. v. Int'l Brotherhood of Teamsters et al.*, 561 U.S. 287, 296-97 (2010)).

19     In determining whether a valid arbitration agreement exists, federal courts apply

20  "ordinary state-law principles that govern the formation of contract." *Pokorny v. Quixtar, Inc.*,

21  601 F.3d 987, 994 (9th Cir. 2010); *see* 9 U.S.C. § 2 (an arbitration clause is enforceable under

22  the FAA unless "grounds exist at law or equity for the revocation of any contract"). In

23  determining which state's laws to apply, courts use the choice-of-law rules of the forum state,

24  which in this case is California. *Id.* Here, California law should control.[6]

25  ────────────

26  [6] California contract law is the correct law to apply to Defendants' arguments here. *Kim v. Jump Trading, LLC*, 2025 WL 1359136, at *6 (N.D. Ill. May 9, 2025) ("in the arbitration context,
27  courts must apply traditional state promissory estoppel principles to decide whether a non-party should be bound by the terms of another's contract" (citations omitted)).
28

Under California law, generally, a party may not enforce an arbitration agreement to which it is not a signatory. Non-signatories are permitted to invoke arbitration agreements in two "limited circumstances" under the doctrine of equitable estoppel. *In re Henson*, 869 F.3d 1052, 1060 (9th Cir. 2017). These limited circumstances, known as the "*Goldman* circumstances," were adopted by the Ninth Circuit in *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013). They are as follows:

> (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement.

*Id.* at 1128-29 (citing *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 219, 221 (2009)). The test under federal common law is similar. "[F]ederal law permits third parties to enforce arbitration agreements only where the claims at issue are intertwined with the contract in which the arbitration agreement appears." *Patterson*, 710 F. Supp. 3d at 709.

## B.    Jump Fails to Establish the Existence of an Agreement to Arbitrate

In its motion to compel arbitration, Defendants attempt with little earnest effort to enforce arbitration clauses in various contracts, all of which are signed only by entities that are not a Parties to this action. Defendants woefully fail to establish either of the two "limited circumstances" under which the doctrine of equitable estoppel permits non-signatories to enforce an arbitration agreement to which they are not a party. Revealing the thinness of the doctrine's application here, Defendants provide next to no explanation or analysis of their theory.

They instead summarily contend that, because "it appears" Plaintiffs' Complaint refers to the contracts it submitted, then it follows that they somehow have standing to enforce those contracts against Plaintiffs. This incorrectly conflates its (doomed) argument that because the contracts are referenced in the Complaint, they should be deemed incorporated by reference and therefore may be considered on a motion to dismiss. Even if Defendants successfully argued that the contracts form the basis of Plaintiffs' claims and therefore are incorporated by reference, it does not follow that Defendants may enforce any and all terms against Plaintiffs. Defendants

skip over the entire first part of the analysis—namely, whether there exists a valid agreement to arbitrate. None of their arguments about delegation or estoppel matter if Defendants, as non-signatories, lack standing to enforce the arbitration provision against Plaintiffs, who are also non-signatories.

## C.    Defendants Make Unintelligible Arguments Regarding Which Arbitration Clause Applies and Which Law Controls

The party seeking to compel arbitration bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *Knutson*, 771 F.3d at 565. Defendants claim "each" of the contracts they attached to their Motion contains an agreement to arbitrate. Of the three contracts that include an arbitration clause, only three include arbitration clauses and they are all substantially different.

| Exhibit A | Exhibit B | Exhibit C | Exhibit D |
|---|---|---|---|
| No arbitration clause | Arbitration between two non-U.S. businesses | Arbitration between one non-U.S. business and one Nevada-based business | Arbitration between one non-U.S. business and one Nevada-based business |
| | Governed by the laws of the State of Illinois | Governed by the laws of the State of Nevada | Governed by the laws of the State of New York |
| | Administered in Chicago | Administered in Clark County, Nevada | Administered in in either Chicago, Illinois or New York, New York |
| | Under the AAA Commercial Arbitration Rules | No reference to governing rules | Under the AAA Commercial Arbitration Rules |

Rather than prove the existence of an agreement, Defendants have thrown everything at a wall hoping something will stick. This is fatal to Defendants' Motion because they fail to establish any one of the alleged contracts are an agreement to arbitrate.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                                    CASE NO.: 3:25-CV-03989-PHK

19

Exhibit A contains no arbitration agreement. Dkt. 33-1. Defendants cannot enforce an agreement that does not exist.

