1

**KOBRE & KIM LLP**
Jonathan D. Cogan (admitted *pro hac vice*)
Steven W. Perlstein (admitted *pro hac vice*)
Igor Margulyan (admitted *pro hac vice*)
Daisy Y. Joo (admitted *pro hac vice*)
Mathew T. Elder (admitted *pro hac vice*)
800 Third Avenue
New York, NY 10022
Tel: (212) 488-1200
jonathan.cogan@kobrekim.com
steven.perlstein@kobrekim.com
igor.margulyan@kobrekim.com
daisy.joo@kobrekim.com
mathew.elder@kobrekim.com

Daniel A. Zaheer (Bar ID 237118)
150 California Street, 19th Floor
San Francisco, CA 94111
Tel: (415) 582-4800

*Attorneys for Defendants*
*Jump Trading, LLC and*
*Jump Crypto Holdings LLC*

2
3
4
5
6
7
8
9
10
11
12
13
14

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

15
16
17

AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

JUMP TRADING, LLC; JUMP CRYPTO HOLDINGS LLC; AND DOES 1-10

Defendants.

18
19
20
21
22
23
24
25
26
27
28

CASE NO. 3:25-CV-03989-PHK

**DEFENDANTS JUMP TRADING, LLC AND JUMP CRYPTO HOLDINGS LLC'S NOTICE OF MOTION AND MOTION FOR SANCTIONS PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Hearing Date: November 20, 2025
Time: 1:30 p.m.
Place: Courtroom F, 15th Floor

Judge: Hon. Peter H. Kang

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on Thursday November 20, 2025 at 1:30 p.m., or at such other date as may be agreed upon or ordered in the United States District Court for the Northern District of California, Courtroom of the Honorable Peter H. Kang, Courtroom F, 15th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Jump Trading, LLC ("Jump Trading") and Jump Crypto Holdings LLC ("Jump Crypto," and together with Jump Trading, the "Defendants"), will and hereby do move this Court for an order granting the following relief pursuant to Federal Rule of Civil Procedure 11:

1. Dismissal of Plaintiffs' Complaint, which asserts claims that depend on allegations that are demonstrably false (or, alternatively, striking the allegations addressed in this Motion and identified in the attached Appendix);

2. Awarding Defendants their reasonable costs and attorneys' fees incurred in connection with this Motion and the Motion to Dismiss Plaintiffs' Complaint; and

3. Any other relief that the Court considers appropriate.

*See* Fed. R. Civ. P. 11(c)(1), (2), (4).

This Motion is based upon this Notice of Motion, the following Memorandum of Points and Authorities, the Declaration of Jonathan Cogan filed in support of this Motion, the exhibits thereto, and the supporting declarations and exhibits filed in support of Defendants' Motion to Dismiss or Alternatively to Compel Arbitration and Stay Litigation filed with the Court on July 9, 2025 (Dkt. Nos. 32, 33, 34), the pleadings and other papers on file with the Court, oral argument of counsel, if any, and any other matter submitted to the Court.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiffs or their counsel violated Rule 11 of the Federal Rules of Civil Procedure by signing and filing a complaint with frivolous claims lacking any evidentiary basis, which are contradicted by the evidence available to Plaintiffs and could not have been the product of a reasonable investigation or made in good faith.

2. Whether, upon finding a violation of Rule 11 of the Federal Rules of Civil Procedure, the Court should impose monetary and non-monetary sanctions.

i

# **TABLE OF CONTENTS**

I.     INTRODUCTION AND FACTUAL BACKGROUND......................................................1

II.    LEGAL STANDARD ........................................................................................................2

III.   PLAINTIFFS' COMPLAINT VIOLATES RULE 11 ........................................................3

    A.  Plaintiffs' Make Multiple Baseless Allegations Regarding Defendants' Purported Obligation To Provide Liquidity For The Benefit Of UST Investors. ...................4

    B.  Plaintiffs' Intentionally Vague Allegations Concerning The Purported Contractual Liquidity Obligation Demonstrates Their Fictional Nature. .............5

    C.  The Allegations Are Demonstrably False Based On Information In the Public Record Or Otherwise Available To Plaintiffs' Counsel. .......................................7

    D.  The Complaint's Entirely Conjectural Claims Could Not Have Been Based On A Reasonable And Competent Inquiry. ....................................................................11

        1.  Plaintiffs' Allegation Of A "Jump Partner Company" Representation Is Intentionally Misleading. ........................................................................11

        2.  Plaintiffs' Counsel's Asserted Bases For Their Allegations Are Without Merit. .......................................................................................................13

    E.  The Unsupported Allegations Render All Of Plaintiffs' Claims Untenable. ........16

IV.    PLAINTIFFS WERE PROVIDED NOTICE AND REASONABLE OPPORTUNITY TO CORRECT THE RULE 11 VIOLATIONS ........................................................................17

V.     PLAINTIFFS' RULE 11 VIOLATIONS WARRANT SANCTIONS ............................18

VI.    CONCLUSION ...............................................................................................................21

# TABLE OF AUTHORITIES

**CASES**                                                                                                      **Page(s)**

*Bonner v. Arastehjoo,*
    No. C 11-1350 CW, 2011 WL 5191410 (N.D. Cal. Oct. 31, 2011) ...................................... 3

*Brown v. Royal Power Mgmt., Inc.,*
    No. C-11-4822-EMC, 2012 WL 298315 (N.D. Cal. Feb. 1, 2012) ..................................... 19

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters. Inc.,*
    892 F.2d 802 (9th Cir. 1989) ..................................................................................................... 3

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.,*
    498 U.S. 533 (1991) ..................................................................................................................... 2

*Byrnes v. Lockheed-Martin, Inc.,*
    257 F. App'x 34 (9th Cir. 2007) ............................................................................................. 16

*Byrnes v. Lockheed-Martin, Inc.,*
    No. C-04-03941 RMW, 2005 WL 3555701 (N.D. Cal. Dec. 28, 2005) ............................ 16

*Christian v. Mattel, Inc.,*
    286 F.3d 1118 (9th Cir. 2002) ................................................................................................... 2

*Conn v. Borjorquez,*
    967 F.2d 1418 (9th Cir. 1992) ................................................................................................... 3

*Copple v. Astrella & Rice, P.C.,*
    442 F. Supp. 2d 829 (N.D. Cal. 2006) .................................................................................. 10

*Dreith v. Nu Image, Inc.,*
    648 F.3d 779 (9th Cir. 2011) ................................................................................................... 20

*G.C. and K.B. Investments, Inc. v. Wilson,*
    326 F.3d 1096 (9th Cir. 2003) ................................................................................................... 3

*Gottschalk v. City & Cnty. of San Francisco,*
    964 F. Supp. 2d 1147 (N.D. Cal. 2013) ................................................................................ 17

*H.P.D. Consolidation, Inc. v. Pina,*
    No. 15-cv-05309-EMC, 2017 WL 1046960 (N.D. Cal. Mar. 20, 2017) ............................. 19

*Holgate v. Baldwin,*
    425 F.3d 671 (9th Cir. 2005) ................................................................. 3, 10, 11, 13, 17

*In re Connetics Corp. Sec. Litig.,*
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ................................................................................... 2

*Kaplan v. California Pub. Emps.' Ret. Sys.*,
   No. C 98-1246 CRB., 1998 WL 575095 (N.D. Cal. Sept. 3, 1998)..................................3, 21

*Kendrick v. Zanides*,
   609 F. Supp. 1162 (N.D. Cal. 1985) ...................................................................................21

*Segan LLC v. Zynga Inc.*,
   131 F. Supp. 3d 956 (N.D. Cal. 2015) ................................................................................20

