# APPENDIX A

| | **Paragraphs from Plaintiffs' Complaint (Dkt. 1)** |
|---|---|
| | *Allegations from Plaintiffs' Third-Party Beneficiary Breach of Contract Cause of Action* |
| ¶ 64 | Jump entered into contracts with Prime Trust or with Terraform Labs or with both entities (the "Subject Contracts"). The Subject Contracts generally obligated Jump to provide liquidity of UST for the benefit of UST investors who used Wallet Apps. |
| ¶ 65 | Specifically, the Subject Contracts obligated Jump to provide funding for and authorize the execution of investor sell orders, whereby UST investors placed orders to exchange their UST tokens for U.S. dollars, and which required Jump to fund and authorize access to its accounts with Prime Trust and to debit U.S. dollars from those accounts in order to fill the orders. |
| ¶ 66 | UST investors who used Wallet Apps had no direct privity of contract with Jump. The investors were, nevertheless, third-party beneficiaries of the Subject Contracts. The primary intent and motivating purpose of the Subject Contracts and Jump's obligations thereunder was to provide beneficial services to UST investors who used Wallet Apps to buy and sell UST by giving them liquidity for their investments. The sole purpose and utility of UST liquidity that Jump provided was to allow UST investors to place buy and sell orders for UST through Wallet Apps and to financially gain from their investments. Jump and the parties to the Subject Contracts did or reasonably should have appreciated at the time they entered into the Subject Contracts that UST investors who used Wallet Apps would seek to enforce the Subject Contracts in the event that Jump breached its obligations to provide liquidity for buy and sell orders, as conduct that prevented such orders to be filled would, and in fact did, cause investors substantial losses in connection their investments in UST. |
| ¶ 67 | Jump breached its obligations under the Subject Contracts by refusing to fund its Prime Trust accounts and by refusing to authorize Prime Trust to debit its account when UST investors placed orders to sell UST, thereby preventing Prime Trust from filling sell orders from investors holding UST on Wallet Apps. Jump breached this obligation for its own gain, refusing to accept new deposits of UST and keeping UST investors' U.S. dollars as UST's price fell. |

| | |
|---|---|
| ¶ 68 | Jump's breach was a substantial factor in causing harm to Plaintiffs and the Class. Jump's refusal to fill orders to sell UST in exchange for U.S. dollars at the time the orders were placed was the cause in fact of Plaintiffs' and the Class's harm because it was a necessary antecedent of the loss of their funds. If Jump had filled the investors' orders, as was it was required to do under the Subject Contracts, Plaintiffs and the Class would not have suffered losses associated with the refusal to fill their orders. Jump's breach was also the proximate cause of Plaintiffs' and the Class's harm because Jump was responsible for filling UST investor orders and the consequences of its breach was the denial of investors sell orders as the UST was collapsing in value. This breach caused Plaintiffs and the Class to lose as much as 90 percent of their investments. Many investors, including Plaintiffs, lost tens or hundreds of thousands of dollars. |
| ¶ 69 | Plaintiffs allege based on information and belief that all relevant contractual obligations referenced herein were written contracts. To the extent any contractual obligations that Plaintiffs herein allege were breached by Defendants were obligations arising under oral contracts, Plaintiffs seek relief from California Code of Procedure, section 339(1) based on the fact that the identity that Defendants and their role as the liquidity provider for UST was a fact that was not known or, based on reasonable diligence, knowable to Plaintiffs until June 20, 2023, at which time Prime Trust disclosed for the first time that Jump Trading was its liquidity provider at the time of the collapse of UST. |
| *Allegations Regarding UST/LUNA Loan Agreements Between Terraform Labs Limited ("TFL") and Tai Mo Shan Limited* ||
| ¶ 38 | Between January 2019 and July 2021, Jump entered a series of agreements with Terraform Labs and Prime Trust designed primarily to grow, stabilize, and support investment in UST. Jump specifically agreed to provide liquidity for UST investments in the U.S. market. In return for its support, Jump secured significant financial advantages, including receiving over 61 million Luna tokens at a steep discount—more than 99% below market price. These agreements effectively rewarded Jump for its role in stabilizing the ecosystem and allowed it to profit substantially as Luna's price surged. Overall, Jump sought to benefit from the Terra ecosystem's growth while providing liquidity and market support during volatile periods. |
| ¶ 39 | Under these agreements, Terraform Labs agreed to provide a series of lump sum loans to Jump in amounts between 30 and 50 million UST tokens, which at the time were worth $30 to $50 million U.S. dollars based on UST's peg to the dollar. Jump was obligated under the agreement to deposit the loaned UST tokens into accounts with Prime Trust for the purpose of providing UST liquidity for investors using Wallet Apps that integrated with UST. |