Exhibit B is Tai Mo Shan's loan agreement with Terraform Labs. Dkt. 33-2. It states, "If a dispute *arises out of or relates to this Agreement*, or the breach thereof, and the dispute cannot be settled through negotiation, then the dispute shall be finally resolved by binding arbitration." *Id*. at p. 9 (emphasis added). The *Agreement* referenced in the clause contains only the terms of Terraform Labs's loans to Tai Mo Shan. Plaintiffs' claims do not "arise out of or relate to" the Terraform Labs/Tai Mo Shan loan—the arise from and relate to Jump Trading and Jump Crypto's failure to provide liquidity and market making services for UST. There is no reference anywhere in Exhibit B to arbitrating claims arising out of Jump Trading or Jump Crypto's failure to comply with market maker obligations. In fact, there is no reference to Jump Trading or Jump Crypto at all. Accordingly, this cannot be read as an agreement to arbitrate Plaintiffs' claims.

Exhibit C is Tai Mo Shan's asset custody account agreement with Prime Trust and it includes a similar arbitration clause for claims "*arising under this Agreement*." Dkt. 33-3 at p. 11 (emphasis added). Again, the *Agreement* in the provision concerns Prime Trusts's appointment as a custodian of Tai Mo Shans's assets and makes no reference to Jump Trading, Jump Crypto, or market making obligations. Plaintiffs' claims, meanwhile, relate only to Jump Trading and Jump Crypto's market making obligations. Tai Mo Shan's custody account agreement, therefore, is not an agreement to arbitrate Plaintiffs' claims.

Exhibit D, Tai Mo Shan's trading agreement with Prime Trust, contains an arbitration clause that, like the clause in *Patterson*, limits its application to "the parties." Dkt. 33-4 at pp. 5-6 ("each party hereby irrevocably and unconditionally (i) consents to submit to the jurisdiction of … the relevant arbitral forum;" "the parties hereby agree to waive the right to sue each other in court"). The agreement cannot, by its own terms, apply to nonparties. *See Patterson v. Jump Trading, LLC*, , 2025 WL 215519, at *1 (upholding district court's order denying motion to compel arbitration because "[t]here is no mention of any third party or nonsignatory in the arbitration agreement"). This is akin to the facts in *Kramer v. Toyota Motor Corp.*, where the plaintiffs sued an auto manufacturer who then sought to compel arbitration provision in the

consumer contract with the dealer. 705 F.3d 1122. The arbitration agreement clearly covered only disputes between the plaintiffs and the dealers. *Id.* at 1127. The Ninth Circuit ruled, "[t]he language of the contracts evidences plaintiffs' intent to arbitrate arbitrability with the dealerships and no one else, [and] the dealerships are not a party to this action." *Id*. This Exhibit D also fails to establish an agreement between the parties to arbitrate the claims.

The question of which contract Defendants seek to enforce carries other consequence as well. For example, Defendants' failure to specify an agreement prevents the Court from determining which law to apply to this Motion. An arbitration clause involving a foreign party and invoking an international arbitral forum will be subject to the New York Convention. 9. U.S.C. § 202. Not all the agreements here meet that criteria. Exhibit B involves two foreign entities, but claims it is governed by American law and is administered by the AAA in the United States. Dkt. 33-2 at p. 9. Exhibits C and D involve one supposedly foreign party, Tai Mo Shan,[7] but again invoke American state law and an American arbitral forum. Since no party to this case is a party to any of the contracts, it can't be said that "a foreign entity [is] seeking to enforce arbitration." *Patterson* 710 F. Supp. 3d at 708. This ambiguity should result in an analysis most favorable for the non-moving party, although the outcome will be the same regardless of which law applies.