*Song FI, Inc. v. Google, Inc.*,
   No. C 14-5080 CW, 2016 WL 4180214 (N.D. Cal. Aug. 8, 2016) .....................................19

*Superior Consulting Servs., Inc. v. Steeves-Kiss*,
   786 F. App'x 648 (9th Cir. 2019) ........................................................................................20

*Superior Consulting Servs., Inc. v. Steeves-Kiss*,
   No. 17-CV-06059-EMC, 2018 WL 10418794 (N.D. Cal. Mar. 8, 2018).............................20

*Timmons v. Linvatec Corp.*,
   263 F.R.D. 582 (C.D. Cal. 2010) .....................................................................................3, 21

*Townsend v. Holman Consulting Corp.*,
   929 F.2d 1358, 1362 (9th Cir. 1990).....................................................................................3

*Truesdell v. S. Cal. Permanente Med. Grp.*,
   209 F.R.D. 169 (C.D. Cal. 2002) ........................................................................................20

*Truesdell v. S. California Permanente Med. Grp.*,
   293 F.3d 1146 (9th Cir. 2002)...........................................................................11, 13, 16

*West Coast Theater Corp. v. City of Portland*,
   897 F.2d 1519 (9th Cir. 1990).............................................................................................21

**STATUTES**

California Penal Code section 484(a) .........................................................................................5

California Penal Code section 496.............................................................................................5

**RULES**

Fed. R. Civ. P. 11(b)(3).............................................................................................................3

Fed. R. Civ. P. 11(c)(1)....................................................................................................i, 17, 18

Fed. R. Civ. P. 11(c)(2)........................................................................................................i, 17

Fed. R. Civ. P. 11(c)(4)........................................................................................................i, 19

Fed. R. Civ. P. 11 Advisory Comm. Notes to 1993 Amend. ..............................................19, 20

iv

NOTICE OF MOT. AND MOT. FOR SANCTIONS PURSUANT TO RULE 11 OF THE FRCP
CASE NO. 3:25-CV-03989-PHK

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.   INTRODUCTION AND FACTUAL BACKGROUND

3        This motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure

4   ("Motion") is necessitated by Plaintiffs' refusal to withdraw specious allegations lacking any

5   factual foundation and that could not have been based on a reasonable and competent pre-

6   litigation inquiry.  Plaintiffs are alleged investors in a crypto asset called "UST," which was

7   designed to maintain a $1 value but lost its "peg" during a market collapse in May of 2022.  Dkt.

8   1 ("Compl.") ¶¶ 2–3.  Six months later, Plaintiffs, having lost the value of their investments, first

9   brought a class action against Prime Trust, LLC ("Prime Trust"), a bank and trust company,

10  alleging Prime Trust had promised to ensure that UST was "adequately collateralized."  Dkt. 34-

11  2 ("Nev. Compl.") ¶ 26.  Years later, Plaintiffs, purporting to represent the same class of UST

12  investors, now sue Defendants Jump Trading and Jump Crypto based on a concocted theory that

13  Plaintiffs are third-party beneficiaries of some unspecified contract (or contracts) between Jump

14  entities and Prime Trust and/or Terraform Labs PTE Ltd. ("TFL"), the developer and issuer of the

15  crypto asset.  According to Plaintiffs, these purported contracts required Defendants to ensure

16  Plaintiffs, along with "thousands of depositors" of Prime Trust, could sell their UST tokens

17  regardless of market conditions.  Compl. ¶¶ 47, 53–54.  As set forth in Defendants' Motion to

18  Dismiss or Alternatively to Compel Arbitration and Stay Litigation filed with the Court on July

19  9, 2025 (Dkt. 32) (the "Motion to Dismiss"), the Complaint is hopelessly defective due to, among

20  other things, threshold jurisdictional and venue issues and because it fails to sufficiently plead the

21  purported "liquidity obligation" fundamental to each of Plaintiffs' claims.

22        But the Complaint's shortcomings are far more serious than ordinary pleading defects.

23  Plaintiffs' claims are all predicated on fabricated allegations that they do not have a good faith

24  basis to maintain.  Plaintiffs' baseless allegations include:

25
26  - The false assertion that Defendants were contractually obligated to provide
    liquidity or funding to ensure Plaintiffs (and other third-party UST investors)
27    could buy and sell their UST investments from Prime Trust regardless of market
    conditions (Compl. ¶¶ 64–69; *see also, e.g., id.* ¶¶ 5, 40–43, 51, 53–54);

28

1

- References to agreements that Plaintiffs are aware do not provide for any such liquidity obligation or any third-party beneficiary language—and were not even entered into by the Jump entities they have chosen to sue (*id.* ¶¶ 38–39); and

- A purported representation by a "Jump partner company" promising to UST investors that they could liquidate their investments during a market downturn, which Plaintiffs know—and, indeed, have alleged in their class action against Prime Trust—was not made by any Jump-related entity but rather by an executive of Prime Trust in 2018—years before Plaintiffs allege the purported liquidity agreements were even made by Defendants (*id.* ¶ 5).

These allegations could not have been the product of an objectively reasonable and competent inquiry, and Plaintiffs and their counsel do not have a good faith basis to maintain them now. Accordingly, by this motion, Defendants request that the Court impose sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.

While Defendants understand that a request for Rule 11 sanctions is not to be undertaken lightly, Defendants respectfully submit that sanctions are appropriate here. On August 1, 2025, Defendants served a copy of this motion. Plaintiffs, however, failed to correct or dismiss the Complaint within 21 days of service. Even before Defendants filed the Motion to Dismiss and served this Motion—defense counsel voluntarily shared the agreements that appeared to form the basis of Plaintiffs' frivolous claims (some of which were already available to Plaintiffs' counsel), to show that none contained anything close to the purported liquidity obligation and that they were, in fact, inconsistent with such an obligation. Nevertheless, Plaintiffs' counsel responded that the contracts somehow support their far-fetched theory. Because Plaintiffs continued to maintain their baseless allegations, Defendants were compelled to seek Rule 11 sanctions.

## II.    <u>LEGAL STANDARD</u>

"Filing a complaint in federal court is no trifling undertaking. An attorney's signature on a complaint is tantamount to a warranty that the complaint is well grounded in fact and existing law . . . and that it is not filed for an improper purpose." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) (internal quotation marks omitted); *see also. e.g.*, *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004 (N.D. Cal. 2008); *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991) (the "heart of Rule 11" is the message conveyed by the signer's certification that he "has conducted a reasonable inquiry into the facts and the law and is

2

satisfied that the document is well grounded in both"). The Ninth Circuit has held that sanctions under Rule 11 are appropriate if a filing is made "for an improper purpose" or if it is "frivolous." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) (quotations omitted); *see also* Fed. R. Civ. P. 11(b)(1), (b)(3). "Either the improper purpose or frivolousness ground is sufficient to sustain a sanction." *Townsend*, 929 F.2d at 1362. "[E]vidence bearing on frivolousness … will often be highly probative of purpose." *Id.*

A complaint is frivolous when it is both "legally or factually baseless" and made without a reasonable and competent inquiry. *Id.*; *see also Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005). Rule 11 is judged by an objective standard. *See G.C. and K.B. Investments, Inc. v. Wilson*, 326 F.3d 1096, 1109 (9th Cir. 2003); *see also Conn v. Borjorquez*, 967 F.2d 1418, 1421 (9th Cir. 1992); *see also Holgate*, 425 F.3d at 677 (citation omitted). Rule 11 is therefore violated when no reasonable attorney, "after conducting an objectively reasonable inquiry . . . would have found the complaint to be well-founded." *Holgate*, 425 F.3d at 677 (citation omitted).