| ¶ 43 | The terms of Jump's liquidity agreement were proposed by Terraform Labs to Jump on June 30, 2021 and the subject contracts were created and entered into on or around July 8, 2021. This agreement was preceded by similar arrangements entered into in 2019 and 2020. |
|---|---|
| *Allegations Regarding Unspecified TFL and Prime Trust Agreements* | |
| ¶ 5 | Between November 2019 and July 2021, Jump entered into a series of agreements with Terraform Labs and a trust and escrow company specializing in digital asset investments called Prime Trust to provide market-making services for UST transactions. Jump's role was to provide market liquidity when UST investors placed orders to buy and sell UST tokens. Jump's primary functions under the agreements were to provide investors with UST tokens on demand and to provide a means for investors to get their U.S. dollars back in the event that there was a run on UST that threatened its stability. As a Jump partner company put it in 2018, "if everybody who owned a stablecoin decided to do a run and liquidate and get their money back, then that should be possible. All of the money should be available." Jump was the liquidity provider that contracted to make that possible. In exchange, Jump received the right to purchase other Terraform Labs tokens at a steep discount, which could then be resold into the market to further Jump's own profits. |
| ¶ 40 | When a Wallet App investor placed an order to buy UST on a Wallet App, Prime Trust accessed the investor's banks account, withdrew U.S. dollars, and deposited the U.S. dollars into Jump's Prime Trust account. Jump was then obligated to provide UST tokens from the accounts it held with Prime Trust to fill the investors' orders. Once an order was filled, the investor saw the UST tokens appear in their Wallet App and it began earning interest. |
| ¶ 41 | Also under these agreements, when a Wallet App investor placed an order to sell UST, the order was again routed to Prime Trust. Prime Trust would fill the sell order by withdrawing the UST tokens from the investor's Wallet App and depositing the UST back into Jump's Prime Trust account. Simultaneously, Prime Trust would, with Jump's authorization, debit Jump's U.S. dollars account and transfer the U.S. dollars to the Wallet App user's bank account. |
| ¶ 42 | It was necessary for Jump to fulfill its obligations as a liquidity provider for Wallet App users to transact UST. If Jump withdrew its UST tokens or its U.S. dollars from its Prime Trust accounts or otherwise refused to provide liquidity for UST transactions, it would grind all Wallet App-based UST trading to an immediate halt. |
| ¶ 51 | The anonymous "liquidity provider" Prime Trust identified in its statements to regulators was eventually revealed through investigation to be Jump. This relationship, and the agreement it was based on, were kept secret until June |

| | |
|---|---|
| | 2023 when Prime Trust disclosed Jump's identity as its liquidity provider for the first time in response to regulatory investigations and litigation demands. |
| ¶ 53 | Jump refused to provide the liquidity services it had promised under the contracts when the May 2022 run on UST caused investors to rush to sell. This conduct breached Jump's contractual obligation to fill the orders, accept investors' UST, and permit Prime Trust to debit U.S. dollars from its accounts to deposit them into the investors' banks. Instead, Jump simply refused to fill the orders, hoarding the investors' U.S. dollars in its accounts and refusing to take on UST tokens as they sank in value. |
| ¶ 54 | By refusing to fulfill its obligations, Jump prevented Wallet App investors from mitigating their losses. It did so for its own enrichment, keeping the investors' U.S. dollars in its accounts and refusing to take on UST as its value plummeted. |
| *Allegations from Plaintiffs' Conversion, Unjust Enrichment, Civil Theft, and Unfair Business Practices Causes of Action* | |
| ¶ 72 | As alleged above, Defendants prevented transactions involving UST, denying Plaintiffs and Class Members from accessing and selling their UST. Plaintiffs and Class Members placed sell orders for UST that were routed to Prime Trust but were never filled because Defendants refused to make the funds available and refused to allow Plaintiffs and the Class to execute their trades. In so doing, Defendants effectively took possession and control of the U.S. dollars that rightfully belonged to Plaintiffs and Class Members. |
| ¶ 74 | Instead of holding the U.S. dollars the demanded and that should have rightfully been retuned tot them, Plaintiffs and the Class were left holding UST that they could not sell. The value of the UST held by Plaintiffs and members of the Class has fallen since the time they placed orders to sell from nearly $1.00 per token to nearly $0.00 per token, resulting in significant economic losses. |
| ¶ 80 | Rather than executing the transactions ordered by Plaintiffs and the Class at a reasonable time and suffering any losses associated with their inability to fill sell orders at any price below $1.00 per token, Defendants instead calculated to avoid suffering losses at the expense of Plaintiffs and the Class by refusing to provide their promised liquidity services and refusing to execute any transactions in UST whatsoever. Plaintiffs and the Class, on the other hand, suffered significant losses as a direct and proximate result of Defendants' failure to execute the sell orders when made. |
| ¶ 81 | Under the principles of equity and good conscience, Defendants should not be permitted to retain the funds belonging to Plaintiffs and the Class because Defendants failed to perform their contractual obligations to execute the transactions ordered by Plaintiffs and the Class. |

| ¶ 83 | If Plaintiffs and members of the Class knew that Defendants would breach their contractual obligations to execute the transactions ordered by Plaintiffs and the Class, they would not have agreed to permit their funds to be transferred to Defendants. |
|---|---|
| ¶ 95 | Defendants' acts and practices constitute a continuing and ongoing unlawful business activity defined by the UCL. Defendants interfered with Plaintiffs and the Class's right to possess their funds, and unlawfully retained funds belonging to Plaintiffs and the Class in a manner that constituted theft. Defendants also failed and continue to fail to reimburse losses due to their refusal to execute Plaintiffs and the Class's sell orders, all in violation of, inter alia, the following California laws:<br><br>    a. California Penal Code section 484(a); and<br><br>    b. California Penal Code section 496. |