**D.    There Are No Effective Delegation Clauses in Any of the Contracts Defendants Cite**

As a preliminary matter, the Court, and not an arbitrator, must determine arbitrability of this claim. It is well established law that "disputes concerning contract formation are for courts to decide in the first instance, regardless of an agreement to arbitrate." *Connell v. ByteDance, Inc.*, 2025 WL 1828472, at *3 (N.D. Cal., 2025) (citing *Granite Rock Co. v. Int'l Brotherhood of Teamsters et al.*, 561 U.S. 287, 296–97 (2010)).

Citing the Ninth Circuit's 2015 decision in *Brennan v. Opus Bank*, Defendants argue that the contracts do not need to include explicit delegation clauses because reference to the AAA is

---

[7] Exhibit B described Tai Mo Shan as "a Cayman Islands exempted company," but lists a location for notice in Chicago, Illinois. Dkt. 33-2 at p. 9.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                    CASE NO.: 3:25-CV-03989-PHK

21

itself a clear and unmistakable delegation clause. 796 F.3d 1125 (9th Cir. 2015). Not so. *Brennan v. Opus Bank* is expressly limited to the facts of the case, which involved an undisputed contract between sophisticated parties:

> [W]e limit our holding to the facts of the present case, which do involve an arbitration agreement "between sophisticated parties." Indeed, it is undisputed that Brennan was a sophisticated party […]. [W]e need not decide nor do we decide here "the effect [if any] of incorporating [AAA] arbitration rules into consumer contracts" or into contracts of any nature between "unsophisticated" parties.

*Id.* at 1131 (citations omitted); *see also Shansby v. Edrington, USA, Inc.*, 2023 WL 2456789, at *2 (N.D. Cal. Mar. 9, 2023) ("*Brennan* left unresolved whether its ruling applies when at least one of the arbitration agreement parties is unsophisticated"). Plaintiffs' lack of sophistication here renders *Brennan* inapposite authority. *See Meadows v. Dickey's Barbecue Restaurants Inc.*, 144 F.Supp.3d 1069, 1079 (N.D.Cal., 2015) ("the Court concludes that the Toff Plaintiffs were not 'sophisticated,' and that the rule announced in *Brennan* and *Oracle* does not apply in this case. […] For persons such as Plaintiffs here, incorporation of the AAA rules does not meet that test.")

Based on the facts of *this case*, there is no clear and unmistakable delegation of the question of arbitrability to an arbitrator. Exhibit A contains no arbitration agreement. Dkt. 33-1. Exhibit C makes no reference to delegation or to the rules of an arbitral forum. Dkt. 33-3 at p. 11. Exhibits B and D both refer to the AAA's Commercial Arbitration Rules (Dkt. 33-3 at p. 11; Dkt. 33-4 at pp. 5) but these rules apply commercial entities, not to individual investors like Plaintiffs. Prime Trust, contains an arbitration clause that, like the clause in *Patterson*, limits its application to "the parties." Dkt. 33-4 at pp. 5-6 ("each party hereby irrevocably and unconditionally (i) consents to submit to the jurisdiction of … the relevant arbitral forum;" "the parties hereby agree to waive the right to sue each other in court").

Citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019), the same case Defendants cite here, Jump Trading argued in *Patterson* it could enforce this agreement's delegation clause even though it was not a party. The court responded, "Jump's position can prevail only if there is clear and unmistakable evidence that [the plaintiff's] agreement includes

1  an agreement to arbitrate the question of whether a third party nonsignatory to the agreement like

2  Jump is entitled to enforce the agreement." *Patterson*, 710 F. Supp. 3d at 706. Jump had no such

3  evidence, and the court ruled it would decide the question of arbitrability. *Id*. at 708. The Ninth

4  Circuit affirmed, adding, "*Henry Schein* did not involve nonsignatories, and did nothing to

5  mandate delegation when the contract does not require it by 'clear and unmistakable' evidence."