"The primary purpose behind Rule 11 [is the] deterrence of frivolous litigation." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters. Inc.*, 892 F.2d 802, 811-12 (9th Cir. 1989) (citation omitted). The rule was "designed to create an affirmative duty of investigation both as to law and as to fact before motions are filed." *Bonner v. Arastehjoo*, No. C 11-1350 CW, 2011 WL 5191410, at *1 (N.D. Cal. Oct. 31, 2011) (citation and internal quotation marks omitted). Plaintiffs cannot make baseless factual allegations in the hope that future discovery will support them. "[S]uch fishing expeditions are not permissible under federal [] rules." *Kaplan v. California Pub. Emps.' Ret. Sys.*, No. C 98-1246 CRB., 1998 WL 575095, at *6 (N.D. Cal. Sept. 3, 1998); *accord Timmons v. Linvatec Corp.*, 263 F.R.D. 582, 585 (C.D. Cal. 2010) ("[A]llowing plaintiffs to file first and investigate later . . . would be contrary to Rule 11(b), which mandates an 'inquiry reasonable under the circumstances' into the evidentiary support for all factual contentions prior to filing a pleading.").

## III. PLAINTIFFS' COMPLAINT VIOLATES RULE 11

Plaintiffs' claims rest on frivolous allegations lacking any factual foundation: that Defendants (or any Jump affiliate) undertook a purported obligation with contractual

3

counterparties TFL and Prime Trust to benefit third-party UST investors by ensuring that those investors could sell their UST holdings at any time (including during the market collapse) and at any price (including at $1 even when the market price was 1 cent or less).[1]  Plaintiffs do not attach to the Complaint any of the alleged "Subject Contracts," even though they rely on publicly-available agreements, nor do they cite the agreements' purported provisions.  That is unsurprising because these allegations are categorically false—the alleged contractual obligation does not exist—and they could not have been a product of an objectively reasonable and competent inquiry. By signing and filing the Complaint, and by continuing to maintain these allegations despite evidence demonstrating their baseless nature, Plaintiffs and their counsel have violated Rule 11.

### A.    Plaintiffs Make Multiple Baseless Allegations Regarding Defendants' Purported Obligation To Provide Liquidity For The Benefit Of UST Investors.

Plaintiffs baselessly assert that they are intended third-party beneficiaries of some unspecified set of written or oral contracts requiring Defendants to ensure UST assets could always be sold for U.S. dollars for the benefit of UST investors—apparently without limitation, including at pre-collapse prices and in whatever amount:

- The "Subject Contracts" were entered into between Prime Trust or TFL (or both) and "Jump," Compl. ¶ 64, defined to include Jump Trading and Jump Crypto and any of their related entities, *id.* ¶¶ 17; *id.* at p.1.  "Plaintiffs allege based on information and belief that all relevant contractual obligations referenced herein were written contracts," and alternatively plead that they may be "oral" contracts. *Id.* ¶ 69.

- The "Subject Contracts" "generally obligated Jump to provide liquidity of UST," and "obligated Jump to provide funding for and authorize the execution of investor sell orders, whereby UST investors placed orders to exchange their UST tokens for U.S. dollars, and which required Jump to fund and authorize access to its accounts with Prime Trust and to debit U.S. dollars from those accounts in order to fill the orders."  *Id.* ¶¶ 64–65.

- "Jump" breached its "contractual obligations" when "[t]housands of UST depositors placed sell orders through their [digital wallet applications]," "routed .

---

[1] By identifying these allegations from the Complaint as false, Defendants do not credit Plaintiffs' other allegations.

. . to Prime Trust, which required Jump's cooperation as UST's liquidity provider to fill such orders," and "[i]nstead of filling the sell orders, Jump simply refused to respond." *Id.* ¶ 7; *see also, e.g.*, *id.* ¶¶ 53, 67 ("Jump breached this obligation for its own gain, refusing to accept new deposits of UST and keeping UST investors' U.S. dollars as UST's price fell.").

- "Jump was responsible for filling UST investor orders and the consequences of its breach was the denial of investors sell orders as the UST was collapsing in value." *Id.* ¶ 68. "Jump . . . did or reasonably should have appreciated at the time they entered into the Subject Contracts that UST investors who used [digital wallet applications] would seek to enforce the Subject Contracts . . . as conduct that prevented such orders to be filled would, and in fact did, cause investors substantial losses in connection their investments in UST." *Id.* ¶ 66.

- "Jump's primary functions under the agreements were to provide investors with UST tokens on demand and to provide a means for investors to get their U.S. dollars back in the event that there was a run on UST that threatened its stability. As a Jump partner company put it in 2018, 'if everybody who owned a stablecoin decided to do a run and liquidate and get their money back, then that should be possible. All of the money should be available.'" *Id.* ¶ 5.

These and other similar allegations, which are reflected in the Appendix attached hereto, are objectively baseless and could not have been the product of a reasonable and competent inquiry for multiple reasons. As set forth below, information in the public record or otherwise available to Plaintiffs flatly contradicts these allegations, demonstrating they are false and could not be a product of a reasonable and competent inquiry, and Plaintiffs' asserted bases for these allegations and for their refusal to withdraw them confirms that they are based solely on sheer wishful thinking.

**B.    Plaintiffs' Intentionally Vague Allegations Concerning The Purported Contractual Liquidity Obligation Demonstrates Their Fictional Nature.**

Plaintiffs have no evidentiary basis for the allegation that Defendants undertook any liquidity provision obligation, let alone the unbounded liquidity obligation that they claim required Defendants to ensure third-party UST investors could sell their holdings during a market collapse. Plaintiffs' intentionally vague and inconsistent allegations demonstrate their conjectural nature.

To begin, Plaintiffs avoid identifying the contractual parties to any single agreement, even though their Complaint seemingly relies on contracts in the public domain. They claim that an

NOTICE OF MOT. AND MOT. FOR SANCTIONS PURSUANT TO RULE 11 OF THE FRCP
CASE NO. 3:25-CV-03989-PHK

ambiguous group of Jump entities, referred to together in the Complaint as "Jump," entered into contracts with "Prime Trust or with Terraform Labs or with both entities." Compl. ¶ 64. Elsewhere, they allege that their claims relate to whether Defendants "breached contractual duties arising from agreements" with Prime Trust, TFL, or "other entities." *Id.* ¶ 58(a). At times Plaintiffs refer to a single contract—asserting that "the agreement" giving rise to Defendants' relationship with Prime Trust was "secret until June 2023 when Prime Trust disclosed Jump's identity as its liquidity provider," *id.* ¶ 51, even though they purportedly seek to enforce multiple "Subject Contracts," *see id.* ¶ 43 (referring in a single sentence both to a single "liquidity agreement" and also "subject contracts" that were "created and entered into on or around July 8, 2021."). Even as to the form of the agreements, Plaintiffs allege "on information and belief that all relevant contractual obligations" were "written," yet, concededly without any basis to allege in the alternative, they assert that "to the extent" they are "oral," the applicable statute of limitations should be tolled. *Id.* ¶ 69.