6  *Patterson v. Jump Trading, LLC*, 2025 WL 215519, at *1 (9th Cir. Jan. 16, 2025); *see also Kim*,

7  2025 WL 1359136, at *3 ("[b]efore compelling arbitration, it is the province of a court to

8  determine whether a contract exists at all. If the nonsignatories are not parties to the contract,

9  then the Plaintiff has no agreement with them, and even the broadest of delegation clauses does

10  not apply" (cleaned up)).

11       Defendants' evidence here is even more faulty. They seek to compel one non-party to

12  arbitrate against another non-party based on contracts that have no delegation clause other than a

13  reference to inapplicable arbitral rules. "It is the parties to the agreement and their intentions in

14  entering that agreement that matter […]." *Patterson*, 710 F. Supp. 3d at 708. There is simply no

15  evidence here that Tai Mo Shan and Terraform Labs or Prime Trust intended to subject the non-

16  parties involved in this litigation to arbitration. The question of arbitrability should, therefore, be

17  decided by the Court.

18  **E.    Defendants' Equitable Estoppel Argument Should Be Denied Based on Precedent**

19  **Set by Defendants Themselves**

20       "The theory behind equitable estoppel is that a plaintiff may not, 'on the one hand, seek

21  to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an

22  arbitration provision, but, on the other hand, deny arbitration's applicability because the

23  defendant is a non-signatory.'" *In re Henson*, 869 F.3d at 1060 (quoting *Murphy v. DirecTV,*

24  *Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013)).

25       Defendants contend Plaintiffs should be equitably estopped, under "[a]ll potential forum

26  laws (federal common law, California, Nevada, and New York)" from avoiding arbitration. Dkt.

27  32 at p. 38. This is the same argument Jump has made unsuccessfully in multiple prior cases. *See*

28

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO
COMPILE ARBITRATION
CASE NO.: 3:25-CV-03989-PHK

1   *Patterson*, 710 F. Supp. 3d at 708; *Kim*, 2025 WL 1359136, at *8. The Court here should find, as

2   those courts found, that "Jump's argument is without merit." *Patterson*, 710 F. Supp. 3d at 708.

3       In *Patterson*, Jump Trading argued that the lead plaintiff was equitably estopped from

4   claiming that he was not bound to arbitration based on the terms of the agreement between the

5   plaintiff and Terraform Labs. The court ruled that, under Ninth Circuit law, "for equitable

6   estoppel to apply, it is essential that the subject matter of the dispute be intertwined with the

7   contract providing for arbitration." *Patterson*, 710 F. Supp. 3d at 709–10 (citing *Setty v.*

8   *Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1169 (9th Cir. 2021) (cleaned up). Because the

9   plaintiff alleged statutory securities fraud claims against Jump Trading, and Jump Trading was

10  not a party to the plaintiff's agreement with Terraform Labs, his claims against Jump were not

11  intertwined with the Terraform Labs agreement. *Id*. Thus, he could not be estopped to avoiding

12  forced arbitration.

13      Defendants' arguments in *Kim* fared no better. There, Jump Trading and Jump Crypto

14  argued that federal common law applied to the analysis based on the fact that the plaintiffs

15  entered an agreement with Terraform Labs, a foreign entity. *Kim*, 2025 WL 1359136, at *6. The

16  court found that Illinois state law controlled the analysis because the dispute before the court was

17  a dispute between two domestic entities—Jump and the American plaintiffs. *Id*. ("[Terraform

18  Labs] is not a party here—*this* dispute is among domestic parties" (original emphasis)). The

19  court noted that there was little, if any, difference between federal and state common law, and in

20  any event Defendants' equitable estoppel arguments were fatally inadequate. *Id*. at *8.