Plaintiffs are also inconsistent with respect to the contours of the purported liquidity obligation and vague as to their third-party beneficiary theory. Under Plaintiffs' theory, *whenever* an investor placed an order to sell their UST with Prime Trust, Defendants had a contractual obligation to benefit that investor by ensuring the order was filled in U.S. dollars, regardless of the size or market conditions. *See id*. ¶¶ 5, 40–44. On the one hand, Plaintiffs allege that Defendants were required to fill these orders at the then-current market price when the UST sell order was made through Prime Trust. *See id.* ¶¶ 47–48, 55. Yet on the other hand, Plaintiffs imply that the obligation required Defendants to allow investors to redeem their investments at $1.00 per token—the value at which UST was pegged before the market collapse—no matter what the then-current market price was, and for Defendants to suffer the losses from their "inability to fill sell orders at any price below $1.00 per token." *Id.* ¶¶ 5, 80; *see also, e.g.*, *id.* ¶¶ 3, 67, 74. The absence of any details concerning the boundaries of the asserted contractual promise reveals the baseless nature of these allegations.

### C.      The Allegations Are Demonstrably False Based On Information In the Public Record Or Otherwise Available To Plaintiffs' Counsel.

In an attempt to plead some sort of factual detail to give substance to their vague allegations about the "Subject Contracts," the Complaint seemingly refers to contracts that do exist (including those that are in the public record and accessible to Plaintiffs), but none of them contains any provisions remotely bordering on a promise to redeem UST held by investors for dollars.   In fact, the terms of these "Subject Contracts" contradict Plaintiffs' allegations and demonstrate their frivolous nature.

Throughout the Complaint, Plaintiffs' allegations refer to agreements with TFL and Prime Trust in an undifferentiated manner.  Compl. ¶ 38; *see also* Appendix.  They assert that "these agreements" relate to TFL's provision of "a series of lump sum loans" of UST to "Jump," *id.* ¶ 39, and that "under these agreements" Prime Trust "would, with Jump's authorization, debit Jump's U.S. dollars account" to fill UST sell orders, *id.* ¶ 41.  As explained below, even a cursory review of the agreements on which the Complaint appears to rely do not contain any terms that obligate the Jump Defendants (or anyone else for that matter) to deposit anything anywhere or to buy anything from anyone.

As an initial matter, the majority of Plaintiffs' allegations about these "agreements" with TFL and Prime Trust apparently stem from publicly available contracts made by a Jump affiliate and TFL.[2]  These agreements, relating to UST and LUNA loans, are disclosed in the trial record in *SEC v. Terraform Labs Pte. Ltd.*, 1:23-cv-01346 (JSR), the SEC's case against TFL, which Plaintiffs refer to in their Complaint.  Decl. of Jonathan D. Cogan ("Cogan Decl.") ¶¶ 2–4, Exs. A–C.[3]  These contracts—including the only one from July 2021, when Plaintiffs assert the alleged

---

[2] *See* Compl. ¶ 5 ("Between November 2019 and July 2021, Jump entered into a series of agreements" with TFL and Prime Trust."); *id.* ("In exchange, Jump received the right to purchase other Terraform Labs tokens at a steep discount, which could then be resold into the market to further Jump's own profits."); *id.* ¶ 39 ("Under these agreements, Terraform Labs agreed to provide a series of lump sum loans to Jump in amounts between 30 and 50 million UST tokens, which at the time were worth $30 to $50 million U.S. dollars based on UST's peg to the dollar.").
[3] The Declaration of Jonathan D. Cogan filed in support of Defendants' Rule 11 motion is referred herein as the "Cogan Decl."

1   "Subject Contracts" were made (Compl. ¶¶ 43, 64)—were therefore available to and should have

2   been reviewed by counsel before signing and filing the Complaint.  As Plaintiffs' counsel were

3   surely aware, neither Jump Trading nor Jump Crypto is a party to any of these agreements.  Rather,

4   these contracts were made, in each case, by Tai Mo Shan Limited ("TMSL"), an affiliate of Jump

5   Crypto.  Cogan Decl. Exs. A-C; Dkt. 32, Defendants' Motion to Dismiss, at 18-20; Dkt. 33-1,

6   Declaration of Matthew Hinerfeld, Ex. A ("July 2021 Loan Confirmation"); Dkt. 33-2, Ex. B

7   ("Master Loan Agreement").

8       The publicly available TFL loan contracts do not provide any basis for Plaintiffs'

9   allegations that Defendants were contractually obligated to ensure UST holders could liquidate

10  their tokens in exchange for U.S. dollars.  As counsel should have been aware upon reviewing the

11  contracts before filing suit, the July 2021 Loan Confirmation and Master Loan Agreement reflect

12  standard terms, in this case related to loan arrangements, defining obligations for TMSL's

13  repayment of the loaned UST and LUNA to TFL.  *See* July 2021 Loan Confirmation (Dkt. 33-1

14  at 2); Master Loan Agreement (Dkt. 33-2 at 3–12).  The other UST/LUNA loan agreements are

15  no different.  Cogan Decl. Exs. A–C.  None contains anything resembling the sort of liquidity

16  obligation Plaintiffs assert here.

17      The same is true for the purported unspecified agreements between "Jump" entities with

18  Prime Trust.  Compl. ¶¶ 52, 64.  Other than a non-disclosure agreement, the only two agreements

19  entered into by any Jump entity with Prime Trust are (1) a standard agreement upon opening an

20  account with the bank, permitting the account holder to buy and sell investments as desired,

21  subject to limitations imposed by law or Prime Trust as custodian; and (2) an over-the-counter

22  trading agreement pursuant to which Prime Trust could submit indications of trading interest to

23  TMSL.  Dkt. 33 ¶¶ 5–7; Dkt. 33-3, Ex. C ("Prime Trust Account Agreement"); Dkt. 33-4, Ex. D

24  ("Prime Trust OTC Trading Agreement").  These two agreements simply do not contain an

25  obligation anything like what the Plaintiffs allege.  Neither of these contain any provision

26  requiring Defendants to provide liquidity for UST sell orders nor any indication that Prime Trust

27  customers are third-party beneficiaries of the agreements, and they also contain terms inconsistent

28  with such an obligation.

In fact, the agreements between Defendants' affiliate and Prime Trust demonstrate the falsity of the alleged contractual promise by Defendants to provide funding for UST sell orders as Prime Trust's purported "liquidity provider" for the benefit of their third-party UST depositors. As described in Defendants' Motion to Dismiss, the Prime Trust OTC Trading Agreement is squarely inconsistent with Plaintiffs' allegations that Defendants acted as a "liquidity provider" to ensure Prime Trust could execute UST investors' sell orders. The agreement states that "***the Parties will have no obligation to enter any Transactions with each other***," and that by way of that agreement, TMSL was also not "***providing any service to [Prime Trust]***." Prime Trust OTC Trading Agreement ¶ 1 (Dkt. 33-4 at 2) (emphasis added).[4] The terms of the agreement also contradict any intent to benefit UST investors to ensure their UST tokens could be redeemed. For example, paragraph 5 of the agreement provides:

> The Parties acknowledge and agree that when entering Transactions with each other, each Party will be transacting for its own account, in a principal capacity, and in an arm's-length role in relation to each other. Neither Party will be providing any service to the other Party. ***Each Party will enter Transactions solely for its own respective benefit and not for the purpose of benefiting the other Party, such as by providing a service to the other Party.*** The Parties will not act as each other's agent, fiduciary, or advisor and shall have no duties to each other, except to settle any agreed Transactions, and as otherwise specified in a written agreement signed by both Parties.

*Id.* ¶ 5 (Dkt. 33-4 at 3) (emphasis added). These provisions do not manifest any promise undertaken to ensure Prime Trust's UST depositors could sell their UST. They flatly contradict such a notion.