21      As in *Patterson* and *Kim*, Defendants' equitable estoppel arguments fail because the

22  agreements Defendants seek to enforce have nothing to do with Plaintiffs' claims against Jump

23  Trading and Jump Crypto. Exhibit A contains no arbitration agreement. Dkt. 33-1. Exhibit B is

24  Tai Mo Shan's loan agreement with Terraform Labs. Dkt. 33-2. It makes no mention of Jump

25  Trading and Jump Crypto's liquidity services. It states, "If a dispute *arises out of or relates to*

26  *this Agreement*, or the breach thereof, and the dispute cannot be settled through negotiation, then

27  the dispute shall be finally resolved by binding arbitration." *Id*. at p. 9. Plaintiffs' claims do not

28  arise out of Terraform Labs' loan terms. Exhibit C is Tai Mo Shan's asset custody account

---

agreement with Prime Trust and it includes a similar arbitration clause for claims "arising under this Agreement." Dkt. 33-3 at p. 11. Again, Plaintiffs' claims relate to liquidity obligations and do not arise under the terms of Tai Mo Shan's custody account. Finally, Exhibit D, Tai Mo Shan's trading agreement with Prime Trust, contains an arbitration clause that, like the clause in *Patterson*, limits its application to "the parties," which do not include Jump Trading and Jump Crypto. Dkt. 33-4 at pp. 5-6. None of the above agreements intertwine with Plaintiffs' claims because, none of the agreements mention the liquidity obligations of Jump Trading and Jump Crypto.

Defendants do little to mount an attack on the decisions in *Patterson* and *Kim*, citing instead only the thinnest precedent in their favor. Defendants rely, for example, on *Comer v. Micor, Inc.*, 436 F.3d 1098 (9th Cir. 2006). But in that case, the court applied the "general rule," which is that "a nonsignatory is not bound by an arbitration clause," and found the plaintiff was not required to arbitrate. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1103–04 (9th Cir. 2006). Similarly, in *Setty v. Shrinivas Sugandhalaya LLP*, a case cited in one of Defendants' 27 footnotes,[8] the court came to the same conclusion. 3 F.4th at 1169 ("the district court did not abuse its discretion in rejecting [the defendant's] argument that [the plaintiff] should be equitably estopped from avoiding arbitration"). In another swing-and-miss cited by Defendants, *Teleport Mobility, Inc. v. Sywula*, the court compelled the plaintiff to arbitrate, but only did so because it found was a signatory to the arbitration agreement. 2021 WL 2291807, at *3 (N.D. Cal. June 4, 2021). Beyond these three cases, Defendants generally rely on inapposite and out-of-circuit decisions.

## VI.     MOTION TO DISMISS UNDER RULE 12(b)(6)

### A.     Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[8] Defendants' small-font footnotes add up to eight pages of additional briefing (Osborne Decl., at ¶ 16, Ex. 14), violating Civ. L. R. 3-4(c)(2)(b).

(2007). A claim is plausible on its face "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (citing *Twombly*). Courts analyzing a motion to dismiss accept the plaintiff's allegations as true and draw all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 n.1 (9th Cir. 1987).

**B.    All Documents on Which Defendants Rely Are Inadmissible Without Exception**

When the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6), "[r]eview is limited to the complaint." *Cervantes v. City of San Diego,* 5 F.3d 1273, 1274 (9th Cir.1993). "As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (overruled on other grounds)). When a defendant attaches extrinsic evidence to a Rule 12(b)(6) motion, the court ordinarily must convert that motion into one for summary judgment under Rule 56 to give the plaintiff an opportunity to respond. *See* Fed. R. Civ. Pro. 12(d).

One of the few exceptions to this general rule allows a court to "consider 'material which is properly submitted as part of the complaint.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (overruled on other grounds)). This includes documents attached to the complaint and documents incorporated by reference in the complaint. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  If the documents are not physically attached to the complaint, they may be considered only if (1) the complaint refers to the document, (2) the document is central to the plaintiffs' claims, and (3) the document's authenticity is not contested. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

According to Defendants, the four contracts they include with their Motion "appear to be" the agreements Plaintiffs refer to in their complaint. Dkt. 32 at p. 44. In truth, the complaint does not make *any* reference to them at all, either by name or as to their content. The complaint refers to a "series of agreements" that Defendants entered into between January 2019 and July 2021 to serve as a liquidity provider for wallet app users who invested in UST. Dkt. 1 at ¶ 38 ("Between January 2019 and July 2021, Jump entered a series of agreements with Terraform