---

[4] In full, paragraph 1 of the Prime Trust OTC Agreement provides:

> Each Party invests in or otherwise acquires cryptocurrencies and has a general desire to consider entering spot cryptocurrency purchase and sale transactions ("Transactions") with the other Party. The specific terms of any such Transactions will separately be agreed directly between the Parties, and ***the Parties will have no obligation to enter any Transactions with each other***. The Parties may agree to enter Transactions using electronic, written, or oral communications, and once Tai Mo Shan and Counterparty have agreed to the terms of a Transaction (size, price and cryptocurrency) the Transaction is binding and final unless both Parties agree in writing otherwise.

(Dkt. 33-4 at 2) (emphasis added).

1      The Prime Trust Account Agreement is also clear on its face that any actions taken with

2 respect to TMSL's account with Prime Trust—and the assets within that account—were wholly

3 within the discretion of TMSL.  *See* Prime Trust Account Agreement § 2 (Dkt. 33-3 at 2) ("This

4 Account is a self-directed Account that is managed by Account Holder and/or Account Holder's

5 Agents"); *see also id.* § 1 (Dkt. 33-3 at 2) (TMSL "appoint[ed] Prime Trust to be custodian of and

6 to hold or process ***as directed*** all" assets in the account) (emphasis added).  Under this agreement

7 as well, Plaintiffs cannot plausibly allege that Defendants failed to "permit" or "authorize" Prime

8 Trust to access TMSL's account to complete Plaintiffs' UST transactions.  Compl. ¶¶ 53, 65.  Nor

9 can Plaintiffs find any terms evidencing an intent to benefit UST investors, where their provisions

10 relate only to TMSL's own commercial interests.  Accordingly, none of the contracts seemingly

11 referred to in the Complaint support the purported liquidity obligation to ensure UST investors

12 could redeem their holdings.  Plaintiffs' counsel has reviewed these agreements, which defense

13 counsel provided to them before filing the Motion to Dismiss and serving this Motion, and,

14 therefore, they undoubtedly know this to be the case.

15      At bottom, Plaintiffs' allegations that they are third-party beneficiaries of some purported

16 obligation formed from some "closely held secret[]" agreements among these three commercial

17 parties are in effect imaginary, conclusory, and inflammatory assertions of obligations that

18 Defendants never took on.  Compl. ¶ 44.  The only agreements seemingly referred to in the

19 Complaint clearly do not obligate any Defendant or Jump affiliate to do any of the things Plaintiffs

20 allege.  These allegations are the very sort that Rule 11 is designed to address.  *See, e.g.*, *Holgate*,

21 425 F.3d at 676 (affirming Rule 11 sanctions where complaint "failed to allege evidence of a

22 conspiracy and an act in furtherance of a conspiracy"); *Copple v. Astrella & Rice, P.C.*, 442

23 F. Supp. 2d 829, 836–37 (N.D. Cal. 2006) (conspiracy allegations sanctionable under Rule 11

24 because the complaint was "devoid of any facts supporting the existence of an agreement . . . nor

25 [did] the facts plead[ed] reasonably support the inference of an agreement").

26

27

28

**D.    The Complaint's Entirely Conjectural Claims Could Not Have Been Based On A Reasonable And Competent Inquiry.**

Plaintiffs' vague and contradictory assertions based on "information and belief" do not immunize Plaintiffs' counsel from Rule 11 sanctions, because they are demonstrably false and therefore could not be based on a reasonable and competent inquiry.  *See Truesdell v. S. Cal. Permanente Med. Grp.*, 293 F.3d 1146, 1153 (9th Cir. 2002) (affirming imposition of sanctions where "complaint stated allegations 'upon information and belief' that Plaintiff's counsel must have known were false").  The conjectural nature of Plaintiffs' claims is clear based on (1) a misleading (and demonstrably false) allegation apparently made to mask their frivolous nature; and (2) Plaintiffs' representations about their purported "investigation."  Rule 11 is violated because no reasonable attorney, "after conducting an objectively reasonable inquiry . . . would have found the complaint to be well-founded."  *Holgate*, 425 F.3d at 677 (citation omitted).

**1.    Plaintiffs' Allegation Of A "Jump Partner Company" Representation Is Intentionally Misleading.**

At best, the actual agreements—i.e., the UST/LUNA loan agreements, which are available to Plaintiffs' counsel in the public record, and the Prime Trust agreements that defense counsel provided to them in advance of the Motion to Dismiss—provide for an inference that (1) TMSL was loaned UST and LUNA from TFL; (2) TMSL opened a bank account with Prime Trust; and (3) Prime Trust could submit indications of interest to TMSL to trade crypto assets.  But these agreements, in no way, shape, or form, contain a liquidity obligation requiring Defendants to *redeem* all UST holdings or anything close to what Plaintiffs allege Defendants were required to do.  In fact, Defendants were not required to do anything at all.  Failing to identify any contractual term to support their far-fetched theory, Plaintiffs appear to intentionally (and wrongly) attribute an alleged representation to a "Jump partner company" to falsely suggest that some Jump-related contract exists providing for the alleged obligation to provide liquidity.  Compl. ¶ 5.

The Complaint's opening proviso on the alleged "series of agreements" with TFL and Prime Trust describes them as requiring Defendants to "provide a means for investors to get their U.S. dollars back in the event there was a run on UST that threatened its stability."  *Id.*  This

11

characterization is based on a factual assertion that a "Jump partner company" purportedly stated that UST investors like Plaintiffs would always be able to redeem their holdings. *Id.* But as Plaintiffs know—indeed, they quote and cite the source of this representation in their duplicative pending class action against Prime Trust, even though they leave out that information in the Complaint here—this statement was actually made by a Prime Trust executive, not anyone affiliated with a Jump entity. Nev. Compl. ¶¶ 4, 26. In their Nevada action, Plaintiffs alleged that Prime Trust owed a fiduciary obligation to Plaintiffs to ensure that they could liquidate their UST during a market collapse. The statement in full makes clear that the executive that represented *Prime Trust* was the alleged "hold[er]" of funds for the benefit of their own depositors and that *Prime Trust* was the "third-party" that assertedly assured that "if everybody who owned a stablecoin decided to do a run and liquidate and get their money back."[5]

Plaintiffs' attribution to a Jump-related entity a statement they know was made by a Prime Trust representative appears not to be merely sloppy drafting. Rather, it appears to be intentionally designed to manufacture a basis to infer the existence and contours of the purported contractual obligation Defendants undertook. In reality, as demonstrated above, none of the agreements between any Jump entity and Prime Trust demonstrates that Defendants (or its affiliates) were providing any "service" as a purported liquidity provider. Further, none of them reflects any intent to benefit UST investors, including by ensuring their investments could be liquidated to dollars during a market downturn.

---

[5] Prime Trust's representation—quoted in full in Plaintiffs' Nevada pleading—is as follows:

> You want to make sure that if it's backed one-to-one, that each one of those dollars is somewhere. So that if everybody who owned a stablecoin decided to do a run and liquidate and get their money back, then that should be possible. All of the money should be available. So we do that. We are the third-party, auditable entity that holds those funds. We hold U.S. dollars, we hold other types of assets, we hold gold in bank vaults … we back the stablecoins.

Nev. Compl. ¶ 26.