1  Labs and Prime Trust designed primarily to grow, stabilize, and support investment in UST.

2  Jump specifically agreed to provide liquidity for UST investments in the U.S. market."); ¶ 39

3  ("Under these agreements, Terraform Labs agreed to provide a series of lump sum loans to Jump

4  in amounts between 30 and 50 million UST tokens, which at the time were worth $30 to $50

5  million U.S. dollars based on UST's peg to the dollar. Jump was obligated under the agreement

6  to deposit the loaned UST tokens into accounts with Prime Trust for the purpose of providing

7  UST liquidity for investors using Wallet Apps that integrated with UST.")

8        None of the four contracts Defendants attach mention UST. Nor do they reference either

9  of the Defendants. They cannot, therefore, be the agreements referenced the complaint that

10 "obligated Jump to provide liquidity of UST." Dkt. 1 at ¶ 64. Since the four contracts Defendants

11 cite are not mentioned in Plaintiffs' complaint, they are not incorporated by reference and are not

12 subject to judicial notice. *Khoja v. Orexigan Therapeutics, Inc*., 899 F.3d 988, 998-1002 (9th Cir.

13 2018) ("if the document merely creates a defense to the well-pled allegations in the complaint,

14 then the document did not necessarily form the basis of the complaint. Otherwise, defendants

15 could use the doctrine to insert their own version of events into the complaint to defeat otherwise

16 cognizable claims.") Moreover, Plaintiffs have no information regarding the authenticity of the

17 contracts and find the declaration of Mr. Hinerfeld inadequate to establish their foundation.

18 Plaintiffs, accordingly, have no choice but to challenge their authenticity and seek leave to

19 conduct discovery relating thereto.

20        With the extrinsic evidence excised from the record, Defendants' Motion must be denied.

21 All but one of Defendants arguments (relating to extraterritorial application of certain statutory

22 claims) rely entirely on the contracts.

23 **C.    The Well-Pleaded Allegations in Plaintiffs' Complaint State Causes of Action**

24        Regardless of whether the Court considers the extrinsic evidence, Plaintiffs' Complaint

25 makes plausible factual allegations that adequately state claims for relief.

26        The facts alleged in the Complaint establish that Defendants agreed to act as market

27 makers and assumed contractual obligations to provide liquidity for UST. *Id*. at ¶¶ 7, 38-42. This

28 involved filling investor buy and sell orders using UST it acquired from Terraform Labs. *Id*. at ¶

1   39. Plaintiffs were the intended beneficiaries of Defendants' liquidity services, as those services

2   were, in part, for the benefit of Plaintiffs and the sole purpose and utility of UST liquidity was to

3   allow investors to place buy and sell orders and to financially gain from their investments. *Id*. at

4   ¶¶ 65-66. Defendants breached their obligations by refusing to fill investor sell orders when

5   UST's value began to fall, causing investors to lose the full value of their investments. *Id*. at ¶¶

6   67-68. The complaint further alleges Defendants illegally took possession of Plaintiffs funds

7   when they had an obligation to return them in order to mitigate their own losses caused by the

8   fall in value of UST, in violation of California's civil theft statute. *Id*. at ¶¶ 90-92.

9       Defendants do not dispute that they were the liquidity provider Prime Trust identified as

10   the cause of investor losses. They do not dispute that they refused to fill investor sell orders or

11   that they illegally took possession of investors' funds. They merely claim that they had no

12   contractual obligation to act as UST's liquidity provider for Plaintiffs' benefit. This contention

13   alone is insufficient for dismissal.