1    By filing a complaint containing false and misleading allegations, Plaintiffs have violated

2    Rule 11. *See, e.g.*, *Truesdell*, 293 F.3d at 1153–54 (upholding sanctions against counsel under

3    Rule 11 where pleadings contained allegations that counsel "must have known were false").

4    **2.    Plaintiffs' Counsel's Asserted Bases For Their Allegations Are**

5    **Without Merit.**

6    Plaintiffs' counsel's asserted bases for their frivolous claims demonstrate that no

7    reasonable attorney would believe Plaintiffs' Complaint to be well-founded based on an

8    objectively reasonable investigation at the time. Their persistence in maintaining such claims—

9    even following a review of the relevant contracts flatly contradicting their conjectural

10   allegations—and the discovery requests Plaintiffs served on Defendants further confirm that

11   Plaintiffs chose to file this lawsuit without any reasonable basis for their allegations. *See Holgate*,

12   425 F.3d at 676–77 (Rule 11 is violated when an attorney files a baseless complaint and no

13   reasonable attorney, "after conducting an objectively reasonable inquiry . . . would have found

14   the complaint to be well-founded.") (citation omitted).

15   Before serving this motion, counsel for Defendants wrote to Plaintiffs' counsel regarding

16   the Complaint's frivolous claims and asked Plaintiffs to identify the basis for their allegations.

17   Cogan Decl. ¶ 5, Ex. D. Plaintiffs' counsel asserted that they were based in part on information

18   learned during their firm's representation of a witness in the SEC's trial against TFL, including

19   exhibits from that trial referring to an agreement between "Jump" and TFL wherein "Jump would

20   provide liquidity" for investors of UST. *Id.* ¶ 6, Ex. E. As explained above, any objectively

21   reasonable investigation of this case would have revealed the contracts disclosed in that trial

22   regarding UST/LUNA loans between TFL and any Jump affiliate discussed above. *See supra*

23   Part III.C. A reasonable attorney reviewing these contracts, would have surely known that (1) the

24   terms provide no basis to allege any contractual obligation existed by which Defendants promised

25   to ensure UST investors could redeem their holdings and (2) any agreement concerning UST and

26   LUNA tokens were not even made by Defendants but by a Jump affiliate.[6]

27   _____

28   [6] Further, Plaintiffs' choice to sue Defendants instead of TMSL—the actual contractual party—
     appears to be a deliberate choice, likely in an attempt to avoid the arbitration provisions in each

NOTICE OF MOT. AND MOT. FOR SANCTIONS PURSUANT TO RULE 11 OF THE FRCP
CASE NO. 3:25-CV-03989-PHK

Plaintiffs' counsel also represented that these allegations were based in part on information learned during discovery in their litigation against Prime Trust: namely, that Prime Trust identified "Jump Trading" as its "liquidity provider." *Id.* ¶ 6, Ex. E. This vague representation likewise confirms the allegations are not well-grounded in reason or fact. While the Complaint alleges that the disclosure of "Jump's identity" "revealed" "this relationship, and the agreement it was based on"—the information counsel purportedly learned from Prime Trust comes nowhere close to providing a basis to make the allegations against Defendants that Plaintiffs have made here. No reasonable attorney would allege an expansive, far-fetched theory of liability on behalf of thousands of investors of UST tokens against a defendant that was merely identified as a "liquidity provider" by a third party. It simply does not follow that, because some Jump entity may have been referred to by a third party as a "liquidity provider," Defendants undertook a specific contractual obligation for the benefit of all UST investors to ensure Plaintiffs and thousands of other market participants could exchange their UST holdings without limitation and regardless of market conditions. Indeed, in Plaintiffs' suit against Prime Trust, they were incredulous of Prime Trust's statements about its "liquidity provider" and described them as efforts by the bank to "blame" a third party for Prime Trust's alleged breach of its fiduciary obligation. Nev. Compl. ¶ 47.

Even after counsel for Defendants provided Plaintiffs with the contracts that appeared to be referenced in the Complaint, they refused to drop their allegations. Cogan Decl. ¶¶ 7–8, Ex. F–G. Plaintiffs' counsel stated that upon review:

> The contracts show that Jump (1) agreed to take on loans of Luna from TFL, (2) agreed to give Prime Trust access to its trading systems, and (3) created deposit accounts for digital assets with Prime Trust. These agreements are consistent with Jump agreeing to provide liquidity for UST.

*Id.* ¶ 8 Ex. G. This representation is revealing in that it squarely does not address the specific factual allegations that are refuted by these contracts.

---

of these contracts and avoid arbitration with TMSL.

14

1      Plaintiffs and their counsel have refused to acknowledge that these agreements were not

2   made by either Defendant but by Jump Crypto's affiliate TMSL—and as such, their allegations

3   that Jump Trading and Jump Crypto were contractually obligated by any of their terms (let alone

4   the non-existent liquidity obligation) is demonstrably false.  In addition, they have not addressed

5   the fact that the Prime Trust agreements definitively establish that TMSL was not a service

6   provider to Prime Trust and that their terms refute any agreement to benefit their UST depositors.

7   They also do not contend with their terms that are sharply inconsistent with the purported

8   obligation that "required Jump to fund and authorize access to its accounts" or to "debit U.S.

9   dollars from those accounts in order to fill the orders."  Compl. ¶ 65.  Nevertheless, Plaintiffs have

10  reached the conclusion that the contracts "reinforce" their "allegations in the complaint."  Cogan

11  Decl. ¶ 8, Ex. G.  In reality, however, Plaintiffs have not and cannot identify any non-conjectural

12  basis to believe there may be some unknown contract out there made by Defendants or, for that

13  matter, any Jump affiliate to ensure UST investors could have redeemed their UST investments

14  at any time, even during a market collapse.

15      After defense counsel notified Plaintiffs that Defendants would proceed with preparing a

16  Rule 11 motion (Cogan Decl. ¶ 8).  Plaintiffs served expansive discovery requests and opposed

17  Defendants' motion to stay discovery ("Motion to Stay").  Dkt. 36; Dkt. 37-1.  As explained in

18  Defendants' reply brief in support of their Motion to Stay, these requests, while few in number,

19  use extremely broad defined terms that can only be intended for improper fishing for materials in

20  search of some evidence of the purported liquidity obligation.  Dkt. 40 at 17-19.  In other words,

21  Plaintiffs made allegations regarding the existence of a contractual liquidity obligation without a

22  good faith basis and are now attempting to take broad discovery in the hopes that it will turn up

23  something that supports their outlandish theory.  But the Federal Rules of Civil Procedure do not

24  permit Plaintiffs to file a pleading without a good faith basis and then abuse discovery procedures

25  to vainly search for evidence to support their unfounded Complaint.

26      Plaintiffs' Complaint therefore violates Rule 11.  They have no basis other than their own

27  imagination for asserting a liquidity obligation or their alleged third-party beneficiary status of

28  that non-existent liquidity obligation, and nothing in the agreements to which Plaintiffs allude in

15

1    their complaint can save their allegations.  Plaintiffs' persistence in making these assertions—in

2    the face of defense counsel's disclosures and their own review of the contracts at issue—and their

3    intent to abuse the discovery process makes sanctions all the more appropriate.  *See, e.g.*, *Byrnes*

4    *v. Lockheed-Martin, Inc.*, No. C-04-03941 RMW, 2005 WL 3555701, at *9 (N.D. Cal. Dec. 28,

5    2005) (filing a claim "with no facts to support it and the continued pursuit of it following clear

6    recognition of that is conduct which violates Rule 11"), *aff'd*, 257 F. App'x 34 (9th Cir. 2007);

7    *Truesdell*, 293 F.3d at 1153.

8         **E.    The Unsupported Allegations Render All Of Plaintiffs' Claims Untenable.**

9         Plaintiffs' demonstrably untrue allegations form the basis of their case.  Indeed, Plaintiffs

10   themselves concededly describe their lawsuit as "alleg[ing] ***only that Jump breached contractual***

11   ***obligations to serve as a liquidity provider and fill investors' orders to sell***."  Compl. at p.4 n.1

12   (emphasis added).  Plaintiffs' incorrect and unsupported allegations concerning the purported

13   obligations are necessary to each of their claims, not just their breach of contract claim.