14   **D.    If Defendants' Documents Are Admitted, this Motion Has Been Converted to a**

15   **Motion for Summary Judgement and Should Be Denied Outright**

16       "[I]f a court considers extrinsic evidence attached to a Rule 12(b)(6) motion because a

17   plaintiff either referenced or relied on its contents, the court normally must convert the Rule

18   12(b)(6) motion into a Rule 56 summary judgment motion and give the plaintiff an opportunity

19   to respond." *G & C Auto Body Inc v. Geico Gen. Ins. Co.*, 2008 WL 687371, at *5 (N.D. Cal.

20   Mar. 11, 2008).

21       Defendants' arguments for dismissal rely almost entirely on the written declaration of

22   their General Counsel and four documents that are neither attached nor referenced in the

23   Complaint. This is extraneous evidence transforms the motion to one for summary judgement,

24   which should be denied based on Defendant's unwillingness to participate in discovery and on

25   the presence of disputed material facts.

26       First, Defendants have refused to respond to any of Plaintiffs' discovery requests. *See*

27   *generally*, Dkt. 45-1, Joint Discovery Dispute Letter of August 27, 2025. Plaintiffs have had no

28   opportunity to interrogate the authenticity of the documents, conduct discovery regarding other

documents that were not attached, investigate the likely possibility that the agreements at issue are not included in formal contracts, or interrogate the claims of Jump's General Counsel regarding the contracts that were produced. Where a party moves for summary judgement an opposing party may be entitled to discovery. Fed. R. Civ. P. 56(d).

Second, Defendants fail to meet their burden of establishing that there is no genuine dispute of material fact that warrants summary judgement. Exhibit D, the Tai Mo Shan/Prime Trust Trading Agreement appears to create an obligation for Tai Mo Shan to execute transactions for investors, albeit without reference to UST, just as Plaintiffs allege. Paragraph 2 of the contract states:

> Unless otherwise agreed between the Parties, within 24 hours after either Party sends a settlement notice covering any previously executed Transactions, Counterparty must complete its settlement obligations on any Transactions covered by the settlement notice. Within 24 hours after Counterparty makes these deliveries, Tai Mo Shan must complete its delivery obligations covered by the settlement notice.

Dkt. 33-4 at p. 2. While Plaintiffs have not had the benefit of discovery, this clause appears to require Tai Mo Shan, which Mr. Hinerfeld's declaration described as a "Jump entity" (Dkt. 34 at ¶¶ 8-9), to execute settled investor transactions in a timely manner.

Third, the available information shows an abundance of genuine issues of disputed material fact that warrant denial. Jump claims it entered no other agreements to provide liquidity for UST. Ample evidence shows it did. Court filings from the SEC's case against Terraform Labs revealed that in 2020, Do Kwon stated Terraform Labs "*agreed to enter a partnership* with Jump Trading whereby Jump will deploy its own resources to improve liquidity of Terra." Ex. 2 (emphasis added). An August 2020 email from Kanav Kariya referred to a "*partnership*" between Jump and Terraform Labs and described a "*Gentleman's agreement*" whereby Jump would "support trading on terra stable coin pairs on all exchanges we're connected to and help maintain the peg." Ex. 3 (emphasis added). In June 2021, Kwon emailed Kariya and stated Terraform Labs would lend UST to Jump so it could "deposit this UST in PrimeTrust – when users buy UST from PrimeTrust, PT credits your account with USD and withdraws UST to send to users." Ex. 4. Tai Mo Shan's August 2021 "OTC Trading Agreement" with Prime Trust

referred to "specific terms" for cryptocurrency transactions that "will *separately be agreed* directly between the Parties." Dkt. 33-4 at p. 2 (emphasis added).

These documents establish genuine disputes of material facts that preclude summary judgement. *Panchenko v. Comenity Cap. Bank*, 2025 WL 2374109, at *2 (N.D. Cal. Aug. 13, 2025). Whether the Court analyzes the Motion under Rule 12(b)(6) or Rule 56, the Motion should be denied.