14        Plaintiffs' First Cause of Action (Third-Party Beneficiary Breach of Contract) is premised

15   entirely on the purported liquidity obligation Jump Trading and Jump Crypto allegedly undertook.

16   *Id.* ¶¶ 63–69.  Plaintiffs' remaining claims—conversion (*id.* ¶¶ 70–76), unjust enrichment (*id.*

17   ¶¶ 77–86), civil theft (*id.* ¶¶ 87–92), and unfair business practices (*id.* ¶¶ 93–98)—all presume

18   that Defendants had some obligation or duty to ensure UST investors could redeem their assets

19   for dollars.

20        Like Plaintiffs' breach of contract allegations, the Complaint asserts Defendants were also

21   unjustly enriched because they "refus[ed] to execute the transactions ordered by Plaintiffs" and

22   "failed to perform their contractual obligations."  *Id.* ¶¶ 79, 81.  For their conversion claim,

23   Plaintiffs allege that Defendants "effectively took possession and control of the U.S. dollars that

24   rightfully belonged to Plaintiffs and Class Members," i.e., that Defendants were obligated to

25   exchange their UST for dollars.  *Id.* ¶ 72.  Plaintiffs' civil theft claim is a mirror image:

26   Defendants allegedly infringed on some purported "right" of Plaintiffs to receive "funds held" in

27   Defendants' accounts.  *Id.* ¶¶ 90–91.  Lastly, Plaintiffs' unfair business practices claim is

28   concededly based on the same "acts and practices" underpinning their other claims, by which

1  Defendants "interfered" with an alleged "right" to the U.S. dollars, "unlawfully retained" those
2  funds, and also "fail[ed] to reimburse losses due to their refusal to execute" the UST sell orders.
3  *Id.* ¶ 95.  Accordingly, each of Plaintiffs' claims hinges on their baseless assertions regarding the
4  purported contractual duty or obligation owed to them.  While even "the mere existence of one
5  non-frivolous claim" would be insufficient to evade Rule 11 sanctions, here, there are none.
6  *Holgate*, 425 F.3d at 677 (citation and internal quotation marks omitted).

7  **IV.    PLAINTIFFS WERE PROVIDED NOTICE AND REASONABLE**
8  **OPPORTUNITY TO CORRECT THE RULE 11 VIOLATIONS**

9  Rule 11(c) permits a court to sanction a party and/or its attorney, "[i]f, after notice and a
10 reasonable opportunity to respond, the court determines that Rule 11(b) has been violated."  Fed.
11 R. Civ. P. 11(c)(1).  Pursuant to Rule 11's "safe harbor provision," the party seeking sanctions
12 must serve the sanctions motion on the opposing party at least 21 days before filing the motion,
13 and sanctions may only be sought if the challenged pleading is not withdrawn or corrected within
14 that time period.  *See, e.g.*, *Gottschalk v. City & Cnty. of S.F.*, 964 F. Supp. 2d 1147, 1168 (N.D.
15 Cal. Aug. 12, 2013).  Defendants satisfy these requirements.

16 Defendants served this Motion on August 1, 2025.   Cogan Decl. ¶ 9, Ex. H.  Plaintiffs'
17 counsel failed to take corrective action within 21 days of that service.  Fed. R. Civ. P. 11(c)(2).
18 Additionally, in an effort to resolve this matter without litigation expense and resorting to motion
19 practice, defense counsel began engaging with Plaintiffs on these issues approximately a month
20 after Plaintiffs filed their Complaint and when, following a review of their allegations, it appeared
21 that Plaintiffs' factual assertions were frivolous.

22 On June 9, 2025, counsel for Defendants first provided notice to Plaintiffs' counsel that
23 the Complaint contained multiple false allegations and appeared to lack a good faith basis for
24 asserting these claims. Cogan Decl. ¶ 5, Ex. D. On June 25, 2025, counsel for Plaintiffs responded
25 asking Defendants to share on an attorney's-eyes-only basis the contracts with TFL and Prime
26 Trust that show that none have the "unconditional obligation requiring Jump to provide liquidity
27 for UST." *Id.* ¶ 6, Ex. E.  On July 1, 2025, Defendants shared "copies of the agreements between
28 a Jump affiliate and TFL apparently referenced in [the] Complaint as the 'Subject Contracts,'"

17

again pointing Plaintiffs to where in the public record certain of these contracts could be found. *Id.* ¶ 7, Ex. F. Defendants also willingly provided copies of agreements between Jump affiliate TMSL and Prime Trust, neither of which created any obligation for TMSL (or any entity) to provide liquidity for UST transactions either. *Id.*

Apparently in pursuit of unwarranted discovery, Plaintiffs thereafter asked whether there were additional agreements—whether or not related to the allegations in the Complaint— expanding the inquiry to fish for all contracts "between Jump (or affiliates) and TFL (or affiliates)." *Id.* ¶ 8, Ex. G. Three days later, on July 4, Plaintiffs' counsel, without waiting for a response on the additional agreements, represented that their review of the contracts supported their allegations. *Id.* By way of this response, Plaintiffs' counsel has chosen to maintain their baseless assertions even though the contracts provided to them contradict the alleged obligation to ensure UST could be redeemed by Prime Trust's UST depositors. Accordingly, Defendants proceeded to file the Motion to Dismiss on July 9 and to prepare a formal Rule 11 Motion.

## V.    PLAINTIFFS' RULE 11 VIOLATIONS WARRANT SANCTIONS

Defendants respectfully seek an order from this Court (1) dismissing the Complaint (or, alternatively, striking the allegations addressed in this Motion and identified in the Appendix attached hereto), and (2) awarding Jump Trading and Jump Crypto the reasonable fees and expenses incurred in presenting this Motion and its Motion to Dismiss. *See* Fed. R. Civ. P. 11(c)(1), (2), (4).

This Court has the authority to impose a range of nonmonetary and monetary sanctions, as "reasonably necessary to deter repetition of the conduct . . . or comparable conduct by similarly situated persons." Fed. R. Civ. P. 11 Advisory Comm. Notes to 1993 Amendment. Sanctions may be imposed in the form of nonmonetary directives, penalties, or payment to the movant of the reasonable attorneys' fees and other expenses directly resulting from the violation. *See* Fed. R. Civ. P. 11(c)(4). The relevant factors listed in the Advisory Committee Notes to Rule 11 in determining whether to impose a sanction and in what form include: "[w]hether the improper conduct was willful, or negligent"; "whether it infected the entire pleading, or only one particular count or defense"; "what effect it had on the litigation process in time or expense"; "whether the

responsible person is trained in the law"; and "what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case." Fed. R. Civ. P. 11 Advisory Comm. Notes to 1993 Amendment. Here, the factors listed in the Advisory Committee Notes to Rule 11 weigh in favor of both nonmonetary and monetary sanctions.

Plaintiffs' counsel are experienced lawyers, yet they signed and filed the Complaint knowing that it contained allegations without any factual basis. Those allegations were contradicted by the agreements available to them in the public record, which they presumably reviewed before filing the Complaint since they referred (albeit vaguely) to them in the Complaint. Assuming they reviewed those agreements before filing the Complaint, Plaintiffs and their counsel knew (1) that a different Jump entity entered into those agreements;[7] and (2) the agreements did not require Defendants (or any other Jump entity for that matter) to provide liquidity (let alone boundless liquidity) as alleged in the Complaint. Plaintiffs continued to maintain their factual assertions even when "confronted with evidence presented by Defendants that their assertions were wrong." *Brown v. Royal Power Mgmt., Inc.*, No. C-11-4822-EMC, 2012 WL 298315, at *3 (N.D. Cal. Feb. 1, 2012) (imposing sanctions when "counsel continued to make . . . factual assertions even when confronted with evidence presented by Defendants that their assertions were wrong"); *cf. H.P.D. Consolidation, Inc. v. Pina*, No. 15-cv-05309-EMC, 2017 WL 1046960, at *3-4 (N.D. Cal. Mar. 20, 2017) (imposing sanctions based on amended complaint after plaintiff was on notice that initial complaint lacked evidentiary support).