**E.    Plaintiffs' Statutory and Common Law Claims Should Be Permitted to Go Forward or Can Be Perfected Through Amendment**

As an afterthought, Defendants claim Plaintiffs' statutory claims for violating California's civil theft statute (Cal. Penal Code §§ 484 & 496) and unfair competition law (Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL")) should be dismissed because they cannot be applied beyond California's borders. Dkt. 32 at p. 36. They further argue Plaintiffs' common law claims for conversion and unjust enrichment should be dismissed because they are "not asserted under any state law." *Id*. at p. 38. These positions are without merit and should be disregarded.

In analyzing the extraterritorial application of the UCL, "[m]ultiple courts—including the California Supreme Court in [*Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011)]—have permitted the application of California law where the plaintiffs' claims were based on alleged misrepresentations that were disseminated from California" *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1130 (N.D. Cal. 2014). As argued above, there are strong indicia that Defendants maintain a presence in California. As such, there is a distinct possibility, which Plaintiffs cannot confirm without the benefit of the jurisdictional discovery Plaintiffs request, that Defendants' alleged misconduct emanated from California such that extraterritorial application of the UCL would be permitted.

Plaintiffs concede that there are limits to the extraterritoriality of California's civil theft statute, as articulated in *Dfinity USA Rsch. LLC v. Bravick*, 2023 WL 2717252, at *5 (N.D. Cal. Mar. 29, 2023). That case found a Michigan defendant was not subject to the statute, but explicitly permitted the plaintiff to amend based on the principle that "[w]henever a person, with intent to commit a crime, does any act within this state in execution or part execution of that

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO COMPEL ARBITRATION                                    CASE NO.: 3:25-CV-03989-PHK

30

intent, which culminates in the commission of a crime, either within or without this state." *Id*. In the context of a class action, the question should be deferred to class certification rather than decided on the pleadings. *See C. M. v. MarinHealth Med. Grp., Inc.*, 2024 WL 217841, at *5 (N.D. Cal. Jan. 19, 2024) ("[w]hether it is appropriate to certify a nationwide class that might include absent class members who are residents of states other than California will be determined at class certification"). If it appears based on discovery that there is no extraterritorial application of the statute, Plaintiffs' motion to certify the class will be limited or face denial.

Finally, Plaintiffs' claims for conversion and unjust enrichment are well-pleaded and should not be dismissed. Where common law claims applicable in all states, such as conversion and unjust enrichment, are asserted on behalf of a nationwide class, the claims may asserted based on the law in the defendant's home state or without reference to any specific state law at all. *See In re Theos Dark Chocolate Litig.*, 750 F. Supp. 3d 1069, 1084 (N.D. Cal. 2024) (refusing to dismiss common law causes of action applicable to a potential nationwide class because such claims "do not invoke any particular state's law"). Should the Court find the complaint inadequate in its expression of this intent, courts grant leave to amend where a plaintiff fails to identify which state law applies to common law claims. *Romero v. Flowers Bakeries, LLC*, 2016 WL 469370, at *13 (N.D. Cal. Feb. 8, 2016).

### VII.    CONCLUSION

Defendants' Motion should be denied. It uses slight of hand to put contracts that Plaintiffs did not reference in their Complaint in front of the Court as though those contracts were the entire basis of the Complaint. It then criticizes Plaintiffs for the inadequacy of the contracts. Plaintiffs cannot be compelled to arbitrate based on these contract, and their claims should not be dismissed based on these contracts. To the extent there are shortcomings in Plaintiffs' Complaint, they are all easily remedies by amendment.

Dated this September 8, 2025          ERICKSON KRAMER OSBORNE LLP


                                      */s/ Kevin M. Osborne*
                                      Julie C. Erickson
                                      Elizabeth A. Kramer
                                      Kevin M. Osborne

                                      *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this September 8, 2025, the foregoing **PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO
COMPEL ARBITRATION** was filed and served using the CM/ECF system, which will serve
as notification of such filings on all counsel of record.


*/s/ Kevin M. Osborne*
Kevin M. Osborne
ERICKSON KRAMER OSBORNE LLP
959 Natoma St.
San Francisco, CA 94103
Phone: 415-635-0631
Fax: 415-599-8088
kevin@eko.law

*Attorneys for Plaintiffs*