With respect to non-monetary sanctions, based on these factors, the Court should, at a minimum, impose sanctions to strike the specific allegations offending Rule 11 from the Complaint. The striking of allegations devoid of evidentiary support is the most direct way to deter such conduct. *See, e.g.*, *Song FI, Inc. v. Google, Inc.*, No. C 14-5080 CW, 2016 WL 4180214, at *2–5 (N.D. Cal. Aug. 8, 2016) (striking allegations lacking evidentiary support); *see also* Fed. R. Civ. P. 11 Advisory Comm. Notes to 1993 Amendment (listing "striking the offending paper" as a possible nonmonetary sanction under Rule 11). In doing so, however, there

---

[7] As noted above, Plaintiffs presumably sued Defendants rather than TMSL in an attempt to avoid arbitration since the contracts TMSL did sign all contain arbitration clauses.

1   would be no remaining assertions (conclusory or otherwise) supporting the claims.  *See supra*

2   Part III.E.  The untrue factual allegations "infect[] the entire pleading."  Rule 11 Advisory Comm.

3   Notes to 1993 Amendment.  Defendants therefore respectfully submit that the appropriate form

4   of nonmonetary sanction reasonably tailored to deter such conduct would be dismissal, as no

5   lesser remedy would remedy the wrong.  Dismissal is within the Court's discretion to promote

6   the "public's interest in expeditious resolution of litigation" and "the court's need to manage its

7   docket."  *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 788 (9th Cir. 2011) (citation and internal

8   quotation marks omitted).  This action is a follow-on suit on behalf of the same putative class of

9   UST investors represented by the same law firm.  In this action, they have concocted a contractual

10  obligation against Defendants based on a vague disclosure by Prime Trust identifying "Jump

11  Trading" as a "liquidity provider" nearly two years ago.  All that has changed in those two years

12  is that Prime Trust is now in bankruptcy.  In view of these proceedings, Plaintiffs and their counsel

13  appear to have lodged frivolous claims as an attempt to extract a settlement from non-bankrupt

14  entities.

15          An award of attorneys' fees is also warranted.  Plaintiffs' refusal to withdraw the

16  Complaint in the face of undisputed evidence that it is based on untrue allegations of fact has

17  unnecessarily prolonged this litigation and required Defendants to expend considerable time and

18  resources dealing with Plaintiffs' violations, including in preparing this Motion, the Motion to

19  Dismiss, and in responding to the arguments in Plaintiffs' opposition brief to Defendants' Motion

20  to Stay.  Accordingly, to remedy this, the Court should award Defendants their costs and

21  attorneys' fees incurred as a result of the Rule 11 violation.  *See, e.g.*, *Superior Consulting Servs.,*

22  *Inc. v. Steeves-Kiss*, No. 17-CV-06059-EMC, 2018 WL 10418794, at *1 (N.D. Cal. Mar. 8, 2018)

23  (award of attorneys' fees due to a failure to include the "critical fact" of a "provision's existence

24  and terms," the lack of "colorable basis to support a property right" left "nothing to support the

25  legal claims"), *aff'd*, 786 F. App'x 648 (9th Cir. 2019); *Segan LLC v. Zynga Inc.*, 131 F. Supp.

26  3d 956, 965 (N.D. Cal. Sept. 10, 2015) (holding plaintiff and its counsel liable for defendant's

27  attorneys' fees was "equitable and adequately serve[d] the deterrent purpose of Rule 11");

28  *Truesdell v. S. Cal. Permanente Med. Grp.*, 209 F.R.D. 169, 178 (C.D. Cal. July 24, 2002) (award

1    of attorneys' fees and costs reasonably expended by defendant in responding to unwarranted

2    complaint was a necessary "to deter comparable conduct by Plaintiff's counsel in future").

3    Defendants will submit a calculation of fees upon request from the Court or after briefing on this

4    Motion and the related Motion to Dismiss is complete.

5            Defendants do not bring this Motion lightly.  But sanctions are warranted where Plaintiffs

6    have lodged a "collection of bare accusations unsupported by allegations of fact."  *West Coast*

7    *Theater Corp. v. City of Portland,* 897 F.2d 1519, 1527–28 (9th Cir. 1990).  Rule 11 requires

8    counsel to "have in hand sufficient credible information (as opposed to opinions or conclusions)

9    from whatever source to enable them to form a reasonable belief that the allegations to which they

10   put their signature are well-grounded in fact."  *Kendrick v. Zanides,* 609 F. Supp. 1162, 1172

11   (N.D. Cal. May 23, 1985) (emphasis and citation omitted).  They cannot assert baseless allegations

12   on a whim and a gamble that future discovery may support them.  *See Kaplan*, No. C 98-1246

13   CRB, 1998 WL 575095, at *6; *accord Timmons*, 263 F.R.D. at 585.  Nor should they be permitted

14   to file suit without a good faith basis and conduct an intrusive fishing expedition only to further

15   protract litigation that no reasonable attorney could have filed in the first place.  Because the

16   Complaint falls well short of the standards set by Rule 11, sanctions are appropriate under the

17   circumstances presented here.

18   **VI.    <u>CONCLUSION</u>**

19           For the foregoing reasons, Defendants Jump Trading and Jump Crypto respectfully request

20   that the Court grant this Motion and order sanctions (1) dismissing the Complaint (or alternatively,

21   striking the allegations addressed in this Motion and identified in the Appendix attached hereto);

22   (2) awarding Defendants the reasonable costs and attorneys' fees incurred as a result of the

23   violation of Rule 11; and (3) any other relief that the Court considers appropriate under Rule 11.

24

25

26

27

28

1

2

3    Dated: September 26, 2025                    Respectfully submitted,

4                                                */s/ Jonathan D. Cogan*

5                                                **KOBRE & KIM LLP**
                                                 Jonathan D. Cogan (admitted *pro hac vice*)
6                                                Steven W. Perlstein (admitted *pro hac vice*)
                                                 Igor Margulyan (admitted *pro hac vice*)
7                                                Mathew T. Elder (admitted *pro hac vice*)
                                                 Daisy Joo (admitted *pro hac vice*)
8                                                800 Third Avenue
                                                 New York, NY 10022
9                                                Tel.: +1 212 488 1200
                                                 jonathan.cogan@kobrekim.com
10                                               steven.perlstein@kobrekim.com
                                                 igor.margulyan@kobrekim.com
11                                               mathew.elder@kobrekim.com
                                                 daisy.joo@kobrekim.com
12

13                                               Daniel A. Zaheer (Bar ID 237118)
                                                 150 California Street, 19th Floor
14                                               San Francisco, CA 94111
                                                 Tel.: (415) 582-4800
15                                               daniel.zaheer@kobrekim.com

16
                                                 *Attorney for Defendants*
17                                               *Jump Trading, LLC and*
                                                 *Jump Crypto Holdings LLC*
18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOT. AND MOT. FOR SANCTIONS PURSUANT TO RULE 11 OF THE FRCP
CASE NO. 3:25-CV-03989-PHK